UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 16-60471-CR-GAYLES

DENNIS GODELIA, individually,        Miami, Florida
and as personal representative
of the Estate of Debra Godelia,      August 21, 2019
and STERLING YOUMAS,

                 Plaintiffs,         9:58 a.m. to 6:04 p.m.

vs.

ZOLL SERVICES, LLC, et al.,          Pages 1 to 137

                 Defendant.
_____

JURY TRIAL
BEFORE THE HONORABLE DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:      JERMAINE LEE, ESQ.
                         ERIC A. HERNANDEZ, ESQ.
                         ARTURO MARTINEZ, ESQ.
                         HERNANDEZ LEE MARTINEZ
                         255 Aragon Avenue, Suite 200
                         Coral Gables, Florida 33134


FOR THE DEFENDANTS:      JORDAN S. COHEN, ESQ.
                         WICKER SMITH O'HARA McCOY & FORD
                         515 E Las Olas Boulevard
                         Suite 1400
                         Fort Lauderdale, Florida 33301
                                   -and-
                         PEDRO L. DEMAHY, ESQ.
                         DEMAHY LABRADOR DRAKE VICTOR
                         ROJAS & CABEZA
                         806 Douglas Road
                         Douglas Entrance - 12th Floor
                         Coral Gables, Florida 33134

STENOGRAPHICALLY REPORTED BY:

PATRICIA DIAZ, FCRR, RPR, FPR
Official Court Reporter
United States District Court
400 North Miami Avenue
11th Floor
Miami, Florida 33128
(305) 523-5178

I N D E X

WITNESSES FOR THE PLAINTIFFS:                          PAGE

   DR. EUGENE FRANK PARTIN   (Videotaped Deposition)      8

   DR. SZYMKIEWICZ    (Videotaped Deposition)             9

RICHARD DAKEN

   VOIR DIRE EXAMINATION BY MR. DEMAHY                    11
   DIRECT EXAMINATION BY MR. LEE                          16
   CROSS-EXAMINATION BY MR. DEMAHY                        42
   REDIRECT EXAMINATION BY MR. LEE                        43

STERLING YOUMAS

   DIRECT EXAMINATION BY MR. HERNANDEZ                    49
   CROSS-EXAMINATION BY MR. DEMAHY                        76
   REDIRECT EXAMINATION BY MR. HERNANDEZ                  88

SAMANTHA ORSINI                                          96

DENNIS GODELIA

   DIRECT EXAMINATION BY MR. HERNANDEZ                   104

PLAINTIFFS' EXHIBITS

| EXHIBIT | RECEIVED | ADMITTED |
|---|---|---|
| 200 | | 23 |
| 52 | | 36 |

DEFENSE EXHIBITS

| EXHIBIT | RECEIVED | ADMITTED |
|---|---|---|
| 461 | | 25 |

(Call to the Order of the Court.)

THE COURT:  Calling Godelia versus Zoll, LLC, case number 16-CV-60471.  Counsel, please make your appearance.

MR. LEE:  Jermaine Lee on behalf of the plaintiff.

MR. DEMAHY:  Pete DeMahy and Jordan Cohen on behalf of Zoll.

THE COURT:  Okay.

MR. DEMAHY:  Your Honor, I have a couple of things for you.  It was late.  I was not able to type it but this is the curative instruction that I am suggesting.  I have already shown it to Mr. Lee.

THE COURT:  Mr. Lee, is there an objection to this?

MR. LEE:  None, Your Honor.

THE COURT:  Let me read it first.

Okay.

MR. DEMAHY:  There is another issue related to that same event that Mr. Cohen will argue in a minute, but just quickly on the bolstering issue, I will cite to Your Honor, if I may, Garcia versus Geico at 2013 WL 12 --

THE COURT:  Read it a little slower, please.

MR. DEMAHY:  2013 WL 120183 from the Southern District of Florida which cites to Florida cases.  It's a much more common state court issue but this decision is right on point.  I have already given Mr. Lee the citations.

THE COURT:  Thank you.

Anything else we need to take up?

MR. COHEN:  Good morning, Judge, may it please the Court.  We are here to renew our motion for mistrial that the Court heard some argument on yesterday.  I will try to be brief.  Yesterday, just about as soon as Dr. Anand took the bench, plaintiffs' counsel elicited testimony from him unprompted that Dr. Anand was no longer using the LifeVest and the reason he was no longer using it was because of the result of the vest clinical trial which results were published in 2018, before he prepared his report and before he was deposed in 2019.

I know we laid out that history with the Court.  I am not going to revisit it here and the Court found that it was prejudicial for the jury to hear from Dr. Anand not only that he was not using the LifeVest but he raised a much broader issue and said generally cardiologists everywhere are reevaluating whether or not this is a device that is actually good.  I am obviously paraphrasing.

As I was looking back at the docket last night, I was reminded that the Court already entered an order on this.  So Docket Entry 153, pages six to seven, Your Honor's ruling on Zoll's omnibus motion in limine, this was entered after argument last Friday evening, we had moved to exclude all results of the vest clinical trial because the results came out in 2018.  As a matter of fact in law, it's irrelevant.  I will

talk in a moment for why.

I will say it's also very prejudicial for that to come in.  Your Honor agreed with us.  I am reading from Your Honor's order, quote, Defendant moves to exclude all evidence of the 2018 result of the Vest clinical trial as irrelevant.  While the Court agrees that the result of the 2018 clinical trial are not relevant to whether Mrs. Godelia's LifeVest was defective, the Court finds that Dr. Anand may testify about how he reviewed the clinical trial to bolster his opinion that, quote, early defibrillation is what permits patient survival, end quote.  Accordingly, the motion is denied in part on this issue."

So, Dr. Anand knew or should have known -- respectfully, I think plaintiffs' counsel knew or should have -- I think knew that it was totally improper and in violation of a clear court order to elicit testimony from Dr. Anand regarding those results in 2018.

Now, in addition to the reasons why we explained and the Court agreed that it was prejudicial, there is one more thing I wanted to briefly talk about this morning.  This is a manufacturing defect case.  This is a device that went through and received the FDA stamp of approval.

That means the FDA evaluated and approved the design of the device and also the manufacturing plan of the device. Inherent in that, the FDA has already made a decision, as a

matter of law, that the benefits of the LifeVest outweigh the risk for the indicated patient population.  There is no factual dispute in this case that Mrs. Godelia was the indicated patient population.

So, I would suggest to the Court it would be highly improper to allow plaintiffs' counsel to attempt to elicit testimony to get an issue in front of this jury where he is asking them to reconsider that analysis.  It was done by the FDA and as a matter of law in a PMA case that was preempted and cannot be an issue in this trial.  So, it would have been really improper to try to get an issue in front of the jury to suggest that they should be considering whether or not the LifeVest was actually a safe and effective device in 2013.  He couldn't do that.

He took it a step further.  He had his expert testify that in 2018 people are reconsidering the safety and efficacy of the LifeVest.  The FDA has never said that.  The LifeVest continues to be lawfully marketed.  There have been no changes in the approvals or indication.

I mean, I know Mr. DeMahy tried to put together a curative instruction, but we believe this is something that the bell cannot be unrung.  The Court ruled on this and plaintiffs' counsel is inviting the jury to make a decision that the Eleventh Circuit and all those cases tell us that they can't even be asked to consider.  Thank you, Judge.

THE COURT:  Okay.  We have the jury here and ready.  I will hear from Mr. Lee the next break.

MR. COHEN:  Can I just put one case on the record?

THE COURT:  Very quickly.

MR. COHEN:  It's Moody versus Ford Motor 506 F. Supp 2d, 823.  It's a Northern District of Oklahoma, March 20th, 2007.

THE COURT:  I'm sorry, F.Supp 2d?

MR. COHEN:  823.

THE COURT:  For what proposition?

MR. COHEN:  For the proposition that a willful violation of a court order on a motion in limine is grounds for granting a mistrial.

THE COURT:  Okay.  Let's bring them in, please, Mr. Byars.

COURT SECURITY OFFICER:  Yes, sir.

(The jury entered the courtroom at 10:05 a.m.)

THE COURT:  All right.  Please be seated.

Good morning, ladies and gentlemen.  Welcome back.

There are a couple of things.  Regarding timing yesterday, we had started the testimony of Dr. Anand but because of scheduling, his testimony will not be concluded until tomorrow morning.  So we are going to take some other evidence out of turn, nothing unusual.  It's just scheduling.  We will resume with his testimony on Thursday morning.

Second, you heard Dr. Anand give an opinion yesterday that he stopped prescribing the LifeVest because of an article he read regarding LifeVest.  The Court is striking that testimony opinion and in reference to the article, you will not consider that testimony and opinion when you deliberate.

All right.  Mr. Lee, you are ready to proceed?

MR. LEE:  Yes, Your Honor.

THE COURT:  All right.

MR. LEE:  Your Honor, we are going to play the video deposition portions that we have of Mr. Partin.  It's brief.

THE COURT:  Okay.  Ladies and gentlemen, both sides are able to present testimony through deposition testimony, meaning prior testimony taken under oath in the presence of the lawyers for both sides.  You should consider that testimony as if the person was testifying live here during the trial.  All right.  Whenever you are ready.

MR. LEE:  Yes, Your Honor.

(The deposition testimony of Dr. Eugene Frank Partin was played in open court.)

MR. HERNANDEZ:  Mr. Partin.

MR. LEE:  We will now play the video of Dr. Szymkiewicz.

THE COURT:  Whenever you are ready.

(The videotaped deposition of Dr. Szymkiewicz was played in open court.)

THE COURT:  All right.  Why don't we take about five minutes.  Please don't discuss anything about the case.

COURT SECURITY OFFICER:  All rise for the jury, please.

(The jury exited the courtroom at 11:26 a.m.)

THE COURT:  I have a judge's meeting at 12:15 so we will have to start.

MR. LEE:  Dr. Anand couldn't clear Thursday.  The note was supposed to say Friday.  We are all in agreement.  We are in agreement we can take continue his testimony Friday.  We agreed to change it.

THE COURT:  If the depo doesn't conclude by like 12:05, I will have to pause that as well.

MR. LEE:  It should be finished by that time.

THE COURT:  Okay.  We will be in recess.

(Brief recess.)

COURT SECURITY OFFICER:  All rise for the jury, please.

THE COURT:  All right.

(The jury entered the courtroom at 11:39 a.m.)

THE COURT:  Please be seated.  Ladies and gentlemen, I have a meeting at 12:15 so we will be breaking, in any event, at 12:05 for lunch.

(The videotaped deposition of Dr. Szymkiewicz played in court.)

THE COURT:  Is this a good time to stop?

MR. LEE:  Yes, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, we will recess now for lunch.  We will resume back here at 1 o'clock.  Please do not discuss anything about the case.

COURT SECURITY OFFICER:  All rise.

(The jury exited the courtroom at 12:04 p.m.)

THE COURT:  All right.  After the deposition, what witness will you have next?

MR. LEE:  We are going to do Mr. Daken instead of reading the deposition and driving all of us crazy.

THE COURT:  All right.  We will see you back here at 1 o'clock.

MR. DEMAHY:  Judge, just so you know, I am going to ask to voir dire Mr. Daken outside the presence of the jury before he testifies.

THE COURT:  Okay.

MR. DEMAHY:  Thank you.

(Lunch recess.)

(Call to the Order of the Court.)

THE COURT:  Sorry for the delay.  Our meeting ran a little longer.

Ready?

MR. LEE:  Yes, Your Honor.

MR. DEMAHY:  Your Honor, I'd like to voir dire him outside the presence of the jury.

THE COURT:  Oh, just a moment.  Why don't you bring in

the witness, please?

All right.  Sir, if you will come forward, please, to the stand.

There is an incline as you walk up, so please watch your step.

All right.  Before you have a seat, I need you to please raise your right hand and be sworn.

(The witness, Richard Daken, was duly sworn.)

COURTROOM DEPUTY:  Please be seated.  State and spell your first and last name for the record.

THE WITNESS:  Richard, R-I-C-H-A-R-D, Daken, D-A-K-E-N.

MR. DEMAHY:  May I proceed, Your Honor?

THE COURT:  Yes, sir.

VOIR DIRE EXAMINATION

BY MR. DEMAHY:

Q.  Good afternoon, Mr. Daken.  I want to ask you a series of questions.  It won't take too long.

You have admitted in your deposition that you are not an expert on FDA regulations and that you are not offering any opinions on that because you are not qualified.  Correct?

A.  Correct.

Q.  You have also admitted that you are not an expert on the software algorithm that the LifeVest utilizes.  Correct?

A.  The algorithm.  Correct.

Q.  You are not an expert on how a defibrillator is designed to

distinguish between different types of rhythm.  Correct?

A.  No, I don't believe I said that I was not an expert on that.

Q.  Well, in your deposition we asked you:

"You are not an expert in terms of how defibrillators are designed to attempt to distinguish between a real rhythm or noise or artifact.  Correct?

"Answer:  No, that was software algorithm."

A.  That's software.

Q.  You are not an expert on that?

A.  On software, no.

Q.  That's what drives -- the defibrillator is a software?

A.  It makes choices for you, yes.

Q.  You didn't even review the algorithm?

A.  No, that's propriety, is my understanding.

Q.  You didn't review it?

A.  No.

Q.  You didn't know what software the LifeVest was running.  Correct?

A.  Correct.

Q.  You don't know how a LifeVest is supposed to function per its specifications in the face of noise or artifacts.  Correct?

A.  In the face of noise or artifacts?

Q.  Yes.

A.  Yes, it's supposed to ignore noise or artifact if it's on

one electrode, but if it goes to two electrodes, it's supposed to acknowledge and change the patterns.

Q.   Do you remember this question and your answer:

"Do you know anything about how the LifeVest is supposed to function per specifications in the face of noise, other than this one highlighted in paragraph -- page 15 of Dr. Efimov's report?"

Your answer, "No."

Do you remember that?

A.   I honestly don't remember it, no.

Q.   Do you deny or contest that that's what you said?

A.   I am not saying that's not what I said.  What I am saying is I gave an answer today on what I really meant.

Q.   Okay.  So when we take your deposition and we were going to question you on that topic, you said no, you didn't know anything about it?

A.   At that time, yes.

Q.   You are not an expert on --

THE COURT:  Counsel, you know, in voir diring the witness before testimony it's usually to test the person's qualifications for the opinion that they are about to render. Your questions all seem to be on confirming the things on which he is not going to render an opinion.

If that's the substance -- I mean, this is for cross, not for voir dire.

MR. DEMAHY:  Well, Your Honor, my point is he shouldn't be giving opinions on these and some other areas at all.

THE COURT:  Well, how -- I don't even know that he is going to give an opinion.

MR. DEMAHY:  Because he gave them in his deposition.

THE COURT:  Counsel, you should let me finish speaking.

Just for clarify, Mr. Lee, state again specifically the area of expertise for which you are seeking to have this witness offer an opinion.

MR. LEE:  Your Honor, Mr. Daken is offering two opinions; one, the soldering joint was cold, not properly soldered, and the second one is that in connection with doing solder joints, you have to have certain quality standards, and his opinion is that those quality standards weren't followed and that's why the solder connection is broken.  That's it.

He is not offering any software, any CPR, any of the things Mr. DeMahy has just offered.  He is not offering opinions on that, Your Honor.

THE COURT:  Okay.

MR. DEMAHY:  The problem is that the specifications for the soldering are set by the FDA and approved by the FDA and he is not, as he has admitted, going to offer any opinions, so for him to give an opinion on what he thinks soldering should be goes into the design, goes into what the FDA has approved, and he cannot come in and say, this is what I think should be done

in soldering when he doesn't know what the FDA requires and what the FDA has approved.  It's injecting an issue that goes directly to preemption and he shouldn't be commenting on it, because he has admitted he is not an expert on that.

THE COURT:  Well, they have proffered what -- well, we talked about his opinion, but his expertise is what as you are offering him, Mr. Lee?

MR. LEE:  On soldering, Your Honor.  He is offering an expertise on soldering.  He is not offering an opinion on the PMA process.

THE COURT:  Do you have any questions for him regarding his expertise on soldering?

MR. DEMAHY:  Yes.

BY MR. DEMAHY:

Q.  You are not an expert on microscopic examination on the small black wire involved in this case to show whether it has tensile fracture, whether it has suffered tensile fracture. Isn't that correct?

A.  Correct.

Q.  Because you are not a metallurgist and that's something that a metallurgist does?

A.  Correct.

THE COURT:  Let's bring in the jury.

COURT SECURITY OFFICER:  All rise for the jury, please.

(The jury entered the courtroom at 1:31 p.m.)

THE COURT:  All right.  Ladies and gentlemen, please be seated, everyone.  Thank you for your patience.  My meeting, first of all, ran a little longer.  It was a Judges' meeting and, as they say, directing judges is like herding cats.

So, the time allotted was not mine alone to control.

Then there are some legal things that we needed to take care of outside your presence so we did get a little work done while you were also waiting.

We are ready to resume with the trial.  Mr. Daken, again, can you please raise your right hand and be sworn.

(The witness, Richard Daken, was duly sworn.

COURTROOM DEPUTY:  Please state and spell your first and last name for the record.

THE WITNESS:  Richard, R-I-C-H-A-R-D, Daken, D-A-K-E-N.

DIRECT EXAMINATION

BY MR. LEE:

Q.  Good afternoon, Mr. Daken.  Please share with the jury what you now do in your free time that you have retired.

A.  In my free time that I have retired, that's all a family business.  I do a lot of babysitting.

Q.  When did you retire, Mr. Daken?

A.  May 1st of this year.

Q.  And before you retired, how were you employed?

A.  I was a division manager for healthcare technology for Rimkus Consulting Group.

Q.   Can you explain to the jury what did you as the division --

A.   Division manager.

Q.   In your capacity at Rimkus?

A.   Well, Rimkus is an expert consulting firm.  They would get calls in from insurance companies or sometimes from lawyers looking for an expert in a particular field of engineering.  I happen to be the expert for Rimkus in the field of healthcare technology, so if there was a case that came in that something went wrong in a hospital or some new piece of equipment was damaged in delivery, I would be the one assigned to look at that.

Q.   In your capacity at Rimkus, did you have any involvement with medical devices?

A.   That's what the healthcare technology essentially was, yes.

Q.   And before your time at Rimkus, did you have any involvement with medical devices?

A.   Yes.  Prior to going with Rimkus, I worked in four different hospitals over a period of 25 years in charge of medical technology.

Q.   Explain to the jury what you did in the capacity when you worked at the hospitals with medical devices.

A.   Essentially, when a medical device is going to be bought by the hospital for use, there would be a research as to what would be the proper, the best fit model piece of equipment from a manufacturer for the hospital for what the hospital wanted to

use.

We would do prepurchase evaluations, which essentially is bringing in several items from each manufacturer of that particular thing they were looking for and comparing them side by side, one in a laboratory setting, two in a clinical setting.  After that, once a device was bought and we bought it, they installed it, then we maintained it, did any repairs on it and we saw to it that the user staff was educated and trained.

Q.   Were you in charge of staff at the hospitals, at any of the hospitals during the time you were involved in that?

A.   That was my primarily my job, yes.

Q.   In connection with that position, did you become familiar with quality assurance practices that were required with respect to medical devices?

A.   Yes.

Q.   In connection with your work, whether it be at Rimkus or the hospitals, did you have any experience as it relates to -- I know you have told me it's soldering not soldiering, so I am going to say soldering.

A.   Yes, I have a lot of experience with soldering.

Q.   Share with the jury how it is that you developed your experience with soldering.

A.   I went to a private high school that was both a full college prep high school and a technical school.

My first year there as a freshman, the freshman year in the electronics program was spent in the lab learning to solder and turning in assignments to be evaluated and having to correct them.

After leaving there, I went to -- at that point it was North College of Engineering, to be an electrical engineer, and part of the things you did in the lab was solder.

I then, thanks to the change in the draft rules, wound up in the Air Force for four years before finishing college and was given the duties as ground radio repair technician, and in the '60s and '70s that required a great deal of soldering and de-soldering, you had to take out old failed components, put in new components and properly put them in.

Visual inspection was always required of the soldering connection.

I went back to school after that, finished my degree and started teaching.  I started teaching in a brand new associate's program and in order to graduate with an associate's degree in engineering technology, the students had to design, construct and prove working a project of their choice, which meant they had to know how to solder, which meant I had to teach them how to solder.

I went from there to being an adjunct professor at New Jersey Institute of Technology, teaching and writing the biomedical clinical engineering courses, but also teaching what

was called senior project design which, again, was a course that the students had to pick a project on their own, they had to build it, develop it, write the user's manual, everything, have it built, shown to be working, which involved evaluating the technology they used, the way they built the product, and the soldering that was done in it.

Q.   We don't want you to give us your age, but if you can give us in terms of years experience-wise you had soldering, just a number.

A.   Well, let's say starting in '61, so we're looking at quite a few years there.

Q.   In connection with your teaching practices, military, you have learned about quality assurance standards as it relates to soldering?

A.   Well, as it relates to engineering and soldering, yes.

Q.   Have you reached an opinion on the LifeVest device in this case, Mr. Daken?

A.   I have two opinions.

Q.   What is your first opinion?

A.   The first opinion I have is that the device had a failure of the cable due to a pulled solder joint.

Q.   I want to back up for one second so we all understand. Explain to us what soldering is so we know what the term means.

A.   Essentially, when it is involved, it is the bonding of electrical wires or electrical components so that they act

together.  You use a solder alloy that will be heated up and brought into contact with the devices and melt and infuse through them to make them one continuous item to make sure they stay in place.

Q.  Do you have a second opinion to offer with regard to the LifeVest device, Mr. Daken?

A.  The failure of the cable was due to non-complete compliance with the FDA guidelines.

MR. DEMAHY:  Your Honor, I object and move to strike.

THE COURT:  Overruled.

BY MR. LEE:

Q.  Mr. Daken, what did you do to arrive at your first opinion that the solder connection, I believe the term you used was -- what was the term you used to define the solder connection?

A.  It was a cold solder joint.

Q.  What did you do to arrive at your first opinion that the solder joint in the device was cold?

A.  I did what would routinely be done, I did a visual inspection, I did a magnified visual inspection, and then I did an x-ray.

Q.  For those of us that are not as sophisticated soldering, can you explain to the jury what is a cold solder joint?

A.  I think the easiest way is to try to draw the good solder joint and compare that to a bad one.  Solder, when it's heated up, it begins to melt and it's either being used with an

external flux, which helps to clean the connections and burns off, or it has an internal flux inside the solder itself.

When you are doing a soldering connection, if everything is held proper and you put the heat onto the connection, which is your soldering iron, you put the heat on and you get it started to warm up and then you use the solder, it's like a pencil tip, you just take the solder, bring it down to the heat and let it run back and forth over the connection so that the heat distributed with it and that all of the flux burns off, and that you get a good, firm connection with solder throughout the connection.

If it's done properly, solder shows up as a bright silver color.  If it's not proper and it's not bright silver, it's a cold solder joint, it's a dull gray color and sometimes there are traces that you can see under the magnifying glass of the remainder of the flux not having been burned off.

Q.  You used the term "flux."  So we all understand what flux is, can you explain to the jury what flux is?

A.  It's a chemical compound that, again, it's either something you would physically use externally of the solder or it's included in solder inside, as part of the core of the solder.

What it does is it acts as a cleaning solution to make sure that you are going bare wires to bare component leads to each other without anything in between, no oils or anything like that.  So it's a good, firm connection.

Q.   As a trained and experienced individual as you are with solder connections, with your history, your teaching, are you able to visually identify a cold solder connection?

A.   Yes.

Q.   For a trained and experienced individual as you are with soldering, is a visual inspection a reliable method --

A.   Yes.

Q.   -- to identify a solder connection?

A.   Yes.

Q.   A cold solder connection.

Is anything more required to identify what is a cold solder connection, Mr. Daken?

A.   No.

MR. LEE:  Your Honor, we move the device in as Plaintiffs' Exhibit 200 which, hopefully, is a number that's not on any list.

THE COURT:  Is there an objection?

MR. COHEN:  None.

THE COURT:  All right.  It will be admitted.

(Plaintiffs' Exhibit 200 was admitted in evidence.)

BY MR. LEE:

Q.   Mr. Daken, the device you have with you, Your Honor, if we may have the witness step down and put the device on the ELMO.

THE COURT:  Sure, you can step down, sir.

BY MR. LEE:

Q.   Let's do it this way before we have to move on.  Take out the device, look at it internally, and then we will come and have you show it.

A.   This is the particular part of the device that's in question, and you want the whole device?

Q.   Yes.

THE COURT:  There is a camera above the witness box.

You can come back to the seat.  Is this fine or do you want him to come to the ELMO?

MR. LEE:  No, that's fine, actually.

THE COURT:  Have a seat, sir.

BY MR. LEE:

Q.   Open the device, the cables so we can see it.  That's perfect.  Just briefly explain to us the parts of the device that you have with you, Mr. Daken.

A.   Okay.  The first part that I will talk about is the one I am showing with my hands.  This component with all the rest of its casing on it is considered to be the rear TE electrodes, that's the therapy electrodes that would deliver the shock. The wire that's in question is this one.  I can't get a better view here, but there is a break on the wiring at this one end.

The rest of this is a combination setup.  There are four electrodes, the circular disc that would be used on the patient to pick up the heart rate so they get the signal from the patient's body to the machine.  The other therapy electrode is

the front therapy electrode.  In order to get the shock to go through the patient like with the defibrillator, you have to use two electrodes and aim the shock through it.  That's what this one is for.

The black box in the middle is referred to as a distribution node, and if you look at this, you will see that there are two wires coming off on the sides, and one wire connecting it at the bottom.  The connection at the top is where this particular wire should have been in place and connected internally.

MR. LEE:  Your Honor, at this time we'd like to move into evidence, it's Defendant's Exhibit, we will call it 461-1. It's just a photograph from a report that we pulled out of the report and separated.

THE COURT:  Is there an objection?

MR. DEMAHY:  None.

THE COURT:  All right.  The photograph will be admitted as 461.

(Defendant's Exhibit 461 was admitted in evidence.)

BY MR. LEE:

Q.  Mr. Daken, this is a photograph of a magnification done by Zoll's expert.  Using this magnification, sir, can you explain to the jury what we are seeing as it relates to this picture and how a cold solder would look compared to a properly soldered connection?

MR. LEE:  If he marks the screen, will it show?

THE COURT REPORTER:  I think it will show if he marks it there.

A.   What I have just circled is actually the black wire cable that you see coming out of here.  The rest of this, the rest of the body is up close examination, I don't know what his magnification is, of that particular metal at the end of this.

What you are seeing here is a visual of it.  If you look at the bottom of this down towards this area, what you are looking at is it's a brighter color all of a sudden.  Most of this is dull gray.

There is brighter spot, that's where the solder has enough temperature and enough time run to get to be properly soldered. The rest of this is showing that it's cold solder throughout.

BY MR. LEE:

Q.   Mr. Daken, circle when you speak what you are referring to.

A.   What I was referring to is down here.  The other thing you see down at this end down here is it looks to be, if you want to call it a brown thin stripe going right down here, that's a piece of electrical wire that's still in the solder.  So when it snapped, that piece is still there from where it was connected previously.

If you look at this, you will notice several spots, a spot here, a spot here, a spot here.  Those are indents, holes in the solder.  What that means is the solder didn't flow

smoothly. It didn't get to be joined properly, so there is gaps in the solder.

The next important thing is this area right here. Notice the discoloration, the orange and what looks to be yellow, that's what flux looks like if it hasn't been burned off. If it hasn't been burned off, it's a cold solder connection, simply because it doesn't allow the solder to bond with the materials that are being connected together.

So this picture tells me I've got a very cold solder joint that failed.

Q. Your second opinion, Mr. Daken, how did you arrive at the second opinion you have to offer today?

A. Well, actually, the second opinion was not generated completely by me. It was my interpretation of the report that Mr. Wang wrote for Zoll Medical. He was an FDA retired expert that Zoll hired to do a mock inspection of their facility and one of the findings -- actually, two of the findings had to do with the fact that there was no oversight and no specifications provided for the solder connections, that they were lacking the oversight conditions.

In other words, you have someone that's doing the soldering. That's their job all day long, solder, solder, solder. When they are done, someone else who really knows how to do good soldering should look at that and say, this is or is not a good solder connection. If it's not, send it back to be

reworked.  If it is, it goes forward.

Unfortunately, while they were doing the soldering, there was no oversight that we could find.  Their expert said there isn't.

MR. DEMAHY:  Objection.  Move to strike.  Lack of foundation from this witness.

THE COURT:  All right.  Can the parties approach sidebar, please?

(Sidebar conference.)

THE COURT:  I want to be clear, he is basing his opinion just on that.

MR. LEE:  Not just that, I was going to ask him if he reviewed the regulation which actually in plain legal English he is familiar with them in his capacity at the hospital where he had to be familiar with the same FDA regulations.  What I can do is, I can back up and ask him in the hospital setting if he was familiar with the FDA regulations, so I can set up that foundation.

THE COURT:  Okay.  But he said earlier that he was not offering an opinion on FDA regulation.

MR. LEE:  He is not offering an opinion as to -- what he is saying is his quality processes for soldering, if you read the regulations in plain legal English, those regulations require training, inspection and things of that nature.  All he is saying is if training was done, which would require someone

doing a proper solder and inspection, this would have been prevented and that same quality standards with soldering is no different than when you read the FDA regulations.

He is not saying anything of a violation.  He is just saying the soldering process, the quality process for soldering, if you just read this portion of the regulations, which is written in plain English, it requires that you have adequate training and inspection and things of that nature. That's the extent of his opinion.

MR. DEMAHY:  Judge, when we were arguing these motions in limine on Friday, you made it very clear that even our expert, who is an expert on federal regulations, that you were not going to let the experts tell the jury what the law is.  We talked about that.  Let me finish.

That man just a couple of minutes ago when I was voir diring him, and there is more to this I can show you, he admitted he is not an expert on the manufacturing process. When he worked at the hospital, it was at the user end and, as I read, he is not an expert in the FDA regulations and he was not going to challenge any of the opinions of our FDA expert.

This is a creative way to get -- he has already, over objection, told that jury that this soldering process did not meet the FDA regulations.  Over objection, he already got that in.  Now, they are going to continue to build this web of, well, you know, I am not really an FDA expert but I am going to

tell you what the regulation says.

This is improper, Judge.

THE COURT:  I agree.  I am not going to allow it.  He can testify about, and render his opinion about soldering and what he saw, but in the context of FDA regulations, he himself said earlier during voir dire that he doesn't have any expertise on that.  I am not going to let him opine on something for which he said he doesn't have an expert opinion and he said he relied on a report written by someone else and I allowed that report to come in.  I am not going to let you take that further step.

MR. LEE:  He is not going to say any regulation.  He is going to say I reviewed the regulations, that's it.  He is not saying they violated any regulation.  He is not going to say anything to say anyone violated any regulations.

He is going to say the quality processes, as he understood, from soldering, the things you're supposed to do, he is just seeing that is what he has learned you also have to do.  That's it.  He is not saying it's a violation of X, Y, Z, or anything, because he cannot.  It's for the jury to determine if that's a violation.  We have told him that's not something any of us can do.

MR. DEMAHY:  He shouldn't make any comments on FDA regulations, Your Honor, none, none, because it's disguising -- what he comments is disguising them and wrapping them around

the FDA regulation.  When you heard what he said, then I've got to cross-examine him and then you say, well, Mr. DeMahy, you've opened the door.

THE COURT:  Well, I am going to listen to the questions and if I think it's a step too far I am going to cut off the testimony.

I assume you are going to object.

MR. DEMAHY:  Yes.

THE COURT:  All right.

(Sidebar conference was concluded.)

BY MR. LEE:

Q.   Mr. Daken, I want to be clear.  You are not offering any opinions that Zoll violated any FDA regulations.  Correct?

A.   Correct.

Q.   In connection with your review, did you read the regulations?  Don't tell us which ones you read, just if you read them.

MR. DEMAHY:  Objection.  Irrelevant.

THE COURT:  Overruled.  You can answer.

A.   Yes.

BY MR. LEE:

Q.   Were you able to understand what you read, sir?

MR. DEMAHY:  Objection.  Irrelevant.

THE COURT:  Overruled.  You may answer.

A.   Yes, they were in plain English.

BY MR. LEE:

Q.  The quality assurance practices that you have learned with respect to soldering over your time with soldering, are there minimum things you are required to do in connection with that soldering process to make sure solder connections are proper?

A.  Yes.

MR. DEMAHY:  Objection, Your Honor.  Foundation, relevance and attempt to re --

THE COURT:  Overruled as to that question.

BY MR. LEE:

Q.  Sir?

A.  Yes.

Q.  In connection with your work at the hospital, did you become familiar with a general, not an expertise, understanding of the FDA regulations as it relates to medical devices, sir?

MR. DEMAHY:  Objection.  Foundation, relevance, lack of specificity.

THE COURT:  Sustained.

BY MR. LEE:

Q.  Mr. Daken, in your capacity at the hospital setting with medical devices, did you have any regulations that you had to abide by with respect to your work in that hospital setting?

MR. DEMAHY:  Objection.  Relevance.

THE COURT:  Overruled.  You may answer.

A.  Yes, I did.

BY MR. LEE:

Q.   In that hospital setting, Mr. Daken, did you have to comply with certain quality standards as it relates to soldering?

MR. DEMAHY:  Objection.  Relevance and lack of specificity.

THE COURT:  Overruled.

A.   Yes.

BY MR. LEE:

Q.   Is there a minimum quality process or standard that someone doing soldering work should follow to ensure that that soldering process is done correctly and does not result in a faulty solder joint?

MR. DEMAHY:  Objection.  Foundation and preemption.

THE COURT:  Overruled.  I will let you answer that question but you have to get specific about what we are talking about.

A.   Yes.

BY MR. LEE:

Q.   Does it relate to, sir, training and inspection?

MR. DEMAHY:  Same objection.

THE COURT:  I will sustain the objection as to leading.

BY MR. LEE:

Q.   What do you understand as it relates to making sure solder joints are proper that is common in the engineering field relating to solder connections?  What is it, at minimum, that

is required someone do and follow to make sure a solder connection is a proper connection?

MR. DEMAHY:  Objection.  Foundation and preemption.

THE COURT:  Overruled.  You may answer.

A.  All right.  There is a couple of steps to make sure that solder connection is done properly.  The first thing you want to do is make sure it's mechanically firm.  So, if you are doing a circuit board component, you want to make sure that the leads go through the circuit board, they make contact on both sides, and when you do the soldering, that the solder actually flows through the hole around the lead wire and forms a perfect bubble bright silver on either side.

MR. DEMAHY:  Move to strike, Your Honor.

THE COURT:  Overruled.

A.  If you are doing wire to wire connections, you do not want to do a push-point solder.  You do not want to do an overlay solder.  What you want to do is twist the wires so that mechanically they are intact and any pull on them is not just going to break that connection, but it's pulling on this twisted pair of connections.  Then you apply the heat and the solder and melt it, and that way the solder gets in between the twist of the knots and gets all around the wire and becomes a good, firm connection.

BY MR. LEE:

Q.  Sir, is it your testimony that if the processes you just

described are followed, it would ensure that a solder connection doesn't result in a bad or cold solder connection?

MR. DEMAHY:  Same objection, Your Honor.

THE COURT:  Overruled.  You may answer.

A.  If you follow the guidelines or you follow a quality control program and you examine the connection and you see that it's dull gray, then you know you've got a bad connection.  If you see it's silver, it's fine.

BY MR. LEE:

Q.  The processes you just described, is that common processes for soldering across various fields?

A.  Across engineering fields, yes.

Q.  So regardless of the type of device, whether it be a radio, a cell phone, a medical device, camera, the process that you described to ensure that the solder connection is proper and not cold, would those standards also apply.

MR. DEMAHY:  Objection.  Foundation and preemption.

THE COURT:  Overruled.

A.  The issue with a standard of that type is that most soldering today is done by machine.  It is not done by a human being.  Only certain jobs are done by a human using a soldering iron to do it.  The machines are much better.  Because they are programmed, they know exactly how long to be there and how many solder to put in and everything.

A human being is required that you observe what is going on

and make the decision, well, has it been in there long enough, has the heat been there long enough for the solder to flow properly?  Has the solder flowed completely over it?

But the same type of standards apply.  The only one that would be a question is would you always have to use a mechanical lock on wires before you solder them.

Q.   In connection with reaching your opinions in this case regarding the device, did you review anything related to the device history to reach your opinions, Mr. Daken?

A.   I reviewed the history that was provided by Zoll.

MR. LEE:  Your Honor, we would like to move Plaintiffs' Exhibit 52 into evidence.

MR. DEMAHY:  No objection.

THE COURT:  It will be admitted.

(Plaintiffs' Exhibit 52 was admitted in evidence.)

BY MR. LEE:

Q.   Briefly, before we get into this, sir, what is the device history?

A.   What is the device history?

Q.   Yes.

A.   Every device that is made, especially in the medical field, from the day it is a product, finished ready to go out in the field, there is a record supposedly kept that tracks everything that happens so that you would know from day one, I sold product A to hospital B in Minneapolis.

Hospital B would then register and say, we have it, we are tracking it.  Anything that happens to that device, as in it gets incoming inspected by the hospital's people, training gets done on hospital staff on how to use the device, the technical staff who would be caring for the device during its lifetime there would be trained on the proper steps and techniques to care for the device.  All of this is documented in the history.

Then any time the device is inspected, the results of the inspection is logged in and any time the device is in for a repair, that is logged in.

Now, repairs on medical devices from hospital experience, they come in broke, when you do the examination, they are not. So that particular rotation in the history would then be used, fed to the user department to say, hey, we need to do a refresher on the education because the people are sending something down saying it's broke when there is absolutely nothing wrong with it.

So that is the entire history package right up until the day that product is taken out of service and discarded finally and that's the last entry.

MR. DEMAHY:  Your Honor, I am going to move to strike what hospitals do.  And preemption.  Lack of foundation to this device.

THE COURT:  Overruled.

BY MR. LEE:

Q.   Mr. Daken, is there anything in this report that you reviewed and relied as support for your opinions that the solder connection on this device was not properly done?

A.   On this report that's up here now?

Q.   Well, this page -- no, on your report.  Let me go to key page two -- actually, sorry.

Did you review the Zoll document in connection with reaching your opinion, sir?

A.   Yes.

Q.   What is the significance of what we are seeing here as it relates to your opinions that the solder connection was done?

MR. DEMAHY:  Your Honor.  I object as beyond the scope of the disclosed opinions.

THE COURT:  Overruled at this point.

A.   Well, the first thing I see --

BY MR. LEE:

Q.   Let me stop you.  Did you discuss this document in your report, your expert report, sir?

A.   I discussed the history of the device.  I didn't specifically say one document, rather just the history of it.

Q.   And the history of the device came from this document?

A.   It came from this and others.

MR. DEMAHY:  My objection isn't that he doesn't have it.  It's that it is beyond an opinion that's been disclosed, even today.

THE COURT:  I understand.  Overruled.

BY MR. LEE:

Q.   What is it about this document, Mr. Daken, that allows you to reach your opinions as to the solder problem with Mrs. Godelia's device?

MR. DEMAHY:  Same objection.

THE COURT:  Overruled.

A.   Well, if you read in the bottom left-hand column, it starts off with indicate which parts require replacement by placing an X in the appropriate box.  Then if you go over to the right --

Q.   Hold on.  Can you zoom in the bottom box?

Yes, perfect.

A.   It tells you to put an X in the appropriate box if the device needs to be replaced.  If you look on the right-hand side, the wire for TE-2 and the wire for rear TE-1 needed to be replaced.

Q.   And using the device that you have with you, can you show us what wire you are referring to, Mr. Daken?

A.   We are talking about this wiring right here, under the camera.

Q.   The wires we were just talking about that were replaced, which wires are those, Mr. Daken?

A.   TE-1, TE-2.

Q.   Can you put it flat so we can see it a little bit better on the table?

A.   Let's see.  Let me get these others out of the way.  These are known as TE-1 and 2, therapy electrodes.  There is a jumper wire that connects the two together and then continues down into the distribution network we were looking at.  These are the wires they are saying needed to be replaced.

Q.   And do you recall, approximately, what date that wire was replaced, sir?

A.   November 1st of 2013.

Q.   In connection with replacing that wire, would someone -- would replacing this wire require any soldering work to be done?

A.   Yes.

Q.   And the wire that we see going between the two boxes, how does that wire impact the wire that we see with the loose wires at the end?

A.   All it does is bring the connection all the way through to the both, to the second electrode.

Q.   Mr. Daken, you are not a metallurgist, are you?

A.   No, sir.

Q.   Do you have to be a metallurgist, Mr. Daken, to understand what is a cold solder connection?

A.   No, sir.

Q.   Mr. Daken, do you know how soon or -- what was the date that this prior -- let's go back to the report so we are not mistaken, Exhibit 52.  Zoom out, please, and go back to page

two.

The date, 11/1/2013, sir, what is the significance of this date?

A. That's the date the work was done.

Q. Do you know how many times this device was used before it was given to Mrs. Godelia?

A. My understanding, at least ten times, may have been 12.

Q. Is there any use of the device that relates to your opinion to the cold solder connection?

A. There are various repairs that were needed during that point in time, some of which had nothing to do with soldering but others required components to be replaced, wires to be replaced.

Q. Mr. Daken, do you have any experience in fracture analysis?

A. No.

Q. Is that necessary to identify a cold solder joint, Mr. Daken?

A. No.

Q. Why not?

A. A cold solder can be easily distinguished by its color without having to do any other effort or larger involvement of work.

MR. LEE: No more questions, Your Honor.

THE COURT: All right. Cross.

CROSS-EXAMINATION

BY MR. DEMAHY:

Q.  May it please the Court.  Just a follow-up on what you said.  It's your opinion that this cold solder joint I am going to ask you about that in a minute, but you have admitted that you are not a metallurgist and you don't have the qualifications to determine whether this wire suffered from a fracture.  Correct?

A.  I am not a metallurgist.  Correct.

Q.  So you while you have an opinion it's a cold solder, you have no opinion as to whether it was fractured.  Correct?

A.  Correct.

Q.  Okay.  And, therefore, you have no qualifications to comment on our expert's opinion that it was fractured?

A.  Correct.

Q.  What kind of microscope did you use, sir?

A.  A 10X lab microscope.

Q.  What kind of microscope did our expert use?

A.  I don't recall.

Q.  Much more powerful, isn't it?

A.  I assume so, yes.

Q.  Now, Mr. Lee showed you that form, Exhibit 52.  You don't have to put it up -- what's that called?  The device history form.  You have never worked for a manufacturer of a medical device.  Correct?

A.   Only as a consultant.

Q.   You have never worked for or with a wearable defibrillator before.  Correct?

A.   Correct.

Q.   You never testified as an expert regarding wearable defibrillators?

A.   Correct.

Q.   So what you are doing with regard to Exhibit 52, the history is interpreting for the jury what you think it says.  Is that fair?

A.   I was just reading what it said right on it.

Q.   Your interpretation, is that fair, sir?

A.   I guess.

Q.   Thank you.

Now, let's make sure that we make one point perfectly clear here.  In answering one of Mr. Lee's questions you admitted that you are offering zero opinion that Zoll violated one single FDA regulation.  Correct?

A.   Correct.

MR. DEMAHY:  No more questions.

THE COURT:  Redirect?

MR. LEE:  Can we pull back up Plaintiffs' 52.  I'm sorry, let me get the microphone.  Page five and zoom in the bottom box.

REDIRECT EXAMINATION

BY MR. LEE:

Q.   Mr. Daken, when you read to the left where it says, indicate which parts require replacement by placing an X, do you have to be an expert to understand what that means?

MR. DEMAHY:  Objection.  That's leading, Your Honor.

THE COURT:  Overruled.

A.   No.

BY MR. LEE:

Q.   That's written in plain English?

A.   It's written in plain English.

Q.   Telling you put to an X to whatever it is that's being replaced.  Correct?

A.   Correct.

Q.   Do you see an X on the two rear therapy electrode cables you just talked about, sir?

A.   Yes, I do.

Q.   Do you have to be an expert to understand that those two things have an X which would mean, as written in Zoll's document, they are being replaced?

MR. DEMAHY:  Leading, Your Honor.

THE COURT:  Overruled.

A.   Correct.

BY MR. LEE:

Q.   Mr. Daken, is soldering limited to wearable defibrillators?

A.   No.

Q.   Electronic devices have soldering in them.  Correct?

A.   Correct.

MR. DEMAHY:  Objection.  Asked and answered.

THE COURT:  Overruled.

BY MR. LEE:

Q.   You don't have to know about the LifeVest to understand soldering, do you?

MR. DEMAHY:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. LEE:

Q.   Sir, do you have to know about the device, the LifeVest device, to understand soldering?

A.   No.

Q.   Why is that, Mr. Daken?

A.   Soldering has to do with connecting electrically conductive devices together, whatever you are using them for, whether it's to splice the wire in this microphone, splice the wire on a TV, electrical outlet.  It's the same.  It's soldering.  It has no effect on what it's doing and you don't need to know what it's doing.

Q.   Mr. DeMahy mentioned that Mr. Balancia's picture was higher magnification.  Was that helpful in you identifying items that would demonstrate the solder connection was cold, the picture?

A.   The improved vision did, but I had already decided by the time I got that that it was a cold solder joint from my

examination.

Q.  Has it been your understanding in the time you have done this, sir, that you require whatever level of magnification Mr. Balancia did to be able to discern whether a connection is cold solder joint?

A.  No, it did not.

MR. LEE:  Thank you, Mr. Daken.

THE COURT:  Ladies and gentlemen, do any of you have any questions for this witness?

All right.  You may step down, sir.

Please call your next witness.

MR. DEMAHY:  Your Honor, we need to leave the device here.

THE COURT:  If you can leave the device there.

Gentlemen, wait until the other attorneys return and then you can ask them the question.

Mr. Lee, there is a question about whether or not the device used by your witness needs to remain.

Why don't you just talk to Mr. DeMahy in private?

MR. LEE:  I'm sorry, I made him keep it to guard it.

We will represent on the record, Your Honor, I took the device from him for witness purposes.

THE COURT:  Okay.  Your next witness.

MR. LEE:  I am going to call Sterling Youmas, Judge.

MR. DEMAHY:  What time are we going to take a break?

THE COURT:  We will take a short break.  Please don't discuss anything during the break.

COURT SECURITY OFFICER:  All rise for the jury.

(The jury exited the courtroom at 2:24 p.m.)

MR. LEE:  We are going to turn --

THE COURT:  Mr. Lee, until I hear that door close, I don't want you to be speaking.

So what is it?

MR. LEE:  It's the device.  I just wanted to give it to the Court.

THE COURT:  We don't want it.  You hold on to it.  It's your exhibit.

MR. HERNANDEZ:  Your Honor, let me just be clear.  The device we are going to hold it until we have to turn it in to evidence and we are going to hold it after that as well.  We are not turning it over to Zoll yet.

MR. DEMAHY:  I haven't asked you for it.

MR. HERNANDEZ:  I just wanted to be clear on the record.

THE COURT:  Gentlemen, this is not state court.  The clerks don't hold the evidence.  You keep the evidence.

MR. HERNANDEZ:  Exactly.  Thank you.

THE COURT:  Let's take ten minutes.

(Brief recess.)

THE COURT:  All right.  We are back on the record.

Before I proceed with the next witness, I do want to make you aware. Mr. DeMahy, one of the jurors commented that she heard something you said that perhaps was not intended for the entire courtroom.

MR. DEMAHY: What did she hear?

THE COURT: You were close to the mic when you said something, so I just want to make the parties mindful, be careful what you say because there are microphones in the courtroom.

MR. DEMAHY: I wasn't talking about you, was I?

THE COURT: Well, that's what I wanted to know first, but no.

MR. DEMAHY: I apologize, Your Honor.

THE COURT: I am just reminding everyone that there are microphones and you should be careful what you say.

So, the next witness.

MR. HERNANDEZ: Judge, Sterling Youmas.

THE COURT: All right. Let's bring in the jury.

COURT SECURITY OFFICER: Yes, sir.

THE COURT: Mr. Youmas, stand there at the chair before we bring the jury in.

THE WITNESS: No problem, sir.

THE COURT: All right. Please be seated, everyone. We have one in the restroom.

All right. They are ready.

COURT SECURITY OFFICER:  All rise for the jury.

(The jury entered the courtroom at 2:41 p.m.)

THE COURT:  Everyone, please be seated.

All right.  Mr. Youmas, please raise your right hand to be sworn.

(The witness, Sterling Youmas, was duly sworn.)

COURTROOM DEPUTY:  Please be seated.  State and spell your first and last name for the record.

THE WITNESS:  My name is Sterling Youmas. S-T-E-R-L-I-N-G, Y-O-U-M-A-S.

DIRECT EXAMINATION

BY MR. HERNANDEZ:

Q.  Mr. Youmas, what is your relationship to Debra Godelia?

A.  She is my mother.

Q.  What is your relationship to Dennis Godelia?

A.  He is my stepfather.

Q.  And to Romania Wilson?

A.  She is my aunt on my mom's side of the family.

Q.  What do you do for a living?

A.  I am a contractor for an event production company.

Q.  Okay.

How long have you been doing that?

A.  I have been doing event production for five years.

Q.  Can you explain to them a little bit of what that is?

A.  Well, we set up for all corporate events.  We do anything

from LED screens, dance floors, place settings, pipe and drape
to cover walls, so you don't have just a bland, boring wall.

Q.   Okay.  How old are you now?

A.   I am 24.

Q.   How old were you at the time that your mother passed?

A.   I was 19.

Q.   Okay.  Now, I wanted to go back with you some time.  What kind of things did you do with your mother when you were a kid, when you were in elementary, for example?

A.   We did a lot of things.  We tried to do amusement parks. We loved watching movies.  That's the thing.  Any kind of fun things.  Really, it was more like family time, any time we can get family together we would take trips.

That was pretty much it.

Q.   Who would go on those trips?

A.   Pretty much me and my mom and my dad.

Q.   Okay.  When you say your dad, are you talking about --

A.   Dennis.

Q.   Okay.  Now, at what time in your life did Dennis come into your life?

A.   Since I was a toddler, as early as I can remember.

Q.   Okay.  What kind of a role model is he or what kind of a figure is he in your life?

A.   He is a great dad.  He has shown me a lot of things.  He showed me how to be a man, especially when it comes to caring

for someone.  He has shown that truly a lot.

Q.   What kind of examples has he given you with respect to that?

A.   By standing by my mom's side through thick and thin, basically I would say.

Q.   Let me ask you a question:  What kind of -- do you know what kind of job he does?

A.   Yeah, he is a welder for a construction company.

Q.   Okay.  When you say he is a welder for a construction company, what kind of risk does that job have, if any?

A.   It's a very high risk because you are hanging from the side of a building, any kind of infrastructure, welding heavy metals and at any time you can fall and injure yourself and possibly die, so it's a very risky job.

Q.   Do you know why he does this kind of risky job?

A.   Really to provide for me and my mom.  He does it because it's a source of income.

Q.   Now, let's get back to what we were talking about with respect to your mom.  Now, you talked a little bit about movies.  What kind of movies -- well, was there a particular kind of movie that your mom liked to watch?

A.   She loved the Saw movies, scary movies.  She loved horror films, any kind of horror films that she loved.

Q.   Did she expose you to do that?

A.   She did.  I was really terrified at first but, obviously, I

wanted to spend time with my mom so I tended to find a liking to them.

Q.   Do you like them now?

A.   Yes, I do, actually.  I like to watch them on my cell phone.

Q.   Did your dad spend time with you and your mom watching scary movies?

A.   He did from time to time.  Sometimes he wouldn't because he is not a big fan of scary movies, but he would make that compromise and have that family time with us.

Q.   He didn't like the scary movies?

A.   No.

Q.   And he made a sacrifice to watch it with you.  Right?

A.   Yes, to watch scary movies.

Q.   Do you consider that sacrifice to be similar to the work that he does in terms of why he does it?

A.   Yeah, out of love, I would say.

Q.   Now, with respect to this travel -- well, let me back up a second.  Your mom likes scary -- did your mom have a love for animals?

A.   Excuse me, for what?

Q.   Did your mom have a love for animals?

A.   Animals?

Q.   Yes.

A.   Yes, she did.

Q. Can you talk to the jury a little bit about that?

A. She had a pet rabbit that she had and she loved that. She also had a hamster, she loved that, and she also had a teacup Yorkie that she loved as well.

Q. Did she share that interest with respect to animals and the outside with your dad?

A. Yes.

Q. Okay. Would you all travel for that purpose?

A. Yes, we did.

Q. Can you tell us -- can you tell the jury about that?

A. Well, my dad, Dennis, he also is an animal lover as well, so we would all take trips to Ocala and certain places up north Florida to dog events where we would do shows, compete sometimes, and it was just a fun time.

Q. What about at the house, what kind of -- well, did your family raise any animals at the house as a family?

A. Yes. My dad Dennis would breed American bulldogs. He would breed fish, African Cichlids, and that's pretty much it.

Q. Was that your thing? Did you have interest in that?

A. Not so much, nature wasn't really my thing but I would, you know, stick around sometimes and have a little bonding moment to see what's going on.

Q. Okay. Now, we talked a little bit about the relationship with your mom when you were a kid, younger in elementary. How did the relationship with your mom develop as you got a little

bit older and started to get into your preteens and early teens?

A.   Well, obviously the conversation changed wanting to know about girls, you know, get a woman's perspective of, you know, what do girls think about, stuff like that.

Also, I would ask her questions like what should I be doing at my age, stuff like that.  That was it.

Q.   Where was Aunt Romania in the picture with respect to your family during you growing up?

A.   She was an important piece of the family.  She was always there.  She was like, I guess, the second mom to me, but at the same time she was everybody's mom.  She was actually my mom's mom, I would say, and Dennis's as well.

Q.   Do you have any particular memories that you want to share with you and your mom, that you have with you and your mom before she passed with the jury?

A.   No.

Q.   Why is it difficult to do that?

A.   Honestly, it's just too painful.

Q.   All right.  What are the kind of things that you would have wanted to do with your mom?  Sir, do you need a minute?

A.   No, I hear you, sir.  I would love to actually spend more time with her, probably go to amusement parks because she did like that as well.  I would love to see her face when she would see me decide to get married and have kids, grow up as an

adult.

Q. Did you actually talk to your mom about those kind of things?

A. We had like conversations about that but I tended to cut those conversations short due to I felt like that was more of a foreseeing something that I didn't want to see.

Q. Do you wish you -- was it because you were too young?

A. Yeah, I was like, mom, you are going to be here, don't worry about that, we will have this conversation years down the road.

Q. Are those the kind of conversations that you thought you were going to have with her later?

A. Yes.

Q. Are those the kinds of conversations that you wish you could have had with her?

A. Yes.

Q. Now, you mentioned that you wish she could have seen you have a family. Why did you -- why did you want that?

A. Because to us family is important. My mom was so bent on family because she didn't have really a solid family of her own growing up due to her mother passing giving birth to her, so she didn't have someone to lean on growing up as a mother.

Q. What about with respect to you possibly having children? Did you want to share that with your mom?

A. Of course.

Q.   Now, your mom, she became sick.  Right?

A.   Yes.

Q.   What was the major sickness she had or the sickness that she -- what she dealt with in her life?

A.   Diabetes.

Q.   Okay.  Because she dealt with it, did you deal with it?

A.   Yes, her pain is my pain.

Q.   Did the family deal with it?

A.   Yes.

Q.   Describe to the jury a little bit about whether you managed it and how you managed it.

A.   We managed our diabetes by trying to learn as much as we could about it from doctors and nurses.  Obviously, controlling it at home because you don't want to have to keep going to the hospital for every little thing.  I don't know who would want that but...

Q.   Well, let me ask this:  Was it a normal part of your life?

A.   Yes, it became a normal part of our life.

Q.   Did she function with it on a daily basis?

A.   She did.

Q.   If you had to give some characteristics about your mom in terms of her personality, what would those characteristics be?

A.   Energetic, funny, ambitious, loving, caring.

Q.   Now, your mom at some point she became -- she became disabled and couldn't work anymore?

A.   Correct.

Q.   Is that right?

A.   Yes, sir.

Q.   Do you remember around what time that was?

A.   I believe I was in high school, maybe 2010, maybe.  I am not sure.

Q.   Even though she was disabled, did she stop working in the home?

A.   No.

Q.   What kind of things would she do in the home?

A.   She would clean, cook, always check on me and my dad, make sure we were on top of whatever we were doing outside on a day-to-day basis, making sure everything -- the house always taken care of.

Q.   Who ran the finances in the home?

A.   My mom.

Q.   Would she pay all the bills and send the checks?

A.   Yes, she was -- she was more good at handling checks and money and stuff like that.  My dad was more of a breadwinner. Well, he brought home the money, of course, because my mom couldn't work, but she took in the bills.

Q.   Before she became disabled, did she work?

A.   Yes, she did.

Q.   What did she do when she was working?

A.   Her last employment was working for a company called All

About Staffing where she would recruit nurses from all over the world and place them in hospitals.

Q.   Okay.  Was she a hard working?

A.   Yes.

Q.   What about before All About Staffing?  Where did she work before?

A.   She worked for a credit union called Eastern Financial. She worked there, I am not too sure how long, but she worked there for some time.  And the company ended up going, I guess, bankrupt so they had to lay her off.

Q.   That's how she moved to All About Staffing?

A.   Correct.

Q.   Now, there was a point that your mom started to become progressively more sick.  Did the family still manage that?

A.   Yes.

Q.   How did you manage it as a family?

A.   By learning about what this new sickness was and coming together and making sure that everybody is available.

Q.   All right.  Despite her illness, what was her demeanor like and what were her characteristics, despite her illness?

A.   Happy and pleasant.

Q.   Was she happy and pleasant all the time, sir?

A.   I mean for the most part, yeah.  Everybody has their bad days.

Q.   Did she have plans?  What kind of -- we talked about the

economics of the household.  What kind of plans did you all have as a family?

A.  We wanted to take trips.  We wanted to go to -- actually, go to Jamaica because my mom had never been.  My dad has.  Also, they had goals of starting a business together, whether it be getting into the fish business, the dog business or buying, probably moving into a better house, better community.

Q.  How did your mom feel about celebrating birthdays?

A.  She loved it.  She actually was planning her 50th birthday party.  She actually wanted -- like I said, she is big on family so she would try to get family from up north, Tennessee, you know, neighboring states to come together because we don't all do it enough.

Q.  Now, sir, I want to take you to the date of November 18, 2013, the day of the heart incident.  Do you remember -- let me take you first to that morning.  Do you remember seeing your mom that morning?

A.  No.

Q.  Around what time did you next see your mom on that day?

A.  Late afternoon, around 5:00, 6:00.

Q.  Okay.  Around the time of the incident, where were you?  Well, first of all, were you at the house?

A.  Yes.

Q.  At the house, where were you?

A.  I was outside on the front porch talking to --

Q.   I'm sorry, I didn't hear you.

A.   I was outside on the front porch talking on the phone to a best friend of mine.

Q.   Okay.  What did you hear next or what happened next, excuse me?

A.   I hear -- well, my parents came inside the house.  My mom was in the kitchen.  Once I closed the front door, because obviously I had opened the front door for them.  I continued talking on the phone outside.

All of a sudden, I hear my mom yell, "Bae."  So, my reaction was my dad did something either, you know, silly or something that my mom didn't like, whether it be, you know, leaving the TV on or something silly.

Q.   So that didn't prompt you to react right away?

A.   No, because I always usually hear my mom yelling at my dad for something.

Q.   What happened after that?

A.   I hear my dad, Dennis, I hear him say, "Bae," as well, but the way he said it in his voice sounded like something was wrong.

So at that point I got up and I went inside to see and I see my dad, Dennis, crouched over my mom crying and hysteric, I mean --

Q.   Let me stop you there.

A.   Okay.

Q.   When you came into the house and you saw him crouched over, describe to the jury how your mom was.

A.   My mom was laid down on her back on the kitchen floor not moving.

Q.   All right.  I'm sorry I've got to ask you these questions, I really am, but how was your dad situated in relation to her? What was his position?

A.   Can you repeat the question?

Q.   What was his -- what was your dad's position in relation to your mom, who was on the floor?

A.   I don't know.  I don't know.

Q.   I'm sorry?

A.   I don't know.

Q.   Can you remember what his position was?

A.   No.

Q.   Okay.  Do you have any idea why don't you remember?

A.   No.

Q.   Can you tell us what you remember next?  Sir, would you like to take a break?

A.   I am drawing a blank here, honestly.

Q.   Would you like to take a break?

A.   I mean, I guess.

THE COURT:  All right.  We will take a few minutes. All right.  Please don't discuss anything about the case.

COURT SECURITY OFFICER:  All rise.

(The jury exited the courtroom at 3:07 p.m.)

THE COURT:  All right.  You can step down, sir.

We will take a few minutes.

MR. HERNANDEZ:  Would you like some water, sir?

THE WITNESS:  No, I am fine.

(Brief recess.)

THE COURT:  All right.  We are all set.

Sir, there is some water in that jug if you want it.

THE WITNESS:  Thank you, sir.

(The jury entered the courtroom at 3:17 p.m.)

THE COURT:  All right.  Please be seated.  Whenever you are ready.

BY MR. HERNANDEZ:

Q.  Sir, is it difficult to talk about this?

A.  Of course.

Q.  Have you ever talked about this in a public forum like this in front of a bunch of people that you don't know?

A.  No, sir.

Q.  Please do your best.

A.  Of course.

Q.  What do you remember after you walked in and saw your mom and your dad?

A.  I saw my mom just laying there.

Q.  Okay.  Where was your dad?

A.  Next to my mom.

Q.   What was he doing?

A.   He was holding her hand, screaming her name, hoping she would respond.

Q.   What did you think was happening when you walked in there?

A.   I knew something was wrong, didn't know what, but I just assumed that she was having a diabetic episode or her blood sugar had dropped or something.

Q.   You were here during the opening argument.  Right?

A.   Correct.

Q.   Did you hear Mr. DeMahy when he talked about in the opening argument that your dad was shaking your mom?

A.   Yes, sir.

Q.   What was your reaction to that?  What did you think about that when you heard that?

A.   I was kind of upset and shocked.

Q.   Why is that?

A.   Because as he stated, from my depo I think it was not truly accurate on his part.  You know, I stated it but I didn't mean it in that way.

Q.   Tell us what happened, what you actually saw.

A.   I saw my dad kneeling next to my mom holding her right hand and literally just saying, "Bae, come on, bae, wake up."

     Now, from what --

Q.   The defense counsel, you can say it that way.

A.   -- the defense counsel had said was that my dad was shaking

my mom ridiculously forcefully, I thought that was kind of wrong in a sense.

Q.   Okay.

A.   But I understand.

Q.   What happened -- what did you do -- well, first of all, after you walked in and saw your dad holding your mom's hand, what did you see next happen?

A.   I didn't see anything after that.

Q.   Did your dad just stay by her on the floor?

A.   No, he got up and he immediately got my aunt.

Q.   Do you remember if he was already on the phone with your aunt or he called her back or what happened?

A.   He was talking to her on the phone, talking to her, I don't know about what, but just talking to her and I am assuming he got on the phone and called her back.

Q.   Go ahead.

A.   No, that was it.

Q.   What condition was he in?

A.   He was in a frantic state, just overwhelmed with emotion, trying to figure out what was going on, not believing what he was seeing and just trying to understand it.

Q.   What was he saying?  Let me put it this way:  Do you remember him saying anything to you?

A.   The only thing that stood out to me is he was just saying lots of things, was, "Don't touch her."

Q.   Now, when you said he was saying that, did he tell it to you once?  How -- can you describe that a little bit more for the jury?

A.   He screamed it twice only because he was assuming that I was going to touch my mom.

Q.   Okay.  Now, let me back up for a second.  What were you about to do or what were you thinking in terms of -- at that time when you said this happened?

A.   I was going to attempt to give my mom CPR after I realized that she wasn't breathing.

Q.   Did you stop yourself from giving her CPR right away?

A.   I did.

Q.   Why did you stop?

A.   Because by him yelling, saying, "Don't touch her," it immediately triggered me to realize that we had been told to not touch her on the vest because you could possibly get shocked and possibly interrupt anything that the computer is supposed to do for the vest.

Q.   Did you want to interfere?

A.   Of course, it's my mother.

Q.   Were you doing anything else at the time?

A.   Talking to 911.

Q.   How long were you there while you weren't helping her and wondering as to whether you should interfere or not?  How long, do you know?

A.   No, I don't, I can't really give you an exact answer on that.

Q.   Was it painful?

A.   Yes.

Q.   Tell me, did you eventually try to give her CPR?

A.   I slightly attempted but --

Q.   What happened that you slightly attempted?

A.   I tilted her head back making sure she wasn't choking on anything.

Q.   I'm sorry, I want to just back up a second.  Did anything prompt you to actually act?

A.   To act to give her CPR?

Q.   Yes.

A.   No, it was just --

Q.   Well, what about the 911 call?

A.   On the phone call while I was waiting for, you know, help to arrive, but I need to do something.  I don't need to just sit there and wait for paramedics to come.  I don't know how long they are going to take.

Q.   Did anybody on the 911 call tell you to go ahead and try to give her CPR.  Do you remember?

A.   The operator.

Q.   Then tell us what happened next.

A.   As she is talking me through giving CPR, even though I confirmed with her that I knew CPR --

Q.   Let me stop you there for a second.  How did you already know how to give CPR?

A.   I took a class in high school.

Q.   All right.  Do you know if anybody else in your family knew how to do CPR?

A.   My aunt, Romania.

Q.   Now, what did you do -- I'm sorry, I interrupted you.  What were you going to say?

A.   I stopped midway as I was attempting to try to give her CPR because, once again, I realized this vest is in the way.  I can't fully press down on her chest if need be because I might mess up this vest.  I don't want to touch it.  I might get shocked as well.  I even mentioned that to the operator 911 that she has a certain vest on her and if I touch it I may get shocked as well.  She wasn't too clear on the answer and I just broke down and sat there crying next to my mom.

Q.   Did your dad stay in the kitchen at that time?

A.   My dad was basically running, screaming, praying back and forth through the house from the kitchen to their bedroom, back and forth just asking God to help us.  I was trying to stay calm the whole time for him because I need him, too.

Q.   Did fire rescue eventually get there?

A.   Yeah, they did.

Q.   What happened when they got there?

A.   They asked what the situation was, we told them.  They told

us to clear the way.  They put her on a little gurney and took her out to the ambulance truck.  We were told that they got a pulse but failed and they got a pulse again and it failed.  Then they were able to get a pulse again.  They were able to hold that pulse to take her to the hospital, the pulse failed.  They tried again, they got her stabilized but at that point they told us that -- they told us that she won't be the same, from our understanding.

Q.  Did you ever see -- did you ever see your mom regain consciousness?

A.  Not fully.

Q.  What did you see?

A.  From our perspective I seen her trying to either say something, but she is not moving, eyes, mouth, fingers, nothing.  It's like she is trapped and she is trying to say something and I didn't know what.

Q.  Where did you see this?

A.  In the hospital.

Q.  Did you immediately go to the hospital after the incident?

A.  After the ambulance took my mom, my dad left in the car and followed the ambulance truck.  I stayed back to lock up the house.  I stayed on the phone with my dad or called him and asked him where they were, which hospital they took her, too, they took her to one, transported her to another one.

Also, called my aunt.  My aunt came over as well for

support to try to figure out what was going on and I met her at the hospital waiting for doctors, nurses to give us some indication of what just happened.

Q.  Okay.  Was there a point in time that she was put on life support at the hospital?

A.  Yes.

Q.  I'm sorry, sir.  I need to back up for a second.

Do you remember when the paramedics came in?

A.  Yes.

Q.  Did you see them do anything forcible with the vest at all?

A.  No.

Q.  What was last time you saw the vest, if you remember?

A.  The last time I seen the vest was at the hospital.  It was literally sitting next to my mom's gurney in one of the rooms that we are not allowed in but, you know, but employees are and they had a little bag so I am assuming they took it off after they got a pulse to finish --

Q.  Did there come a point in time that they put your mom on life support at the hospital?

A.  Right.

Q.  Do you remember when that was?  Do you know if it was the same day or the next day?  Do you remember the sequence is essentially what I want to find out?

A.  I really can't say.  I would just say it's the same day but more than likely probably turning to the morning.

Q.   Okay.   Did there come a time that the doctors asked whether -- if she had another heart episode whether the family would resuscitate or not?

A.   No, I don't recall.

Q.   Say that again.

A.   I don't recall.

Q.   Did there come a point in time where the family decided not to take her -- to take her off the life support and not resuscitate?

A.   No, I don't recall.

Q.   Do you remember -- what do you remember at the hospital, if anything?   Let me withdraw the question.

Do you remember being in the hospital room with her?

A.   Yes.

Q.   Do you remember talking to her while she was unconscious?

A.   Yes.

Q.   Do you remember -- I'm sorry, just please tell us what else you remember.

A.   I just remember everybody gathering around trying to, you know, talk to her, see if she will wake up, hoping for the best, saying that she could beat this, she could make it out of this, she came so far, just trying to lift everybody's spirit.

In the meantime, doing that we were just waiting for doctors trying to give us answers and they just told us she had a weak heart and she didn't have -- there wasn't enough time

for her to get oxygen to her brain so she is going to be in a different state, and at that point we all lost it.  Then the doctor gave us some time to process, asked us if he wanted to keep her alive in this state and, of course, we do but we just felt like she has been through too much.  She wouldn't -- even though she is a fighter, she has been through too much and at some point we just think it was just enough for her and, plain English, pulled the plug, obviously.

Q.   Do you remember how your aunt was during that time at the hospital?

A.   She was really torn up about the situation but at the same time she was trying to stay strong for me and my dad.

Q.   Do you remember how your dad was at that time in the hospital?

A.   He was like -- he was just, I guess you could say like a baby, just full of tears, full of hurt like I was, but it was just a bad day.

Q.   How many days were you in the hospital before she -- before you, the family, had to take her off of the support and not resuscitate?

A.   Two days.

Q.   How has this affected your dad since then?

A.   It has affected him a lot.  He is -- obviously, he doesn't try to show it because he is trying to be strong but he is hurting, I'm hurting.  He is in a tremendous amount of pain.  I

think he is depressed.  He hasn't come to terms with what has happened and it's hard for him to let go and understand that he can't be part to blame because we did pretty much all we could. Understand she is in a better place.

Q.   Do you think he's changed since then?

A.   I mean, me and him got closer, I could say that.

Q.   Do you know if he has ever gone and sought any professional help because of it?

A.   No.

Q.   What about you, how did that affect you?

A.   It leaves me depressed but I tend to try not to think about it because, obviously, who just wants to be sad and miserable all day?  You don't get things done, you can't move on in life. It just puts you in a horrible state, so I focus and cope on work and try to be around my family even more than ever because I guess you could say when my mom was alive, my mom always forced, tried to enforce the issue that family is important, we all need to come together, but sure enough, really, now I see it.

Q.   Do you miss your mom?

A.   Yes.

Q.   How has your mom's passing affected your direction?

A.   It has left me kind of confused.  I came to my mom for a lot of things.  She gave me a lot of direction as well and since she is not here, after a while my aunt is not the same

but I feel she is the last mother figure I have, so I am just trying to figure out.

Q.   What kind of man do you want to grow into or what kind of man do you want to grow into for your mom?  What do you think she would like to see?

A.   She would want me to be -- she would just want me to an good person.

Q.   You think you are a good person?

A.   I think so.

Q.   Have you ever been in any kind of trouble?

A.   No, sir.

Q.   How have you been doing to support yourself financially?

A.   Just always trying to keep a job.  If I need be, I work more than one job, try and support myself.  Honestly, try and support my dad because to help my dad because he has done so much for me and my mom, but it's a struggle.  It's a struggle.

Q.   Did your mom want you to go to college?  Did your mom want you to go to school to complete your education?

A.   Yeah, my mom wanted me to go to college for two reasons, one, to obviously put myself in a better position in life, and also because she never finished college.  She did a couple of semesters and never finished.  She always wanted to go back and never got a chance to because she was busy raising me.

Q.   Do you have any -- what kind of plans do you have?

A.   Well, if I went to college I was trying to go to school to

be a radiation therapist but I'm thinking that might not be in my cards.  I think I would probably go to school to learn business so maybe I could one day open up a production company of my own.

MR. HERNANDEZ:  Excuse me one second.

Your Honor, I would just like to ask a couple of more questions.

Can you cue up Plaintiffs' 22?

THE COURT:  Sir, what exhibit?

MR. HERNANDEZ:  Plaintiffs' 22, Your Honor, it's already in evidence.  I just wanted to scroll through it then. Let's just start with page one.

BY MR. HERNANDEZ:

Q.   Sir, do you remember -- I am going to go through them one by one, but do you remember these pictures?

A.   Yes.

Q.   Let me go to page two, do you remember this picture?

A.   Yes.

Q.   I am going to go to page three.  Do you remember this picture?

A.   I remember seeing it but I don't remember actually that memory.

Q.   You were too young?

A.   Yeah.

Q.   Let me go to page six.  Do you remember this picture?

A.   No, I don't, but I remember seeing it later on.  I remember the house, though.

Q.   Does it bring good memories to remember your mom like this?

A.   Yeah.

Q.   Let me go to page 14.  Do you remember any of these?

A.   Yeah, that was actually I was graduating from preschool, I am not sure, or VPK, something like that.

Q.   Let me go to the 15th page.  Do you remember these pictures?

A.   Yeah, I remember.  My mom bought me that.

Q.   You remember what?

A.   I said I remember that photo.  My mom bought me a bracelet that I still have to this day.

Q.   Go to the next page.  What about these older pictures?

A.   Yeah, I remember those -- I remember that shark.

Q.   Let me go to page 18.  Do you remember these pictures, sir?

A.   Yes, I remember them.

Q.   You were a little bit heavier back then?

A.   Yeah, on the chunky side.

Q.   Now, at your house do you do anything to keep your mother's memory physically day-to-day?

A.   Yes.

Q.   What do you do?

A.   I have, I guess you could say a little shrine for my mother's ashes, some photos of her and me, some of her

achievements.

Q.   Are you talking about an urn?

A.   Yes.

Q.   And on your closet, what do you have there?

A.   I have the visitor sticker from the hospital of the day my mom passed, I actually wrote down the exact time as well so something to look at.

Q.   Every time you go into --

A.   My closet.

MR. HERNANDEZ:   Thank you, Your Honor.   No further questions.

THE COURT:   All right.   Cross.

MR. DEMAHY:   May it please the Court.

May I proceed, Your Honor?

THE COURT:   Sure.

CROSS-EXAMINATION

BY MR. DEMAHY:

Q.   Good afternoon, Sterling.   Can I call you Sterling?

A.   Yes, sir.

Q.   I know that this is difficult for you, but can I ask you some questions about the things you have testified to?

A.   Yes, sir.

Q.   The monitor is in the way so I can't really get a good look at you.   I want to start by addressing something that you said.

Do you remember when Mr. Hernandez asked you what your

reaction was when I told the jury in opening statement that when you walked into the kitchen you saw your stepfather shaking your mother?

Do you remember that question?

A. Yes, sir.

Q. And you said you were shocked because I had misrepresented your testimony to the jury. Is that what you said?

A. Yes, sir.

Q. Do you remember testifying in your deposition almost three years ago?

A. Yes, sir.

Q. Have you read it?

A. Yes, sir.

MR. DEMAHY: Judge, may I approach the bench and give him this?

THE COURT: Sure.

BY MR. DEMAHY:

Q. I am going to show you pages 50 and 51 of your deposition taken October 11th, 2016, and I blocked off exactly this topic. I am going to show it to you and ask you to read it to the jury. Okay?

MR. HERNANDEZ: Your Honor, I am going to object. It's improper. I don't even know that it's impeachment, but it's improper impeachment.

THE COURT: We will see. Overruled.

BY MR. DEMAHY:

Q.   Let me know when you have read it.

A.   Okay.

Q.   Didn't you testify that when you walked in your stepfather was shaking your mother and, not only that, but he was doing it at a moderate strength level for several seconds?  Did you say that?

A.   I didn't say seven seconds.

Q.   Several seconds.

A.   Several seconds, but, yes, I did say that.

Q.   Do you still think I misrepresented your testimony to the jury?

A.   I believe so.  My words in this document that I stated, I believe they are arguable because medium is not -- in my opinion, medium is not forceful.  I mean, if you tap somebody no one is going to feel it.  You have to obviously put some effort into it to get somebody's attention and that's all my dad was trying to do.

Q.   How about the part where you said he was shaking her?  Is that arguable?

A.   He was shaking her hand.

Q.   You didn't say that.  You said he was shaking her.

A.   Right, her.  Her hand is part of her.

        MR. DEMAHY:  May I approach?

        THE COURT:  Yes, sir.

A.   My apologies for not being too detailed, sir.

BY MR. DEMAHY:

Q.   I know this is difficult for you, but there are some questions that I do need to follow up on.

A.   Okay.

Q.   Let's go back in time.  Do you remember when your mother was diagnosed with kidney failure?

A.   I don't remember the exact year.

Q.   Approximately, goes back to 2007, 2008.  Do you remember?

A.   For kidney failure?

Q.   When she started to have kidney failure?

A.   I can't agree with that.

Q.   Do you remember in 2010, Dr. Gadh -- do you know who Dr. Gadh is?

A.   I remember his name before.  Never met him personally.

Q.   If he said he had a meeting with you, your mother and your stepfather to discuss her condition --

        MR. HERNANDEZ:  Objection, Your Honor.

        THE COURT:  Sustained to the form of the question.

BY MR. DEMAHY:

Q.   You don't remember meeting him?

A.   I mean, I meet lots of doctors.  To meet him and have a conversation at that age about something medical, I doubt I am going to actually remember the technical terms.

Q.   You don't remember meeting him at all.  Correct?

A.   I mean, I don't know.

Q.   Well, do you remember meeting him at all?

MR. HERNANDEZ:  Objection, Your Honor.  Asked and answered.

THE COURT:  Overruled.  You can answer.

A.   I honestly don't know.  I have seen many doctors.

BY MR. DEMAHY:

Q.   Your mother saw many doctors, didn't she?

A.   Yes, she did.

Q.   Do you remember anybody discussing it, including your mother and your stepfather, discussing with you the fact that around 2017 your mother was diagnosed with end stage renal failure?

A.   It was mentioned from, obviously, my dad and my aunt.

Q.   So you understood your mom had a disease that was going to end her life?

A.   Not end her life because I think my parents, because my dad and mom wouldn't tell me that at such a young age, but they would say she is sick.

Q.   I agree with that, that was never discussed with you that you can recall?

A.   No.

Q.   By the same token, nobody told you that she had a short life expectancy at that point.  Right?

A.   No.

Q.   You just knew she was very ill?

A.   Yes.

Q.   And as you told Mr. Hernandez, she continued to get worse for a period of years?

A.   Yes, I seen it.

Q.   You saw it, you experienced it?

A.   Yes.

Q.   It could not have been easy for you to watch her deteriorate like that, could it?

A.   No.

Q.   And you knew she was on daily dialysis.  Correct?

A.   Yes.

Q.   And you saw that.  Correct?

A.   Yes, I have.

Q.   That couldn't have been easy for you?

A.   No.

Q.   You knew she had diabetes she was having trouble controlling?

A.   At first, but we got control of it.

Q.   You knew what she had high blood pressure she was having trouble controlling.  If you don't know, you can say you don't know?

A.   I believe she had it but I believe we had it under control as a family.

Q.   You knew that she had something called gastroparesis that

affected her stomach.  Correct?

A.  Correct.

Q.  You knew that she had lost her vision in one eye.  Right?

A.  Yes, sir.

Q.  And she became disabled and couldn't work?

A.  Yes, sir.

Q.  Those things could not have been easy for you, Sterling.
Is that correct?

A.  Correct.

Q.  But you lived through that?

A.  I managed through it.

Q.  You managed to live through that difficult period?

A.  And I am still going through it now.

Q.  Yes, sir.  But you lived through it and you managed to live
through it even though it was very difficult.  Correct?

A.  Correct.

Q.  That's one of the reasons you didn't want your mother to
suffer anymore when, as you say, you pulled the plug?

A.  Right.

Q.  Then she started to have heart problems.  Right?

A.  Correct.

Q.  Now, before I ask you about that, 2013 was a bad year.  She
went to the hospital many times, didn't she?

A.  Very consistent.

Q.  She was consistently going to the hospital because of her

condition.  Fair?

A.   Fair.

Q.   And you saw her passed out on the floor on more than one occasion before this event.  Correct?

A.   No.

Q.   You did not?

I will go back to that in a second.  Is it your testimony that you don't remember her being passed out on several occasions?

A.   Excuse me?

Q.   Is it your testimony that you do not recall seeing her passed out on several occasions?

A.   Several occasions.

Q.   Two or three?

A.   Two or three occasions?

Q.   Yes, sir?

A.   I seen my mother pass out before but what you just stated was that she passed out on the floor.  I never saw my mom pass out on the floor more than once, which is when she passed away.

Q.   You saw her pass out on a couple of occasions?

A.   A couple of occasions.

Q.   Yes, that's what I asked you.

A.   Yes.

Q.   Now, when she had her heart attack on November 1st, 2013, before the LifeVest ever came into the picture, did your

parents discuss with you what was going on with her heart?

A.  No, they don't want me to worry because they know I am a worrier, but they really tried it keep it as PG as possible and said, "Mommy is sick, she has got a weak heart," and that's pretty much it.  "She is going to get better."

Q.  Did they tell you how sick her heart was?

A.  No.

Q.  Did you ever hear the name of Dr. Jurkovich, a cardiologist that met with her?

A.  I heard the name.

Q.  Did you ever meet with him?

A.  I couldn't tell you.

Q.  You testified earlier in answer to some of Mr. Hernandez's questions that one of the ways that you, as a family, got together to deal with her serious illness was that you would get together and you would learn about her condition so that you could all learn to live with it and to help her.  Do you remember that?

A.  Yes.

Q.  Did you do anything to learn about her heart condition so you could actually assist her if she had a heart attack?

A.  No, not for the heart attack.

Q.  Did you know that when she had a heart attack November 1st, 2013, that the hospital offered a home healthcare nurse would go ahead and stay with her?  Did they tell you that?

A.   They didn't tell me that.  I believe that they told my aunt and my dad that and they relayed the message to me that there is a possibility that we might go with when this option.

Q.   Do you know that they rejected it?  Did they tell you they rejected it?

A.   I can't remember.

Q.   You had some knowledge of CPR but not a lot.  Correct?

A.   I took a class.

Q.   You weren't certified, though?

A.   Not certified.

Q.   And you had never given it before?

A.   Never, no.

Q.   At one point after she left the hospital from that heart attack, you learned that she was going to be wearing some kind of a medical device called a LifeVest.  Correct?

A.   Correct.  Yes.

Q.   Did you know that had been prescribed by her cardiologist?

A.   No, but I knew it had to be prescribed by somebody.

Q.   In other words, you don't go walk into the Walgreens and just buy one, the doctor has to decide it's something that you can use and then you have to be prescribed.  Correct?

A.   Yes, I know a doctor prescribed it.

Q.   Now, did you know that your mother and your stepfather met with a representative of Zoll on two separate occasions to have the device described and educated them on it?  Did you know

that?

A.   Yes, I did.

Q.   Were you present on one occasion when the Zoll representative came to your house and spent time there going over this defibrillator device with your parents?

Were you there?

A.   I can't remember.

Q.   Did you know that you could just call Zoll any time you wanted and they would send somebody out to help you with any questions or issues or problems with the LifeVest?

A.   Yeah, I did.

Q.   You never called?

A.   No.

Q.   Did you know that the representative of Zoll had given your parents a manual so that they could be thoroughly familiar with this important device that would help with your mother's serious condition?  Did you know that?

A.   No.

Q.   You never read the manual, did you?

A.   No.

Q.   Did you know that your stepfather never read it?

A.   I didn't know that.

Q.   Did you know that your mother never read it?

A.   I didn't know that.

Q.   Would you have wanted to read it?

A.   Of course.

Q.   Now, you talked about you and your stepfather becoming closer since this incident.  Is that a yes?

A.   Yes.

Q.   Your stepfather remarried about a year-and-a-half after your mom passed away.  Correct?

A.   A year-and-a-half?

Q.   Within that period, yes, a year-and-a-half, two years.

A.   I thought it was longer than that, but okay.

Q.   But you don't know?

A.   I don't.

Q.   You don't know, you didn't go to the wedding?

A.   You are giving me a fact, so...

Q.   But you know that he remarried?

A.   Yes, I know he remarried.  I seen her.

Q.   Did you go to the wedding?

A.   No.

Q.   Who do you live with now?

A.   My stepfather, Dennis.

Q.   And his new wife?

A.   Yes, sir.

Q.   It's a good thing he moved on, don't you agree?

         MR. HERNANDEZ:  Objection.

         THE COURT:  Sustained.

BY MR. DEMAHY:

Q.  You testified the last time you saw the LifeVest was when it was returned to your family in the hospital?

A.  Yes.

Q.  Did you know that a cable had been pulled out?

A.  No, I did not.

Q.  You never looked at the vest and saw that somebody had ripped the cable out?

A.  No.

Q.  You didn't do that, obviously?

A.  No.

Q.  And to your knowledge, your stepfather didn't do it?

A.  No.

Q.  And it wasn't ripped out when this event was happening?

A.  No.

Q.  I know it seems difficult for you.

Your mother was a person who was suffering a lot.  You understand that her memory and her legacy and everything she taught you continues to live inside you?

A.  Yes, sir.

MR. DEMAHY:  Thank you, I have nothing further.

THE COURT:  Thank you.  Redirect.

MR. HERNANDEZ:  Your Honor, may I approach?  I wanted to show him the deposition transcript.

THE COURT:  Sure.

REDIRECT EXAMINATION

BY MR. HERNANDEZ:

Q.   Sir, when was the first time that you gave testimony?

A.   A couple of years back.

Q.   At this deposition for this case.  Right?

A.   Correct.

Q.   Have you ever given testimony before?

A.   No, sir.

Q.   Okay.  Now, I want to direct you to page 50 of that deposition and to line 20 through 22.  Do you see that there?

A.   Yes, sir.

Q.   Okay.  Now, Mr. DeMahy asked you a few questions about what you said at that deposition.  I just wanted to point some things out.  You see your deposition in front of you.  Right?

MR. DEMAHY:  Judge, I object.  I think this is improper procedure.  It's his own client.

THE COURT:  I'm sorry, this is what?

MR. DEMAHY:  An improper procedure.  This is his own client.

THE COURT:  Overruled.

BY MR. HERNANDEZ:

Q.   Now, in that question, did the attorney that was there, did he -- did you ever mention that Mr. Godelia -- did you actually say the words that your father was shaking your mom by the arm?  Did you actually say those words?

MR. DEMAHY:  Objection.  Leading, Your Honor.

THE COURT:  Overruled.

BY MR. HERNANDEZ:

Q.   Did those words come out of your mouth at that deposition?

A.   Yes.

Q.   Sir, at the question on line 22, who is asking the question?  Were you asking the question?

MR. DEMAHY:  Your Honor, now he is impeaching his own witness.  I object.

THE COURT:  Overruled.

A.   Line 22, was I asking the question?

BY MR. HERNANDEZ:

Q.   Who was asking the question on line 22?  Well, it wasn't you.  Right?

A.   No, it wasn't me.

Q.   And the words that it says there, "arm" and "shaking," did you say that?  Did you say "arm" and "shaking"?

A.   No.

MR. DEMAHY:  Objection.  He has answered that question.

THE COURT:  Overruled.

BY MR. HERNANDEZ:

Q.   You didn't say that.  Right?

A.   No, I didn't say that.

Q.   So it was defense counsel who asked you that question in that manner.  Right?

A.   Yes.

MR. DEMAHY:  That is incorrect and he should read the entire section in pari materia, as I did.

THE COURT:  Mr. Hernandez, if you will read the entire section.

MR. HERNANDEZ:  Sure.  Absolutely, Your Honor.

BY MR. HERNANDEZ:

Q.  Do you remember this?

"Question:  And when you went in there and saw your mom lying on the floor, was Mr. Godelia actually holding your mom by the arm and shaking her?

"Answer:  Yes."

MR. DEMAHY:  The rest of it, Counsel, in pari materia.

THE COURT:  Counsel, let him continue.  Just to be clear, you want him to read to where so that we are all --

MR. DEMAHY:  Where I read, page 51 because it continues in pari materia, it goes to exactly where I had him read it, page 51, line nine.

MR. HERNANDEZ:  I am going to get there as well.

THE COURT:  Well, I prefer that you read the whole thing.  You can follow up after you do that.

MR. HERNANDEZ:  No problem, Your Honor.  You want me to read all the way through?

MR. DEMAHY:  Sure, so the jury can have it.

MR. HERNANDEZ:  No problem.

BY MR. HERNANDEZ:

Q.   The next question on line 24 after you say yes, the very next question:

"Is there any way can recall kind of --

"Answer:  How close?

"Question:  Yes, both.  Well, kind of how forceful it was and how long he was shaking her for?

"Answer:  Yes, it wasn't ridiculous.  It was probably medium, not ridiculous but medium, and he probably did it for a couple of seconds and then at that point he just let go and started breaking down and crying and stuff like that."

MR. DEMAHY:  Counsel, you didn't read line 20 through 24.

MR. HERNANDEZ:  I just read that, sir, earlier.

MR. DEMAHY:  You started on line 25.

MR. HERNANDEZ:  After I read line 20 to 24.

THE COURT:  Why don't you both go look at the same page so you are clear what you both read.

MR. HERNANDEZ:  I already read that.

MR. DEMAHY:  But you didn't read it together.  In pari materia.

MR. HERNANDEZ:  Your Honor, counsel is asking me to re-read the whole thing together.

THE COURT:  Gentlemen, the whole passage that deals with this section, just re-read it and then you can ask whatever follow-up questions you want.

MR. HERNANDEZ:  All right.

I am going to start all over again.

BY MR. HERNANDEZ:

Q.  Okay.  "Question:  And when you went in there and saw your mom lying on the floor, was Mr. Godelia actually holding your mom by the arm and shaking her?

"Answer:  Yes.

"Question:  Is there any way can recall, kind of --

"Answer:  How close?

"Question:  Yes.  Both.  Well, kind of how forceful it was and how long he was shaking her for.

"Yes, it wasn't ridiculous, it was probably medium, not ridiculous but medium and he probably did it for a couple of seconds, and then at that point he just let go and started shaking, breaking down and crying and stuff like that."

Now, in those questions.  Who was saying the words "shaking"?  Who was saying "arm," you or the defense counsel?

A.  The defense counsel.

Q.  Did you ever -- did he ever ask you to clarify at all what part of the arm?

A.  No.

Q.  Tell them what part your dad was holding on your mom.

A.  He was holding my mom's right arm as she was laying on the floor and he was shaking her hand to get her to release, grabbing it or something but, obviously, she just was not

responding.

Q.   Okay.  Can you demonstrate for them how hard he was shaking?

A.   Probably like this, which isn't too bad, but the way this sounds it's like this, which is not the case at all.

Q.   Counsel asked you a series of questions and he made them sound as if they are all facts.

MR. DEMAHY:  Counsel, Your Honor, I don't appreciate the comment.

THE COURT:  Just ask the question.

BY MR. HERNANDEZ:

Q.   For example, I will give you an example.  With respect to the LifeVest, do you know if anybody at any time ever pulled any cables from it?

A.   No, not that I know of.

MR. HERNANDEZ:  One second, Your Honor.

No further questions, Your Honor.

THE COURT:  Ladies and gentlemen, do any of you have any questions?

All right.  You may step down, sir.

THE WITNESS:  Thank you, sir.  Thank you, Your Honor.

THE COURT:  With the couple of breaks where they weren't intended, which is fine, I am not blaming anyone but I lost track of when we last took a break.

Does anyone need a break?

Please call your next witness.

MR. LEE:  Your Honor, Mr. Eric Hernandez is going to be Samantha Orsini and I will ask the questions.

THE COURT:  Okay.

Ladies and gentlemen, the next witness will be presented by deposition testimony.  As I told you before, please consider that testimony as you would as if the witness testified live.  From the statement, I am assuming it's not a video.  The attorneys are going to read the transcript of that deposition.

MR. HERNANDEZ:  Your Honor, you want me to sit on the stand?

THE COURT:  Sure.

This is the testimony of Samantha Orsini?

MR. LEE:  Yes, Your Honor.  She is the rep, the PSR that went out to fit Ms. Godelia -- she was the first one or the second one?

MR. COHEN:  Ms. Orsini.

MR. LEE:  First one.

MR. COHEN:  She did the hospital fit.

THE COURT:  Okay.

MR. LEE:  Whenever you are ready.

(Portions of the deposition of Samantha Orsini were read as follows.)

DIRECT EXAMINATION

BY MR. LEE:

Q. Can you give us your name for the record?

A. Samantha Orsini.

Q. Give us your brief educational background, page five.

A. Medical assistant.

Q. What year did you study?

A. I don't recall.  I don't remember the year.

Q. How long ago?

A. I was 18, so ten years ago.

Q. Page six.  Do you have any other degrees besides your medical assistant degree?

A. No.

Q. Where did you obtain your medical assistant degree?

A. BCC.

Q. Give me your work history before.  How are you currently employed?

A. Subcontractor for Zoll.

Q. How long have you been a subcontractor?

A. I don't exactly know.

Q. Approximately?

A. Approximately, five years.

Q. How were you employed before that?

A. I was a medical assistant for Pinnacle Healthcare.

Q. What did do you as a medical assistant for Pinnacle?

A. Triage patients, check in and out patients.

Q.   How long were you a medical assistant at Pinnacle?

A.   Approximately, nine years.

Q.   Page nine, line 17.

A.   I see it.

Q.   Tell me, how is it that you became a subcontractor with Zoll?  How did that all come to be?

A.   One of the sales representatives made us aware they were hiring for new PSRs and asked if I was interested in taking on that kind of position.

Q.   What steps did you follow to take on that position that you are in now with Zoll?  What happened after the sales rep told you?  What did you do next?

A.   It was a hiring process of you first submit your resumé, they would review it, and then you would go through the proper training.

Q.   How long did the process take from the time you reached out to Zoll until the time you actually became a PSR for Zoll?

A.   I would say approximately three months.

Q.   And in the process, is it fair to say that you submitted your resumé and then you went through whatever training and whatever additional steps until you were approved or authorized to act as a PSR for Zoll?

A.   Yes.

Q.   So what else happened within the three months until you became a PSR?  You submitted your resumé, you did training.

Did anything else happen within that three-month period?

A.   Yes, you do a background check, fingerprints, OSHA training and then I don't specifically remember what it's called but we were trained by a PSR in a conference room how to use the equipment, how to train each patient to use the equipment.

That particular day the PSR there took about eight hours to train us.

Q.   So the training on how to use the LifeVest or how to teach the patients how to use the LifeVest, that was done by a PSR?

A.   Correct.

Q.   That training was done in a span of about eight hours?

A.   Correct.

Q.   So it's been five years you have been with Zoll.  We are now in 2017, so that's about 2012 when you started.

A.   I would say, yes.

Q.   Do you remember when in 2012, 2011, approximately what month?

A.   No.

Q.   Did you receive any other training besides the training we talked about that took eight hours where someone showed you how to use the vest?

A.   Yes.

Q.   What other training did you receive?

A.   We had to sit in on multiple fittings.

Q.   What do you mean?  Sorry, you didn't finish?

A.   Right.  The PSR, we have to watch the PSR do an actual LifeVest fitting with an actual patient.

Q.   So far we have two rounds of training, one where you sit for eight hours and they show you how to do the vest.  Correct?

A.   Correct.

Q.   Then you have the additional training where you actually went to a live training with a PSR that fitted the patient. Correct?

A.   Correct.

Q.   Which one came first, the one you went with the live patient to do the live fitting, or the one where you sat in the training with the PSR to show you how the vest works?

A.   The one with the PSR who showed us how the LifeVest worked.

Q.   And then after that you went to the live training?

A.   Correct.

Q.   To see an actual fitting?

A.   Correct.

Q.   What other training did you receive besides the two trainings we've talked about, and I say two, I grouped them, the one where you met with the PSR to learn how to use the vest, that's one, and the second where you went to a live fitting, that's number two.

     Did you receive any additional training before you became active as a PSR fitter?

A.   No.

Q.   The live fitting training, how many of those did you do?

A.   I don't recall.  I do recall that there were multiple.

Q.   And this was multiple within that three-month span?

A.   Yes.

Q.   When you say "multiple," are you able to approximate a number?  Was it more than ten, less than ten?

A.   Less than ten.

Q.   More than five, less than five?

A.   More than five.

Q.   So somewhere between five and ten?

A.   Approximately.

Q.   What would you do during those live fitting training events?  What would happen?

A.   We would have different case scenarios where the PSR would train the patient and I would just stand in the room and observe, and then different scenarios where I would train the patient and the PSR assisted me in training the patient.

Q.   It was a little bit of both, and let's say out of the five to ten, the beginning ones where you observed and then the later trainings you actually did something and the PSR observed.  Is that a fair way to categorize it?

A.   Yes.

Q.   Out of the five to ten, how many would you say you actually observed and how many would you say you actually did the fitting and the PSR observed?

A.   I would say it was 50/50.

Q.   Besides these two types of training you talked about, did you receive any additional training between that three-month span when you were authorized to be a PSR?

A.   No.

Q.   Well, there was OSHA training but we are not interested in the OSHA training.

A.   Right, we are discussing --

Q.   The LifeVest training.

A.   -- the LifeVest training.  Correct.

Q.   Now, since you became a PSR, did you receive any additional training, line 20?

A.   No.

Q.   So if my math is correct, you started as a PSR in about 2012 and the training you received as it relates to the LifeVest and fitting the LifeVest on patients would have been between the three-month period before you became authorized as a PSR with respect to the LifeVest.  Correct?

A.   I'm sorry, can you repeat the question?

Q.   So from the time you applied to become a PSR for Zoll, the extent of training you received as it relates to the fitting of the LifeVest and placing the LifeVest on patients -- oh, I'm sorry.

So from the time that you applied to become a PSR for Zoll, the extent of the training you received as it relates to

fitting the LifeVest and placing the LifeVest on patients would have been trainings that we talked about?

A.   Yes.

MR. LEE:  Your Honor, we will file a transcript to save her the hassle.

We will file a transcript so Ms. Diaz doesn't have to take it.

MR. COHEN:  Okay.

(The remainder of the deposition was read back and filed with the Court without the need to transcribe as per agreement.)

THE COURT:  Mr. Lee, before we go forward and figure that out, why don't we take ten minutes and then we will come back.

(The jury exited the courtroom at 4:59 p.m.)

THE COURT:  All right.  Ten minutes.

(Brief recess.)

THE COURT:  All right.  All set.

(The jury entered the courtroom at 5:12 p.m.)

THE COURT:  All right.  Please be seated.  Whenever you are ready.

(The reading of the deposition of Ms. Orsini continued.)

THE COURT:  Do we have any further testimony for today?

MR. HERNANDEZ:  Yes, Your Honor.

THE COURT: Okay.

MR. HERNANDEZ: Would you like us to call him?

THE COURT: Sure.

MR. HERNANDEZ: Your Honor, could I run to the restroom?

THE COURT: Sure.

MR. DEMAHY: Judge, are we still on schedule for 6 o'clock, as usual?

THE COURT: Yes, sir.

MR. DEMAHY: Thank you.

THE COURT: Mr. Lee, who will be your next witness?

MR. LEE: Mr. Godelia. Eric is doing the direct.

THE COURT: Okay.

Sir, watch your step.

(The witness, Dennis Godelia, was duly sworn.)

COURTROOM DEPUTY: Please be seated. State and spell your first and last name for the record.

THE WITNESS: Dennis, D-E-N-N-I-S, Godelia, G-O-D-E-L-I-A.

THE COURT: Okay. Wait there for just a moment.

While we are waiting, ladies and gentlemen, I did tell you earlier that we were going to continue the testimony of Dr. Anand tomorrow, but the parties had some further discussion. He said that that testimony will be continued on Friday, so we will still continue tomorrow to take other

witnesses out of turn.

All right.  Are you ready to proceed?

MR. HERNANDEZ:  Yes, Your Honor, just give me a minute.

DIRECT EXAMINATION

BY MR. HERNANDEZ:

Q.   Mr. Godelia, please introduce yourself to the jury.

A.   My name is Dennis Godelia.

Q.   Where are you originally from?

A.   I am from Jamaica.

Q.   What do you do for a living?

A.   I am a welder.

Q.   Since when have you been welding?

A.   I have been welding with steel fabricators since 2014, but I have been welding pretty much since I came to this country.

Q.   Okay.  Are you a U.S. citizen?

A.   Yes, sir.

Q.   All right.  First of all, what relation do you have to Ms. Debra Lee Lawyer Godelia?

A.   She is my deceased wife.

Q.   When did you first meet Ms. Godelia?

A.   I met Ms. Godelia in 1997.

Q.   Can you please tell the jury how you first met her?

A.   My sister worked with her at Eckerd's.  At the time I used to go get my sister but my sister is always lingering, so I went inside because she was pregnant at the time, my sister

was.  I went inside to tell her to hurry up, so when I went to tell her to hurry up and come, I looked and there was this lady standing there taking care of her.  So I just took her bag and walked outside right quick.

Q.  What happened after that?

A.  When I went outside?

Q.  Uh-huh.

A.  My sister came out and before I could ask her, "Who is that," my sister said, "Here is her number, she likes you, too."

Q.  All right.  Tell us how the dating relationship started.

A.  The dating relationship started out real good.  You know, we used to go -- we would go to the movies.

Q.  Let me stop you, how did you first communicate?

A.  By phone.  We didn't have cell phone so she used to go to the corner store and call me from the cell phone.  I remember one particular time it was raining and I was at the house and she says, "Babe, are you up?"  I says, "You know it's raining?"  She says, "Yeah, I'm out there, I am here."

I said, "You are in the rain?"  She said, "Yes."  I said, "Why would you do that?

"I just want to talk to you."

I said, "Okay, just hurry up and get out of the rain," so we talked and she left and got out of the rain.

Q.  How long before you started talking on the phone and having

a relationship did you learn about Sterling?

A.   Pretty much like the first date.

Q.   And what was her attitude with respect to dating her?

A.   She basically said, "I have a son so if you are going to take me you have to take him, too."

Q.   Okay.  Now, did you ever come to meet Auntie Romania?

A.   Yes.

Q.   And how was she a part of your family?

A.   She is Debra's aunt.

Q.   Can you describe to the jury what relationship she had with you and Debra and Sterling?

A.   Oh, we were all one big family because just the four of us pretty much -- just the four people that basically we all interact with each other, pretty much always, every time we have to go over auntie's house and auntie come over my house. As a matter of fact, I had a big dog and my dog was the only person -- she was the only person that could come in the house that was not really by the three of us, she was the only outsider that could come in the house because she didn't like strangers at all.  Auntie came over so often that my dog just got used to her and she loved her.

Q.   Tell me about the first time you met Sterling.

A.   I was at the house and she brought Sterling over and she said, "Here is my son."  I'm like, "Okay."

Q.   What was Sterling's reaction?

A.   He was looking like, who is this guy.

Q.   About how old was he?

A.   I think he was about three.

Q.   Okay.  Did that relationship change with Sterling?

A.   Yeah.  At first he was like, you know, but as we go out more often because we used to go to a lot of movies.  We had a thing called -- we got movie nights where like Friday night at the house we usually watch.  She would pick, this week is my week, baby, next week is mine, and the other week is Sterling.  Sterling sometimes not really have too much attention, but we do the same thing when we go out to the movies.  Like almost every week we have like a particular movie night.  She said, "This movie night, is my week."  And I'm like, "Okay."  Sometimes it's a scary movie.  I don't like scary movie too much but I said, "Let me sit here with my eyes like this."

Q.   You are a pretty big guy to be scared at a scary movie.

A.   The reason why not I am too particular about scary movies, I grew up Jamaica and most part in the countryside is pretty dark and grandparents always tell you about a scary, you know, a ghost is going to take you or something.  So I have that mentality.  Scary movies scare me a lot.

Q.   Did you eventually get married?

A.   Yes, sir.

Q.   How did you ask for her hand or -- let me back up for a second.  Did you break up before you got married?

A.   Yes, we did.

Q.   Let me stop you there.

A.   Yes, we did.

Q.   Did you patch it up?

A.   Yes, we did.

Q.   How did you do that?

A.   Begging her.  I begged auntie, anybody that could get me close or speak for me on my behalf I would beg them to talk to her for me.  At that time I stopped shaving my beard.  I looked like a crazy man because I was, like, I am not going to do anything until I get her back.

When she saw me the first time, she was like, "Uggh, what's wrong with you?"  I said, "Give me a chance."

She said, "Okay, I'm going to talk to you, give you a chance to talk," but she still wasn't with me.  But I begged auntie.  I begged auntie so much she would get tired of me, I knew that.

Q.   Did there come a time where you asked Auntie Romania for her blessing?

A.   Yes.

Q.   Can you tell us about that?

A.   She said that auntie is an intricate part of her life and she says, "I value her opinion."  So she says, "This is the one person that I would like you to ask," and I said, "Okay, I will go and ask her."  And auntie gave me a big hug when I asked her

and she said, "You have my blessings."

Q. What year did you get married?

A. We got married in 2000.

Q. Do you remember the date?

A. I don't remember the date and she will kill me for that. I know it was January.

Q. Okay. So, let me pull up Exhibit 22, the last page. What is this a picture of?

A. That's in Las Vegas.

Q. Was this the wedding day or what was this?

A. This was the day we got married and went back to the hotel because they stole our clothes.

Q. Explain that to me. What do you mean they stole your clothes?

A. Well, we were supposed to leave and go to Las Vegas and get married. The plane was supposed to be at 9:00 a.m. in the morning. It was like late because the plane broke down. When we got there, everybody's luggage was off the plane except ours. The only clothes we had was that right there.

Q. Did that stop you from getting married?

A. No, we got married. As a matter of fact, the hotel kind of like heard about our story and gave us a bottle of champagne or something. They said, "We are going to give you a bottle of champagne for the night," so we got a bottle of champagne.

Q. Now, during this time, what do you call Debra?

A.   I call her baby or bae.

Q.   I am going to call her Debra.

A.   Okay.  No problem.

Q.   During this time when you started working, did there ever come a time that you lived with Auntie Romania?

A.   Yes.  Yes.

Q.   And with Debra and Sterling?

A.   Yes.

Q.   And were you a family unit at that time?

A.   Yes.

Q.   During that time, what did Debra do for a living?

A.   She worked at Eckerd's at night part-time and she was a correction officer -- she used to work by the stadium, the old -- now it's the baseball stadium but back then it was the Orange Bowl as a corrections officer.  Like people that were in an abusive relationship and things like that, she will talk to them and try to get counseling for them and stuff like that.

Q.   After that, where did she work after that?

A.   She went to -- it's Space Coast now but back then it used to be called Eastern Financial.

Q.   Do you know what she did over there?

A.   She was a records specialist.

Q.   And after that, did she have another job after that?

A.   After that she went to All About Staffing.

Q.   Did she enjoy working?

A.   Oh, yeah.  One thing about her, she always loved working.

Q.   Who ran the household?

A.   I called her the boss.  She was the boss, yeah.

Q.   Who did the bills?

A.   She did.

Q.   Who else did she help you with?  Can you tell the jury certain things she helped you with that you appreciated?

A.   Well, I could tell you this much:  Every present, every gift that I've ever gotten, she is the one that bought it. Everything, every single thing that I got, she will be -- she have a big thing about surprises.  She is -- for some strange reason, I love -- she knows I love fish and for some strange reason she bought me a 106-gallon aquarium without me knowing it was coming because I had to leave.  She sent me somewhere to get something and when I got back the fish tank was in the house.

Another instance she -- I have a Chevy truck.  I was like, "Man, one day I want to get some rims on this thing."  One day she said, "Baby, I'm going to take your truck."  I said, "Why?"

"I got to move something," and I came back home and she put rims and all kind of stuff on it.  She said, "Baby, there's your birthday present."

That's how she is.  She likes surprises, me, Sterling, auntie.  She loves surprises, loves parties, loves having family get-togethers.

Q.   What about church?

A.   Oh, she loved church.  She loved church.  She loved church. She loved church so much that I wasn't too big on going but she said, "Why don't you" -- I said, "Well, if you can find a Saturday church, I will go."  She found one.  She said, "You don't have an excuse now.  You got to come," so we went to a Saturday church.

Q.   Now, during the years did she start to become sick, or let me back up.

Did she have diabetes during the entire time that you knew her?

A.   Yes.

Q.   And what did -- was she able to function with that?

A.   Of course.

Q.   And during the years, did she start to become sicker?

A.   Yes.

Q.   Did she become disabled at some point?

A.   Yes.

Q.   Even though she was disabled, what kind of work did she do at the house?

A.   She does everything.  She will cook, she will clean, she will wash.  When she was like that, this is how dedicated she was, I was trying to help her one time when she was washing and she says, "No, you are taking my job from me."  And I am like, "What?"  I said, "Babe, I am trying to help you out."  She

said, "No, that's my job.  You are taking my job from me."

So I closed, I said, "Go ahead," you know.

Q.   Did there come a time that she got kidney disease?

A.   Yes.

Q.   And did there come a time in December of 2010 when she went on dialysis?

A.   Yes.

Q.   Tell us a little bit about how that came about.

A.   She have a nephrologist, Dr. Gadh, and we would visit his office.  I mean, every time she goes, I go with her.  If I can't go, auntie will go, and at one point in time he says the function of her kidneys was deteriorating so he says, you know, she might have to go on dialysis.

Q.   Let me ask you a question:  What kind of dialysis did she start on?

A.   From my recollection of, I think they did a PICC line, if I can remember.

Q.   Let me ask it this way --

A.   I am trying to remember.

Q.   Let me ask it this way:  Was the dialysis process you had initially, was it at home or was it at a facility?

A.   She started at a facility at first.

Q.   Did you eventually get to the home dialysis?

A.   Yes, we did.

Q.   Who did all the work for the home dialysis?

A.   I did.

Q.   Did Sterling and Auntie Romania chip in?

A.   Yes, they helped getting the bag set up and get the medication and all of that stuff.  I was the one that basically get all that stuff organized every night and every morning before I leave to work.

Q.   With this dialysis, did that stop her from living?

A.   Oh, no.

Q.   How was her attitude?

A.   Her attitude was great.  As a matter of fact, by us doing that particular type of dialysis she became a lot more mobile than before.  The first one she would have draining moment where she says, "I feel weak and tired," but with this one she was more energized.  She was like, "I am feeling good."  She didn't have that dreary moment.

Q.   Would she dance?

A.   Of course.

Q.   Okay.  Did she ever stop doing the work at the home?

A.   No.

Q.   What about a kidney transplant, did you all ever think about that?

A.   Yes.

Q.   Tell us a little bit about that.

A.   We went to -- Dr. Gadh recommend that we go to Jackson to see if we can get on the kidney transplant list.  We did.

Q.   What happened at Jackson?

A.   They discussed that she was a candidate because of her age and stuff like that.

Q.   All right.  Did you -- what were your plans in terms of getting a transplant?

A.   You mean plans as after -- after she is -- or going to the process of getting it?

Q.   No, no, no.  Did you want to get a transplant?

A.   Yes.

Q.   What were the -- did you ever think about any options about getting a transplant for her?

A.   Yes.

Q.   What were the options?

A.   Well, I would see if I was a candidate for it.  Go ahead.

Q.   All right.  Did you ever get to the point that they checked you out for a match?

A.   No.  They never checked me out for a match.

Q.   Did you think of Sterling to try to ask him about this candidate?

A.   Yes.

Q.   What did you all decide with respect to that?

A.   She thought he was too young.

Q.   How old was he around that time?

A.   I think about 18, 19.  I can't recall directly, I mean, positively, but somewhere around.  He was just becoming a young

man so he was probably about 18 or 19 years old.

Q.   Okay.  What are some of the characteristics that you can tell me about your deceased wife?

A.   Characteristics about her personality?

Q.   Yes, tell us a little bit about her personality.

A.   She was a neat person.  She was a neat freak.  She loved everything in order.  Even the way we backed up the cars neatly in the driveway.  If the wheels were turned she would say, "Babe, you need to turn the wheels straight."  So I would go ahead and turn it straight to make her happy.  She would come out there sometimes I am cutting the grass and she would try to sweep.  I am like, hey.  She said, "Let me help you out."

Q.   What about the lawn work?

A.   The who?

Q.   The lawn work.  Did she try to help you?

A.   Oh yeah, that's what I am saying.  Sometimes I am out there cutting the grass and she would have the broom sweeping the grass off the driveway.  I said, "What are you doing?"  She said, "I am helping you.  Let me do it.  Let me do it.  At least I am doing something."  I said, "I have no problem," so she would grab the broom and sweep and I let her sweep.

Q.   Did you all have any plans as a family?

A.   Yeah.

Q.   Any future plans?

A.   Yeah.

Q.   Tell us about your future plans.

A.   We wanted to have our own business.

Q.   Doing what?

A.   You know, I love fish.  I like having a lot of fish.  She always said, "Babe, we could make this into a business."  She always say, "If you love what you do, you feel like you never work a day in your life."  I said, "That would be one of my things."  She said, "Anything you want to do, I am right there to support you."

We wanted to move to West Miramar.  We used to drive through that neighborhood almost weekly and look at the million dollar homes because it has land.  I said, "With land I can build out a fish pond and have fish to sell."

She said, "Baby, is this your dream?"  I said, "Yes."  Then she said, "I am with you."

Q.   Were you saving for that?

A.   No, it was kind of difficult.  We weren't saving for that.

Q.   How come?

A.   Well, basically, I was the one that was working pretty much, you know.  Financially, at that point, we didn't see that possibly happening any time soon.

Q.   But you can have dreams.  Right?

A.   Oh, we had dreams.

THE COURT:  Is this a good time to take a break?

MR. HERNANDEZ:  Sure.

THE COURT:  Ladies and gentlemen, we will recess for the evening.  We will resume tomorrow at 10 o'clock.  Please don't discuss the case.  We will see you tomorrow morning.

COURT SECURITY OFFICER:  All rise.

(The jury exited the courtroom at 6:00 p.m.)

THE COURT:  Anything you need to take up before we recess for the evening?

MR. DEMAHY:  No, but I would like to discuss just for the --

THE COURT:  Would you come to the microphone, please?

MR. DEMAHY:  For you, more than anything else really, to see the scheduling from our end, because it's winding down on plaintiffs' end.  We have people flying in.  We are having to deal with scheduling.

Mr. Cohen is more familiar than I am.  I think the good news is that it looks like we will be able to complete all of our witnesses Monday.  The bad news is depending upon when they rest, I don't know how much we are going to have.  We have witnesses coming in tonight.  We are going to do as much as we can, assuming they rest tomorrow morning, or lunchtime.

I am not sure we can fill all of what remains on Thursday and all of that remains on Friday because we had problems getting them here.  But, despite that, they are coming over the weekend.  We can finish, I think, by Monday afternoon.

THE COURT:  Mr. Lee, what's the schedule?

MR. LEE: Once he is finished with Mr. Hernandez, that's it. All we have is Mr. Anand briefly when he comes back Friday and that's it.

THE COURT: Okay. So, assuming Mr. Godelia will take us from 11:30, maybe, and then you intend to rest after that?

MR. LEE: Yes.

THE COURT: The arguments will take us probably through lunch. Assuming you are proceeding, you will have witnesses available for tomorrow afternoon?

MR. COHEN: Yes, we have two experts flying in early today, so we are ready to put them on tomorrow.

THE COURT: All right. That will take up the afternoon, I assume.

MR. DEMAHY: And probably the next morning which is why I am saying, I don't know that we can fill in Friday.

THE COURT: I am less concerned about filling Friday.

MR. DEMAHY: We will be ready to go into the afternoon tomorrow. Probably take us to noon Friday. We have Anand coming in so that will take us a little time. We can do things on Friday.

THE COURT: Okay. So, what we can do if we finish a little early, I don't think the jury is going to complain.

MR. DEMAHY: I won't complain.

THE COURT: If we are proceeding, we can do a preliminary review of the instructions.

MR. DEMAHY:  Yes, sir.

MR. LEE:  Your Honor, speed the process through so at least I can be quick with my cross, if any, do you know who is coming tomorrow?

MR. COHEN:  Tomorrow we have we will have Dr. Efimov and Mr. Balancia, and depending on time, as much as we enjoyed your recitation of Ms. Samantha Orsini's deposition --

MR. LEE:  Today is the last day I ever read a deposition, ever in my life.

THE COURT:  Okay.

MR. COHEN:  Just one question on kind of ordering. Given the fact that we know Dr. Anand is going to come in out of order to finish the testimony in the morning, would the Court prefer to hear directed verdict tomorrow or after Dr. Anand's testimony tomorrow?

THE COURT:  Oh, that's right.

MR. COHEN:  The reason I ask is Ms. Orsini is only available tomorrow morning.

THE COURT:  I forgot about the fact that I can't take up the directed verdict until they rest.  So, why don't you have her in the morning?

MR. COHEN:  She will be ready to go as soon as Mr. Godelia is done.

THE COURT:  Okay.  So, we will have argument on Friday after Dr. Anand testifies.

And if you like, of course, I will advise the jury that we are taking the defense witness out of turn because of the scheduling issue.

Okay.  We will be in recess until tomorrow.

(The proceedings were concluded at 6:04 p.m.)


C E R T I F I C A T E


I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.



March 14, 2022          /s/Patricia Diaz
DATE                    PATRICIA DIAZ, RPR, FPR, FCRR
                        Official Court Reporter
                        United States District Court
                        400 North Miami Avenue, Eleventh Floor
                        Miami, Florida 33128
                        (305) 523-5178

'

**'60s** [1] - 19:11
**'61** [1] - 20:10
**'70s** [1] - 19:11

/

**/s/Patricia** [1] - 121:13

1

**1** [2] - 10:2, 10:11
**10** [1] - 118:2
**106-gallon** [1] - 111:13
**10:05** [1] - 7:17
**10X** [1] - 42:17
**11/1/2013** [1] - 41:2
**11:26** [1] - 9:4
**11:30** [1] - 119:5
**11:39** [1] - 9:18
**11th** [1] - 77:19
**12** [2] - 3:19, 41:7
**120183** [1] - 3:21
**12:04** [1] - 10:5
**12:05** [2] - 9:11, 9:21
**12:15** [2] - 9:5, 9:20
**14** [1] - 75:5
**15** [1] - 13:6
**153** [1] - 4:21
**15th** [1] - 75:8
**16-CV-60471** [1] - 3:3
**17** [1] - 97:3
**18** [5] - 59:14, 75:16, 96:9, 115:24, 116:1
**19** [3] - 50:6, 115:24, 116:1
**1997** [1] - 104:21
**1:31** [1] - 15:25
**1st** [4] - 16:22, 40:8, 83:24, 84:23

2

**2** [1] - 40:2
**20** [4] - 89:9, 92:11, 92:15, 101:12
**200** [2] - 23:15, 23:20
**2000** [1] - 109:3
**2007** [2] - 7:7, 79:9
**2008** [1] - 79:9
**2010** [3] - 57:5, 79:13, 113:5
**2011** [1] - 98:16

**2012** [3] - 98:14, 98:16, 101:15
**2013** [8] - 3:19, 3:21, 6:13, 40:8, 59:15, 82:22, 83:24, 84:24
**2014** [1] - 104:13
**2016** [1] - 77:19
**2017** [2] - 80:12, 98:14
**2018** [7] - 4:10, 4:25, 5:5, 5:6, 5:17, 6:16, 121:13
**2019** [1] - 4:11
**20th** [1] - 7:6
**21** [1] - 121:13
**22** [7] - 74:8, 74:10, 89:9, 90:5, 90:10, 90:12, 109:7
**24** [4] - 50:4, 92:1, 92:12, 92:15
**25** [2] - 17:18, 92:14
**2:24** [1] - 47:4
**2:41** [1] - 49:2
**2d** [2] - 7:6, 7:8

3

**305** [1] - 121:16
**33128** [1] - 121:15
**3:07** [1] - 62:1
**3:17** [1] - 62:10

4

**400** [1] - 121:15
**461** [2] - 25:18, 25:19
**461-1** [1] - 25:12
**4:59** [1] - 102:15

5

**50** [2] - 77:18, 89:8
**50/50** [1] - 101:1
**506** [1] - 7:5
**50th** [1] - 59:9
**51** [3] - 77:18, 91:15, 91:17
**52** [6] - 36:12, 36:15, 40:25, 42:22, 43:8, 43:22
**523-5178** [1] - 121:16
**5:00** [1] - 59:20
**5:12** [1] - 102:19

6

**6** [1] - 103:7

**6:00** [2] - 59:20, 118:5
**6:04** [1] - 121:5

8

**823** [2] - 7:6, 7:9

9

**911** [4] - 65:22, 66:15, 66:20, 67:13
**9:00** [1] - 109:16

A

**a.m** [4] - 7:17, 9:4, 9:18, 109:16
**abide** [1] - 32:22
**able** [10] - 3:9, 8:12, 23:3, 31:22, 46:4, 68:4, 100:5, 112:13, 118:16
**above-entitled** [1] - 121:10
**absolutely** [2] - 37:16, 91:5
**abusive** [1] - 110:16
**accordingly** [1] - 5:11
**accurate** [2] - 63:18, 121:9
**achievements** [1] - 76:1
**acknowledge** [1] - 13:2
**act** [4] - 20:25, 66:11, 66:12, 97:22
**active** [1] - 99:24
**acts** [1] - 22:22
**actual** [3] - 99:1, 99:2, 99:16
**addition** [1] - 5:18
**additional** [5] - 97:21, 99:6, 99:23, 101:3, 101:11
**addressing** [1] - 76:24
**adequate** [1] - 29:8
**adjunct** [1] - 19:23
**admitted** [13] - 11:18, 11:22, 14:22, 15:4, 23:19, 23:20, 25:17, 25:19, 29:17, 36:14, 36:15, 42:5, 43:16
**adult** [1] - 55:1
**advise** [1] - 121:1

**affect** [1] - 72:10
**affected** [4] - 71:22, 71:23, 72:22, 82:1
**African** [1] - 53:18
**afternoon** [8] - 11:16, 16:17, 59:20, 76:18, 118:24, 119:9, 119:13, 119:17
**age** [5] - 20:7, 54:7, 79:23, 80:18, 115:2
**ago** [4] - 29:15, 77:10, 96:8, 96:9
**agree** [4] - 30:3, 79:12, 80:20, 87:22
**agreed** [3] - 5:3, 5:19, 9:10
**agreement** [3] - 9:8, 9:9, 102:11
**agrees** [1] - 5:6
**ahead** [6] - 64:16, 66:20, 84:25, 113:2, 115:14, 116:10
**aim** [1] - 25:3
**Air** [1] - 19:9
**algorithm** [4] - 11:23, 11:24, 12:8, 12:14
**alive** [2] - 71:4, 72:16
**allotted** [1] - 16:5
**allow** [3] - 6:6, 27:7, 30:3
**allowed** [2] - 30:10, 69:15
**allows** [1] - 39:3
**alloy** [1] - 21:1
**almost** [3] - 77:9, 107:11, 117:11
**alone** [1] - 16:5
**ambitious** [1] - 56:23
**ambulance** [3] - 68:2, 68:20, 68:21
**American** [1] - 53:17
**amount** [1] - 71:25
**amusement** [2] - 50:10, 54:23
**analysis** [2] - 6:8, 41:14
**Anand** [14] - 4:5, 4:7, 4:14, 5:8, 5:13, 5:16, 7:21, 8:1, 9:7, 103:23, 119:2, 119:18, 120:12, 120:25
**Anand's** [1] - 120:15
**animal** [1] - 53:11
**animals** [5] - 52:20, 52:22, 52:23, 53:5, 53:16
**answer** [19] - 12:8, 13:3, 13:8, 13:13, 31:19, 31:24, 32:24,

33:14, 34:4, 35:4, 66:1, 67:15, 80:5, 84:13, 91:11, 92:4, 92:7, 93:7, 93:9
**answered** [3] - 45:3, 80:4, 90:18
**answering** [1] - 43:16
**answers** [1] - 70:24
**apologies** [1] - 79:1
**apologize** [1] - 48:13
**appearance** [1] - 3:3
**applied** [2] - 101:20, 101:24
**apply** [3] - 34:20, 35:16, 36:4
**appreciate** [1] - 94:8
**appreciated** [1] - 111:7
**approach** [4] - 28:7, 77:14, 78:24, 88:22
**appropriate** [2] - 39:10, 39:13
**approval** [1] - 5:22
**approvals** [1] - 6:19
**approved** [5] - 5:23, 14:21, 14:24, 15:2, 97:21
**approximate** [1] - 100:5
**aquarium** [1] - 111:13
**area** [3] - 14:8, 26:9, 27:3
**areas** [1] - 14:2
**arguable** [2] - 78:14, 78:20
**argue** [1] - 3:17
**arguing** [1] - 29:10
**argument** [5] - 4:4, 4:23, 63:8, 63:11, 120:24
**arguments** [1] - 119:7
**arm** [8] - 89:23, 90:15, 90:16, 91:10, 93:6, 93:17, 93:20, 93:23
**arrive** [4] - 21:12, 21:16, 27:11, 66:17
**article** [2] - 8:2, 8:4
**artifact** [2] - 12:7, 12:25
**artifacts** [2] - 12:22, 12:23
**ashes** [1] - 75:25
**assigned** [1] - 17:10
**assignments** [1] - 19:3
**assist** [1] - 84:21

**assistant** [6] - 96:5, 96:11, 96:13, 96:23, 96:24, 97:1
**assisted** [1] - 100:17
**associate's** [2] - 19:18, 19:19
**assume** [3] - 31:7, 42:21, 119:13
**assumed** [1] - 63:6
**assuming** [7] - 64:14, 65:4, 69:16, 95:8, 118:20, 119:4, 119:8
**assurance** [3] - 18:14, 20:13, 32:2
**attack** [5] - 83:24, 84:21, 84:22, 84:23, 85:14
**attempt** [4] - 6:6, 12:6, 32:8, 65:9
**attempted** [2] - 66:6, 66:7
**attempting** [1] - 67:9
**attention** [2] - 78:17, 107:10
**attitude** [3] - 106:3, 114:9, 114:10
**attorney** [1] - 89:21
**attorneys** [2] - 46:15, 95:9
**August** [1] - 121:13
**Aunt** [1] - 54:8
**aunt** [11] - 49:18, 64:10, 64:12, 67:6, 68:25, 71:9, 72:25, 80:14, 85:1, 106:9
**Auntie** [4] - 106:6, 108:18, 110:5, 114:2
**auntie** [9] - 106:15, 106:20, 108:7, 108:16, 108:22, 108:25, 111:24, 113:11
**auntie's** [1] - 106:15
**authorized** [3] - 97:21, 101:4, 101:17
**available** [3] - 58:18, 119:9, 120:18
**Avenue** [1] - 121:15
**aware** [2] - 48:2, 97:7

## B

**Babe** [4] - 105:18, 112:25, 116:9, 117:5
**Baby** [3] - 111:19, 111:21, 117:14
**baby** [3] - 71:16, 107:9, 110:1

**babysitting** [1] - 16:20
**backed** [1] - 116:7
**background** [2] - 96:4, 98:2
**bad** [8] - 21:24, 35:2, 35:7, 58:23, 71:17, 82:22, 94:4, 118:17
**Bae** [3] - 60:10, 60:18, 63:22
**bae** [2] - 63:22, 110:1
**bag** [3] - 69:16, 105:3, 114:3
**Balancia** [2] - 46:4, 120:6
**Balancia's** [1] - 45:21
**bankrupt** [1] - 58:10
**bare** [2] - 22:23
**baseball** [1] - 110:14
**basing** [1] - 28:10
**basis** [2] - 56:19, 57:13
**BCC** [1] - 96:14
**beard** [1] - 108:9
**beat** [1] - 70:21
**became** [13] - 56:1, 56:18, 56:24, 57:22, 82:5, 97:5, 97:17, 97:25, 99:23, 101:11, 101:17, 114:11
**become** [8] - 18:13, 32:14, 58:13, 101:20, 101:24, 112:8, 112:15, 112:17
**becomes** [1] - 34:22
**becoming** [2] - 87:2, 115:25
**bedroom** [1] - 67:19
**beg** [1] - 108:8
**begged** [3] - 108:7, 108:15, 108:16
**begging** [1] - 108:7
**beginning** [1] - 100:19
**begins** [1] - 21:25
**behalf** [3] - 3:4, 3:5, 108:8
**bell** [1] - 6:22
**bench** [2] - 4:6, 77:14
**benefits** [1] - 6:1
**bent** [1] - 55:19
**best** [4] - 17:24, 60:3, 62:19, 70:21
**better** [8] - 24:20, 35:22, 39:24, 59:7, 72:4, 73:20, 84:5
**between** [8] - 12:1, 12:6, 22:24, 34:21,

40:13, 100:10, 101:3, 101:17
**beyond** [2] - 38:12, 38:24
**big** [8] - 52:9, 59:10, 106:12, 106:16, 107:16, 108:25, 111:11, 112:3
**bills** [3] - 57:17, 57:21, 111:4
**biomedical** [1] - 19:25
**birth** [1] - 55:21
**birthday** [2] - 59:9, 111:22
**birthdays** [1] - 59:8
**bit** [13] - 39:24, 49:24, 51:19, 53:1, 53:23, 54:1, 56:10, 65:2, 75:18, 100:18, 113:8, 114:23, 116:5
**black** [3] - 15:16, 25:5, 26:4
**blame** [1] - 72:3
**blaming** [1] - 94:23
**bland** [1] - 50:2
**blank** [1] - 61:20
**blessing** [1] - 108:19
**blessings** [1] - 109:1
**blocked** [1] - 77:19
**blood** [2] - 63:6, 81:20
**board** [2] - 34:8, 34:9
**body** [2] - 24:25, 26:6
**bolster** [1] - 5:9
**bolstering** [1] - 3:18
**bond** [1] - 27:7
**bonding** [2] - 20:24, 53:21
**boring** [1] - 50:2
**boss** [2] - 111:3
**bottle** [3] - 109:22, 109:23, 109:24
**bottom** [5] - 25:8, 26:9, 39:8, 39:11, 43:24
**bought** [7] - 17:22, 18:6, 75:10, 75:12, 111:9, 111:13
**Bowl** [1] - 110:15
**box** [6] - 24:7, 25:5, 39:10, 39:11, 39:13, 43:24
**boxes** [1] - 40:13
**bracelet** [1] - 75:12
**brain** [1] - 71:1
**brand** [1] - 19:17
**breadwinner** [1] - 57:19

**break** [12] - 7:2, 24:21, 34:19, 46:25, 47:1, 47:2, 61:19, 61:21, 94:24, 94:25, 107:25, 117:24
**breaking** [3] - 9:20, 92:10, 93:15
**breaks** [1] - 94:22
**breathing** [1] - 65:10
**breed** [2] - 53:17, 53:18
**brief** [6] - 4:5, 8:10, 9:15, 47:24, 62:6, 96:4
**Brief** [1] - 102:17
**briefly** [4] - 5:20, 24:14, 36:17, 119:2
**bright** [3] - 22:12, 22:13, 34:12
**brighter** [2] - 26:10, 26:12
**bring** [8] - 7:14, 10:25, 15:23, 22:7, 40:16, 48:18, 48:21, 75:3
**bringing** [1] - 18:3
**broader** [1] - 4:15
**broke** [4] - 37:12, 37:16, 67:16, 109:17
**broken** [1] - 14:15
**broom** [2] - 116:17, 116:21
**brought** [3] - 21:2, 57:20, 106:23
**brown** [1] - 26:19
**bubble** [1] - 34:12
**build** [3] - 20:3, 29:24, 117:13
**building** [1] - 51:12
**built** [2] - 20:4, 20:5
**bulldogs** [1] - 53:17
**bunch** [1] - 62:17
**burned** [3] - 22:16, 27:5, 27:6
**burns** [2] - 22:1, 22:9
**business** [7] - 16:20, 59:5, 59:6, 74:3, 117:2, 117:5
**busy** [1] - 73:23
**but..** [1] - 56:16
**buy** [1] - 85:20
**buying** [1] - 59:7
**BY** [51] - 11:15, 15:14, 16:16, 21:11, 23:21, 23:25, 24:12, 25:20, 26:15, 31:11, 31:21, 32:1, 32:10, 32:19, 33:1, 33:8, 33:18, 33:22, 34:24, 35:9, 36:16, 37:25,

38:16, 39:2, 42:2, 44:1, 44:8, 44:23, 45:5, 45:10, 49:12, 62:13, 74:13, 76:17, 77:17, 78:1, 79:2, 79:20, 80:7, 87:25, 89:1, 89:20, 90:2, 90:11, 90:20, 91:6, 91:25, 93:3, 94:11, 96:1, 104:5
**Byars** [1] - 7:15

## C

**cable** [5] - 20:21, 21:7, 26:4, 88:4, 88:7
**cables** [3] - 24:13, 44:14, 94:14
**calm** [1] - 67:21
**camera** [3] - 24:7, 35:14, 39:20
**candidate** [3] - 115:2, 115:14, 115:19
**cannot** [4] - 6:10, 6:22, 14:25, 30:20
**capacity** [5] - 17:3, 17:12, 17:20, 28:14, 32:20
**car** [1] - 68:20
**cardiologist** [2] - 84:8, 85:17
**cardiologists** [1] - 4:16
**cards** [1] - 74:2
**care** [4] - 16:7, 37:7, 57:14, 105:3
**careful** [2] - 48:8, 48:15
**caring** [3] - 37:5, 50:25, 56:23
**cars** [1] - 116:7
**case** [16] - 3:2, 5:21, 6:3, 6:9, 7:3, 9:2, 10:3, 15:16, 17:8, 20:17, 36:7, 61:24, 89:4, 94:5, 100:14, 118:3
**cases** [2] - 3:22, 6:24
**casing** [1] - 24:18
**categorize** [1] - 100:21
**cats** [1] - 16:4
**celebrating** [1] - 59:8
**cell** [4] - 35:14, 52:4, 105:15, 105:16
**certain** [6] - 14:13, 33:3, 35:21, 53:12, 67:14, 111:7
**certified** [2] - 85:9,

85:10

**certify** [1] - 121:8
**chair** [1] - 48:20
**challenge** [1] - 29:20
**champagne** [3] - 109:22, 109:24
**chance** [3] - 73:23, 108:13, 108:15
**change** [4] - 9:10, 13:2, 19:8, 107:4
**changed** [2] - 54:3, 72:5
**changes** [1] - 6:18
**characteristics** [5] - 56:21, 56:22, 58:20, 116:2, 116:4
**charge** [2] - 17:18, 18:10
**check** [3] - 57:11, 96:25, 98:2
**checked** [2] - 115:15, 115:17
**checks** [2] - 57:17, 57:18
**chemical** [1] - 22:19
**chest** [1] - 67:11
**Chevy** [1] - 111:17
**children** [1] - 55:23
**chip** [1] - 114:2
**choice** [1] - 19:21
**choices** [1] - 12:13
**choking** [1] - 66:8
**chunky** [1] - 75:19
**church** [7] - 112:1, 112:2, 112:3, 112:5, 112:7
**Cichlids** [1] - 53:18
**circle** [1] - 26:16
**circled** [1] - 26:4
**Circuit** [1] - 6:24
**circuit** [2] - 34:8, 34:9
**circular** [1] - 24:23
**citations** [1] - 3:24
**cite** [1] - 3:18
**cites** [1] - 3:22
**citizen** [1] - 104:15
**clarify** [2] - 14:7, 93:19
**class** [2] - 67:3, 85:8
**clean** [3] - 22:1, 57:11, 112:21
**cleaning** [1] - 22:22
**clear** [12] - 5:16, 9:7, 28:10, 29:11, 31:12, 43:15, 47:13, 47:18, 67:15, 68:1, 91:14, 92:17
**clerks** [1] - 47:21
**client** [2] - 89:15,

89:18
**clinical** [7] - 4:9, 4:24, 5:5, 5:6, 5:9, 18:5, 19:25
**close** [6] - 26:6, 47:6, 48:6, 92:4, 93:9, 108:8
**closed** [2] - 60:7, 113:2
**closer** [2] - 72:6, 87:3
**closet** [2] - 76:4, 76:9
**clothes** [3] - 109:12, 109:14, 109:19
**Coast** [1] - 110:19
**Cohen** [3] - 3:5, 3:17, 118:15
**COHEN** [14] - 4:2, 7:3, 7:5, 7:9, 7:11, 23:18, 95:18, 95:20, 102:8, 119:10, 120:5, 120:11, 120:17, 120:22
**cold** [23] - 14:11, 21:15, 21:17, 21:22, 22:14, 23:3, 23:10, 23:11, 25:24, 26:14, 27:6, 27:9, 35:2, 35:16, 40:21, 41:9, 41:16, 41:20, 42:4, 42:10, 45:23, 45:25, 46:5
**college** [6] - 18:25, 19:9, 73:17, 73:19, 73:21, 73:25
**College** [1] - 19:6
**color** [4] - 22:13, 22:14, 26:10, 41:20
**column** [1] - 39:8
**combination** [1] - 24:22
**coming** [8] - 25:7, 26:5, 58:17, 111:14, 118:19, 118:23, 119:19, 120:4
**comment** [2] - 42:14, 94:9
**commented** [1] - 48:2
**commenting** [1] - 15:3
**comments** [2] - 30:23, 30:25
**common** [3] - 3:23, 33:24, 35:10
**communicate** [1] - 105:14
**community** [1] - 59:7
**companies** [1] - 17:5

**company** [6] - 49:20, 51:8, 51:10, 57:25, 58:9, 74:3
**compare** [1] - 21:24
**compared** [1] - 25:24
**comparing** [1] - 18:4
**compete** [1] - 53:13
**complain** [2] - 119:22, 119:23
**complete** [3] - 21:7, 73:18, 118:16
**completely** [2] - 27:14, 36:3
**compliance** [1] - 21:7
**comply** [1] - 33:2
**component** [3] - 22:23, 24:17, 34:8
**components** [4] - 19:12, 19:13, 20:25, 41:12
**compound** [1] - 22:19
**compromise** [1] - 52:10
**computer** [1] - 65:17
**concerned** [1] - 119:16
**conclude** [1] - 9:11
**concluded** [3] - 7:22, 31:10, 121:5
**condition** [6] - 64:18, 79:17, 83:1, 84:16, 84:20, 86:17
**conditions** [1] - 27:20
**conductive** [1] - 45:15
**conference** [3] - 28:9, 31:10, 98:4
**confirmed** [1] - 66:25
**confirming** [1] - 13:22
**confused** [1] - 72:23
**connected** [3] - 25:10, 26:22, 27:8
**connecting** [2] - 25:8, 45:15
**connection** [45] - 14:12, 14:15, 18:13, 18:17, 19:15, 20:12, 21:13, 21:14, 22:3, 22:4, 22:8, 22:10, 22:11, 22:25, 23:3, 23:8, 23:10, 23:12, 25:8, 25:25, 27:6, 27:25, 31:15, 32:4, 32:13, 34:2, 34:6, 34:19, 34:23, 35:2,

35:6, 35:7, 35:15, 36:7, 38:3, 38:7, 38:11, 40:9, 40:16, 40:21, 41:9, 45:23, 46:4
**connections** [7] - 22:1, 23:2, 27:19, 32:5, 33:25, 34:15, 34:20
**connects** [1] - 40:3
**consciousness** [1] - 68:10
**consider** [5] - 6:25, 8:5, 8:14, 52:15, 95:7
**considered** [1] - 24:18
**considering** [1] - 6:12
**consistent** [1] - 82:24
**consistently** [1] - 82:25
**construct** [1] - 19:20
**construction** [2] - 51:8, 51:9
**consultant** [1] - 43:1
**Consulting** [1] - 16:25
**consulting** [1] - 17:4
**contact** [2] - 21:2, 34:9
**contest** [1] - 13:11
**context** [1] - 30:5
**continue** [5] - 9:9, 29:24, 91:13, 103:22, 103:25
**continued** [4] - 60:8, 81:3, 102:23, 103:24
**continues** [4] - 6:18, 40:3, 88:18, 91:15
**continuous** [1] - 21:3
**contractor** [1] - 49:20
**control** [4] - 16:5, 35:6, 81:19, 81:23
**controlling** [3] - 56:13, 81:18, 81:21
**conversation** [3] - 54:3, 55:9, 79:23
**conversations** [4] - 55:4, 55:5, 55:11, 55:14
**cook** [2] - 57:11, 112:21
**cope** [1] - 72:14
**core** [1] - 22:21
**corner** [1] - 105:16
**corporate** [1] - 49:25
**correct** [62] - 11:20,

11:21, 11:23, 11:24, 12:1, 12:7, 12:19, 12:20, 12:22, 15:18, 15:19, 15:22, 19:3, 31:13, 31:14, 42:8, 42:9, 42:11, 42:12, 42:15, 42:25, 43:3, 43:4, 43:7, 43:18, 43:19, 44:12, 44:13, 44:22, 45:1, 45:2, 57:1, 58:12, 63:9, 79:25, 81:11, 81:13, 82:1, 82:2, 82:8, 82:9, 82:15, 82:16, 82:21, 83:4, 85:7, 85:15, 85:16, 85:21, 87:6, 89:5, 98:10, 98:12, 99:4, 99:5, 99:8, 99:9, 99:15, 99:17, 101:10, 101:14, 101:18
**correction** [1] - 110:13
**corrections** [1] - 110:15
**correctly** [1] - 33:11
**counsel** [16] - 4:6, 5:14, 6:6, 6:23, 13:19, 14:6, 63:24, 63:25, 90:23, 91:13, 92:11, 92:21, 93:17, 93:18, 94:6, 94:8
**Counsel** [2] - 3:3, 91:12
**counseling** [1] - 110:17
**country** [1] - 104:14
**countryside** [1] - 107:18
**couple** [12] - 3:8, 7:20, 29:15, 34:5, 73:21, 74:6, 83:20, 83:21, 89:3, 92:9, 93:13, 94:22
**course** [11] - 20:1, 55:25, 57:20, 62:15, 62:20, 65:20, 71:4, 87:1, 112:14, 114:17, 121:1
**courses** [1] - 19:25
**Court** [20] - 3:1, 4:3, 4:4, 4:12, 4:13, 4:20, 5:6, 5:8, 5:19, 6:5, 6:22, 8:3, 10:18, 42:3, 47:10, 76:13, 102:10, 120:14, 121:14, 121:14
**COURT** [159] - 3:2, 3:7, 3:12, 3:14, 3:20, 3:25, 7:1, 7:4, 7:8, 7:10, 7:14, 7:16, 7:18,

8:8, 8:11, 8:23, 9:1, 9:3, 9:5, 9:11, 9:14, 9:16, 9:17, 9:19, 9:24, 10:1, 10:4, 10:6, 10:10, 10:15, 10:19, 10:25, 11:13, 13:19, 14:3, 14:6, 14:19, 15:5, 15:11, 15:23, 15:24, 16:1, 21:10, 23:17, 23:19, 23:24, 24:7, 24:11, 25:15, 25:17, 26:2, 28:7, 28:10, 28:19, 30:3, 31:4, 31:9, 31:19, 31:24, 32:9, 32:18, 32:24, 33:6, 33:14, 33:21, 34:4, 34:14, 35:4, 35:18, 36:14, 37:24, 38:14, 39:1, 39:7, 41:24, 43:21, 44:6, 44:21, 45:4, 45:9, 46:8, 46:14, 46:23, 47:1, 47:3, 47:6, 47:11, 47:20, 47:23, 47:25, 48:6, 48:11, 48:14, 48:18, 48:19, 48:20, 48:23, 49:1, 49:3, 61:23, 61:25, 62:2, 62:7, 62:11, 74:9, 76:12, 76:15, 77:16, 77:25, 78:25, 79:19, 80:5, 87:24, 88:21, 88:24, 89:16, 89:19, 90:1, 90:9, 90:19, 91:3, 91:13, 91:19, 92:16, 92:23, 94:10, 94:18, 94:22, 95:4, 95:13, 95:21, 102:12, 102:16, 102:18, 102:20, 102:24, 103:1, 103:3, 103:6, 103:9, 103:11, 103:13, 103:20, 117:24, 118:1, 118:4, 118:6, 118:10, 118:25, 119:4, 119:7, 119:12, 119:16, 119:21, 119:24, 120:10, 120:16, 120:19, 120:24

**court** [7] - 3:23, 5:16, 7:12, 8:19, 8:25, 9:23, 47:20

**courtroom** [14] - 7:17, 9:4, 9:18, 10:5, 15:25, 47:4, 48:4, 48:9, 49:2, 62:1, 62:10, 102:15, 102:19, 118:5

**COURTROOM** [4] -

11:9, 16:12, 49:7, 103:16

**cover** [1] - 50:2
**CPR** [12] - 14:16, 65:9, 65:11, 66:5, 66:12, 66:21, 66:24, 66:25, 67:2, 67:5, 67:9, 85:7
**crazy** [2] - 10:9, 108:10
**creative** [1] - 29:21
**credit** [1] - 58:7
**CROSS** [2] - 42:1, 76:16
**cross** [5] - 13:24, 31:2, 41:24, 76:12, 120:3
**CROSS-EXAMINATION** [2] - 42:1, 76:16
**cross-examine** [1] - 31:2
**crouched** [2] - 60:22, 61:1
**crying** [4] - 60:22, 67:16, 92:10, 93:15
**cue** [1] - 74:8
**curative** [2] - 3:10, 6:21
**cut** [2] - 31:5, 55:4
**cutting** [2] - 116:11, 116:17

## D

**D-A-K-E-N** [2] - 11:11, 16:14
**dad** [36] - 50:16, 50:17, 50:24, 52:6, 53:6, 53:11, 53:17, 57:11, 57:19, 59:4, 60:11, 60:15, 60:18, 60:22, 61:6, 62:22, 62:24, 63:11, 63:21, 63:25, 64:6, 64:9, 67:17, 67:18, 68:20, 68:22, 71:12, 71:13, 71:22, 73:15, 78:18, 80:14, 80:17, 85:2, 93:22
**dad's** [1] - 61:9
**daily** [2] - 56:19, 81:11
**Daken** [37] - 10:8, 10:13, 11:8, 11:11, 11:16, 14:10, 16:9, 16:11, 16:14, 16:17, 16:21, 20:17, 21:6, 21:12, 23:12, 23:22,

24:15, 25:21, 26:16, 27:11, 31:12, 32:20, 33:2, 36:9, 38:1, 39:3, 39:18, 39:22, 40:18, 40:20, 40:23, 41:14, 41:17, 44:2, 44:24, 45:14, 46:7
**damaged** [1] - 17:10
**dance** [2] - 50:1, 114:16
**dark** [1] - 107:19
**date** [9] - 40:6, 40:23, 41:2, 41:3, 41:4, 59:14, 106:2, 109:4, 109:5
**DATE** [1] - 121:13
**dating** [3] - 105:11, 105:12, 106:3
**day-to-day** [2] - 57:13, 75:21
**days** [3] - 58:24, 71:18, 71:21
**de** [1] - 19:12
**de-soldering** [1] - 19:12
**deal** [5] - 19:11, 56:6, 56:8, 84:15, 118:14
**deals** [1] - 92:23
**dealt** [2] - 56:4, 56:6
**Debra** [7] - 49:13, 104:18, 106:11, 109:25, 110:2, 110:7, 110:11
**Debra's** [1] - 106:9
**deceased** [2] - 104:19, 116:3
**December** [1] - 113:5
**decide** [3] - 54:25, 85:20, 115:21
**decided** [2] - 45:24, 70:7
**decision** [4] - 3:23, 5:25, 6:23, 36:1
**dedicated** [1] - 112:22
**defect** [1] - 5:21
**defective** [1] - 5:7
**Defendant** [1] - 5:4
**Defendant's** [2] - 25:12, 25:19
**defense** [6] - 63:24, 63:25, 90:23, 93:17, 93:18, 121:2
**defibrillation** [1] - 5:10
**defibrillator** [5] - 11:25, 12:12, 25:2, 43:2, 86:5
**defibrillators** [3] -

12:5, 43:6, 44:24
**define** [1] - 21:14
**degree** [4] - 19:16, 19:19, 96:11, 96:13
**degrees** [1] - 96:10
**delay** [1] - 10:19
**deliberate** [1] - 8:5
**deliver** [1] - 24:19
**delivery** [1] - 17:10
**DEMAHY** [81] - 3:5, 3:8, 3:16, 3:21, 10:12, 10:16, 10:23, 11:12, 11:15, 14:1, 14:5, 14:20, 15:13, 15:14, 21:9, 25:16, 28:5, 29:10, 30:23, 31:8, 31:18, 31:23, 32:7, 32:16, 32:23, 33:4, 33:13, 33:20, 34:3, 34:13, 35:3, 35:17, 36:13, 37:21, 38:12, 38:23, 39:6, 42:2, 43:20, 44:5, 44:20, 45:3, 45:8, 46:12, 46:25, 47:17, 48:5, 48:10, 48:13, 76:13, 76:17, 77:14, 77:17, 78:1, 78:24, 79:2, 79:20, 80:7, 87:25, 88:20, 89:14, 89:17, 89:25, 90:7, 90:18, 91:1, 91:12, 91:15, 91:23, 92:11, 92:14, 92:19, 94:8, 103:7, 103:10, 118:8, 118:11, 119:14, 119:17, 119:23, 120:1
**DeMahy** [9] - 3:5, 6:20, 14:17, 31:2, 45:21, 46:19, 48:2, 63:10, 89:11
**demeanor** [1] - 58:19
**demonstrate** [2] - 45:23, 94:2
**denied** [1] - 5:11
**DENNIS** [1] - 103:18
**Dennis** [11] - 49:15, 50:18, 50:19, 53:11, 53:17, 60:18, 60:22, 87:19, 103:15, 103:18, 104:7
**Dennis's** [1] - 54:13
**deny** [1] - 13:11
**department** [1] - 37:14
**depo** [2] - 9:11, 63:17
**deposed** [1] - 4:10
**deposition** [26] - 8:10, 8:12, 8:18, 8:24,

9:22, 10:6, 10:9, 11:18, 12:4, 13:14, 14:5, 77:9, 77:18, 88:23, 89:4, 89:9, 89:12, 89:13, 90:3, 95:6, 95:10, 95:23, 102:9, 102:22, 120:7, 120:9
**depressed** [2] - 72:1, 72:11
**DEPUTY** [4] - 11:9, 16:12, 49:7, 103:16
**describe** [4] - 56:10, 61:2, 65:2, 106:10
**described** [4] - 35:1, 35:10, 35:15, 85:25
**design** [4] - 5:23, 14:24, 19:20, 20:1
**designed** [2] - 11:25, 12:6
**despite** [3] - 58:19, 58:20, 118:23
**detailed** [1] - 79:1
**deteriorate** [1] - 81:9
**deteriorating** [1] - 113:12
**determine** [2] - 30:20, 42:7
**develop** [2] - 20:3, 53:25
**developed** [1] - 18:22
**device** [55] - 4:17, 5:21, 5:24, 6:13, 17:22, 18:6, 20:16, 20:20, 21:6, 21:17, 23:14, 23:22, 23:23, 24:2, 24:4, 24:5, 24:13, 24:14, 35:13, 35:14, 36:8, 36:9, 36:17, 36:19, 36:21, 37:2, 37:4, 37:5, 37:7, 37:8, 37:9, 37:23, 38:3, 38:19, 38:21, 39:5, 39:14, 39:17, 41:5, 41:8, 42:23, 42:25, 45:11, 45:12, 46:12, 46:14, 46:18, 46:22, 47:9, 47:14, 85:15, 85:25, 86:5, 86:16
**devices** [10] - 17:13, 17:16, 17:21, 18:15, 21:2, 32:15, 32:21, 37:11, 45:1, 45:16
**diabetes** [4] - 56:5, 56:12, 81:17, 112:10
**diabetic** [1] - 63:6
**diagnosed** [2] - 79:7, 80:12

**dialysis** [9] - 81:11, 113:6, 113:13, 113:14, 113:20, 113:23, 113:25, 114:7, 114:11
**Diaz** [2] - 102:6, 121:13
**DIAZ** [1] - 121:13
**die** [1] - 51:14
**different** [6] - 12:1, 17:18, 29:3, 71:2, 100:14, 100:16
**difficult** [8] - 54:18, 62:14, 76:20, 79:3, 82:12, 82:15, 88:15, 117:17
**dire** [4] - 10:13, 10:23, 13:25, 30:6
**DIRE** [1] - 11:14
**direct** [2] - 89:8, 103:12
**DIRECT** [4] - 16:15, 49:11, 95:25, 104:4
**directed** [2] - 120:14, 120:20
**directing** [1] - 16:4
**direction** [2] - 72:22, 72:24
**directly** [2] - 15:3, 115:24
**diring** [2] - 13:19, 29:16
**disabled** [6] - 56:25, 57:7, 57:22, 82:5, 112:17, 112:19
**disc** [1] - 24:23
**discarded** [1] - 37:19
**discern** [1] - 46:4
**disclosed** [2] - 38:13, 38:24
**discoloration** [1] - 27:4
**discuss** [9] - 9:2, 10:3, 38:17, 47:2, 61:24, 79:17, 84:1, 118:3, 118:8
**discussed** [3] - 38:19, 80:20, 115:2
**discussing** [3] - 80:10, 80:11, 101:8
**discussion** [1] - 103:24
**disease** [2] - 80:15, 113:3
**disguising** [2] - 30:24, 30:25
**dispute** [1] - 6:3
**distinguish** [2] - 12:1, 12:6
**distinguished** [1] -

41:20
**distributed** [1] - 22:9
**distribution** [2] - 25:6, 40:4
**District** [3] - 3:21, 7:6, 121:14
**division** [3] - 16:24, 17:1, 17:2
**docket** [1] - 4:19
**Docket** [1] - 4:21
**doctor** [3] - 71:3, 85:20, 85:22
**doctors** [7] - 56:13, 69:2, 70:1, 70:24, 79:22, 80:6, 80:8
**document** [7] - 38:7, 38:17, 38:20, 38:21, 39:3, 44:19, 78:13
**documented** [1] - 37:7
**dog** [5] - 53:13, 59:6, 106:16, 106:20
**dollar** [1] - 117:12
**done** [25] - 6:8, 14:25, 16:7, 20:6, 21:18, 22:12, 25:21, 27:23, 28:25, 33:11, 34:6, 35:20, 35:21, 37:4, 38:3, 38:11, 40:11, 41:4, 46:2, 72:13, 73:15, 98:9, 98:11, 120:23
**door** [4] - 31:3, 47:6, 60:7, 60:8
**doubt** [1] - 79:23
**down** [22] - 22:7, 23:23, 23:24, 26:9, 26:17, 26:18, 26:19, 37:16, 40:3, 46:10, 55:9, 61:3, 62:2, 67:11, 67:16, 76:6, 92:10, 93:15, 94:20, 109:17, 118:12
**Dr** [24] - 4:5, 4:7, 4:14, 5:8, 5:13, 5:16, 7:21, 8:1, 8:18, 8:22, 8:24, 9:7, 9:22, 13:6, 79:13, 79:14, 84:8, 103:23, 113:9, 114:24, 120:5, 120:12, 120:15, 120:25
**draft** [1] - 19:8
**draining** [1] - 114:12
**drape** [1] - 50:1
**draw** [1] - 21:23
**drawing** [1] - 61:20
**dream** [1] - 117:14
**dreams** [2] - 117:22, 117:23

**dreary** [1] - 114:15
**drive** [1] - 117:10
**drives** [1] - 12:12
**driveway** [2] - 116:8, 116:18
**driving** [1] - 10:9
**dropped** [1] - 63:7
**due** [4] - 20:21, 21:7, 55:5, 55:21
**dull** [3] - 22:14, 26:11, 35:7
**duly** [4] - 11:8, 16:11, 49:6, 103:15
**during** [16] - 8:15, 18:11, 30:6, 37:5, 41:10, 47:2, 54:9, 63:8, 71:9, 100:12, 109:25, 110:4, 110:11, 112:8, 112:10, 112:15
**duties** [1] - 19:10

## E

**early** [5] - 5:10, 50:21, 54:1, 119:10, 119:22
**easiest** [1] - 21:23
**easily** [1] - 41:20
**Eastern** [2] - 58:7, 110:20
**easy** [3] - 81:8, 81:15, 82:7
**Eckerd's** [2] - 104:23, 110:12
**economics** [1] - 59:1
**educated** [2] - 18:8, 85:25
**education** [2] - 37:15, 73:18
**educational** [1] - 96:4
**effect** [1] - 45:19
**effective** [1] - 6:13
**efficacy** [1] - 6:16
**effort** [2] - 41:21, 78:17
**Efimov** [1] - 120:5
**Efimov's** [1] - 13:6
**eight** [4] - 98:6, 98:11, 98:20, 99:4
**either** [5] - 21:25, 22:19, 34:12, 60:11, 68:13
**electrical** [5] - 19:6, 20:25, 26:20, 45:18
**electrically** [1] - 45:15
**electrode** [5] - 13:1,

24:25, 25:1, 40:17, 44:14
**electrodes** [6] - 13:1, 24:18, 24:19, 24:23, 25:3, 40:2
**electronic** [1] - 45:1
**electronics** [1] - 19:2
**elementary** [2] - 50:9, 53:24
**Eleventh** [2] - 6:24, 121:15
**elicit** [2] - 5:16, 6:6
**elicited** [1] - 4:6
**ELMO** [2] - 23:23, 24:9
**emotion** [1] - 64:19
**employed** [3] - 16:23, 96:16, 96:22
**employees** [1] - 69:15
**employment** [1] - 57:25
**end** [11] - 5:10, 24:21, 26:7, 26:18, 29:18, 40:15, 80:12, 80:16, 80:17, 118:12, 118:13
**ended** [1] - 58:9
**energetic** [1] - 56:23
**energized** [1] - 114:14
**enforce** [1] - 72:17
**engineer** [1] - 19:6
**engineering** [6] - 17:6, 19:19, 19:25, 20:15, 33:24, 35:12
**Engineering** [1] - 19:6
**English** [7] - 28:13, 28:23, 29:7, 31:25, 44:9, 44:10, 71:8
**enjoy** [1] - 110:25
**enjoyed** [1] - 120:6
**ensure** [3] - 33:10, 35:1, 35:15
**entered** [8] - 4:20, 4:22, 7:17, 9:18, 15:25, 49:2, 62:10, 102:19
**entire** [5] - 37:18, 48:3, 91:2, 91:3, 112:10
**entitled** [1] - 121:10
**Entry** [1] - 4:21
**entry** [1] - 37:20
**episode** [2] - 63:6, 70:2
**equipment** [4] - 17:9, 17:24, 98:5
**Eric** [2] - 95:2,

103:12
**especially** [2] - 36:21, 50:25
**essentially** [5] - 17:14, 17:22, 18:2, 20:24, 69:23
**Eugene** [1] - 8:18
**evaluated** [2] - 5:23, 19:3
**evaluating** [1] - 20:4
**evaluations** [1] - 18:2
**evening** [3] - 4:23, 118:2, 118:7
**event** [6] - 3:17, 9:20, 49:20, 49:23, 83:4, 88:13
**events** [3] - 49:25, 53:13, 100:13
**eventually** [4] - 66:5, 67:22, 107:22, 113:23
**everywhere** [1] - 4:16
**evidence** [11] - 5:4, 7:24, 23:20, 25:12, 25:19, 36:12, 36:15, 47:15, 47:21, 74:11
**exact** [3] - 66:1, 76:6, 79:8
**exactly** [5] - 35:23, 47:22, 77:19, 91:16, 96:19
**examination** [4] - 15:15, 26:6, 37:12, 46:1
**EXAMINATION** [9] - 11:14, 16:15, 42:1, 43:25, 49:11, 76:16, 88:25, 95:25, 104:4
**examine** [2] - 31:2, 35:6
**example** [3] - 50:9, 94:12
**examples** [1] - 51:2
**except** [1] - 109:18
**exclude** [2] - 4:23, 5:4
**excuse** [5] - 52:21, 60:4, 74:5, 83:10, 112:6
**Exhibit** [10] - 23:15, 23:20, 25:12, 25:19, 36:12, 36:15, 40:25, 42:22, 43:8, 109:7
**exhibit** [2] - 47:12, 74:9
**exited** [6] - 9:4, 10:5, 47:4, 62:1, 102:15, 118:5
**expectancy** [1] -

80:24
**experience** [6] - 18:18, 18:21, 18:23, 20:8, 37:11, 41:14
**experience-wise** [1] - 20:8
**experienced** [3] - 23:1, 23:5, 81:6
**expert** [28] - 6:15, 11:19, 11:22, 11:25, 12:2, 12:5, 12:10, 13:18, 15:4, 15:15, 17:4, 17:6, 17:7, 25:22, 27:15, 28:3, 29:12, 29:17, 29:19, 29:20, 29:25, 30:8, 38:18, 42:18, 43:5, 44:4, 44:17
**expert's** [1] - 42:14
**expertise** [6] - 14:8, 15:6, 15:9, 15:12, 30:7, 32:14
**experts** [2] - 29:13, 119:10
**explain** [9] - 17:1, 17:20, 20:23, 21:22, 22:18, 24:14, 25:22, 49:24, 109:13
**explained** [1] - 5:18
**expose** [1] - 51:24
**extent** [3] - 29:9, 101:21, 101:25
**external** [1] - 22:1
**externally** [1] - 22:20
**eye** [1] - 82:3
**eyes** [2] - 68:14, 107:15

---

**F**

**F.Supp** [1] - 7:8
**fabricators** [1] - 104:13
**face** [4] - 12:22, 12:23, 13:5, 54:24
**facility** [3] - 27:16, 113:21, 113:22
**fact** [9] - 4:25, 27:18, 80:11, 87:13, 106:16, 109:21, 114:10, 120:12, 120:19
**facts** [1] - 94:7
**factual** [1] - 6:2
**failed** [5] - 19:12, 27:10, 68:3, 68:5
**failure** [6] - 20:20, 21:7, 79:7, 79:10, 79:11, 80:13
**fair** [6] - 43:10,

43:12, 83:1, 83:2, 97:19, 100:21
**fall** [1] - 51:13
**familiar** [7] - 18:13, 28:14, 28:15, 28:17, 32:14, 86:15, 118:15
**family** [33] - 16:19, 49:18, 50:12, 50:13, 52:10, 53:16, 54:9, 54:10, 55:18, 55:19, 55:20, 56:8, 58:14, 58:16, 59:2, 59:11, 67:4, 70:2, 70:7, 71:19, 72:15, 72:17, 81:24, 84:14, 88:2, 106:8, 106:12, 110:9, 111:25, 116:22
**fan** [1] - 52:9
**far** [3] - 31:5, 70:22, 99:3
**father** [1] - 89:23
**faulty** [1] - 33:12
**FCRR** [1] - 121:13
**FDA** [27] - 5:22, 5:23, 5:25, 6:9, 6:17, 11:19, 14:21, 14:24, 15:1, 15:2, 21:8, 27:15, 28:15, 28:17, 28:20, 29:3, 29:19, 29:20, 29:23, 29:25, 30:5, 30:23, 31:1, 31:13, 32:15, 43:18
**fed** [1] - 37:14
**federal** [1] - 29:12
**felt** [2] - 55:5, 71:5
**few** [4] - 20:11, 61:23, 62:3, 89:11
**field** [5] - 17:6, 17:7, 33:24, 36:21, 36:23
**fields** [2] - 35:11, 35:12
**fighter** [1] - 71:6
**figure** [6] - 50:23, 64:20, 69:1, 73:1, 73:2, 102:12
**file** [2] - 102:4, 102:6
**filed** [1] - 102:10
**fill** [2] - 118:21, 119:15
**filling** [1] - 119:16
**films** [2] - 51:23
**finally** [1] - 37:19
**finances** [1] - 57:15
**Financial** [2] - 58:7, 110:20
**financially** [2] - 73:12, 117:20
**findings** [2] - 27:17
**fine** [5] - 24:8, 24:10, 35:8, 62:5, 94:23

**fingerprints** [1] - 98:2
**fingers** [1] - 68:14
**finish** [7] - 14:6, 29:14, 69:17, 98:25, 118:24, 119:21, 120:13
**finished** [6] - 9:13, 19:16, 36:22, 73:21, 73:22, 119:1
**finishing** [1] - 19:9
**fire** [1] - 67:22
**firm** [5] - 17:4, 22:10, 22:25, 34:7, 34:23
**first** [35] - 3:14, 11:10, 16:3, 16:12, 19:1, 20:19, 20:20, 21:12, 21:16, 24:16, 34:6, 38:15, 48:11, 49:8, 51:25, 59:16, 59:22, 64:5, 81:19, 89:2, 95:16, 95:19, 97:13, 99:10, 103:17, 104:17, 104:20, 104:22, 105:14, 106:2, 106:22, 107:5, 108:12, 113:22, 114:12
**fish** [8] - 53:18, 59:6, 111:12, 111:15, 117:4, 117:13
**fit** [3] - 17:24, 95:16, 95:20
**fitted** [1] - 99:7
**fitter** [1] - 99:24
**fitting** [10] - 99:2, 99:11, 99:16, 99:22, 100:1, 100:12, 100:25, 101:16, 101:21, 102:1
**fittings** [1] - 98:24
**five** [12] - 9:1, 43:23, 49:23, 96:4, 96:21, 98:13, 100:8, 100:9, 100:10, 100:18, 100:23
**flat** [1] - 39:24
**floor** [9] - 61:3, 61:10, 64:9, 83:3, 83:18, 83:19, 91:9, 93:5, 93:24
**Floor** [1] - 121:15
**floors** [1] - 50:1
**Florida** [4] - 3:22, 53:13, 121:15
**flow** [2] - 26:25, 36:2
**flowed** [1] - 36:3
**flows** [1] - 34:11
**flux** [8] - 22:1, 22:2, 22:9, 22:16, 22:17,

22:18, 27:5
**flying** [2] - 118:13, 119:10
**focus** [1] - 72:14
**follow** [9] - 33:10, 34:1, 35:5, 42:3, 79:4, 91:20, 92:25, 97:10
**follow-up** [2] - 42:3, 92:25
**followed** [3] - 14:14, 35:1, 68:21
**follows** [1] - 95:24
**Force** [1] - 19:9
**forced** [1] - 72:17
**forceful** [3] - 78:15, 92:5, 93:10
**forcefully** [1] - 64:1
**forcible** [1] - 69:10
**Ford** [1] - 7:5
**foregoing** [1] - 121:8
**foreseeing** [1] - 55:6
**forgot** [1] - 120:19
**form** [3] - 42:22, 42:24, 79:19
**forms** [1] - 34:11
**forth** [3] - 22:8, 67:19, 67:20
**forum** [1] - 62:16
**forward** [3] - 11:2, 28:1, 102:12
**foundation** [8] - 28:6, 28:18, 32:7, 32:16, 33:13, 34:3, 35:17, 37:22
**four** [5] - 17:17, 19:9, 24:22, 106:12, 106:13
**FPR** [1] - 121:13
**fracture** [4] - 15:17, 41:14, 42:8
**fractured** [2] - 42:11, 42:14
**Frank** [1] - 8:18
**frantic** [1] - 64:19
**freak** [1] - 116:6
**free** [2] - 16:18, 16:19
**freshman** [2] - 19:1
**Friday** [13] - 4:23, 9:8, 9:9, 29:11, 103:25, 107:7, 118:22, 119:3, 119:15, 119:16, 119:18, 119:20, 120:24
**friend** [1] - 60:3
**front** [9] - 6:7, 6:11, 25:1, 59:25, 60:2, 60:7, 60:8, 62:17, 89:13
**full** [3] - 18:24, 71:16

**fully** [2] - 67:11, 68:11
**fun** [2] - 50:11, 53:14
**function** [5] - 12:21, 13:5, 56:19, 112:13, 113:12
**funny** [1] - 56:23
**future** [2] - 116:24, 117:1

---

**G**

**G-O-D-E-L-I-A** [1] - 103:19
**Gadh** [4] - 79:13, 79:14, 113:9, 114:24
**gaps** [1] - 27:2
**Garcia** [1] - 3:19
**gastroparesis** [1] - 81:25
**gathering** [1] - 70:19
**Geico** [1] - 3:19
**general** [1] - 32:14
**generally** [1] - 4:16
**generated** [1] - 27:13
**gentlemen** [13] - 7:19, 8:11, 9:19, 10:1, 16:1, 46:8, 46:15, 47:20, 92:23, 94:18, 95:5, 103:21, 118:1
**get-togethers** [1] - 111:25
**ghost** [1] - 107:20
**gift** [1] - 111:9
**girls** [2] - 54:4, 54:5
**given** [8] - 3:24, 19:10, 41:6, 51:2, 85:11, 86:14, 89:6, 120:12
**glass** [1] - 22:15
**goals** [1] - 59:5
**God** [1] - 67:20
**Godelia** [19] - 3:2, 6:3, 41:6, 49:13, 49:15, 89:22, 91:9, 93:5, 95:16, 103:12, 103:15, 103:18, 104:6, 104:7, 104:18, 104:20, 104:21, 119:4, 120:23
**Godelia's** [2] - 5:7, 39:5
**grab** [1] - 116:21
**grabbing** [1] - 93:25
**graduate** [1] - 19:18
**graduating** [1] - 75:6
**grandparents** [1] - 107:19
**granting** [1] - 7:13

**grass** [3] - 116:11, 116:17, 116:18
**gray** [3] - 22:14, 26:11, 35:7
**great** [3] - 19:11, 50:24, 114:10
**grew** [1] - 107:18
**ground** [1] - 19:10
**grounds** [1] - 7:12
**Group** [1] - 16:25
**grouped** [1] - 99:19
**grow** [3] - 54:25, 73:3, 73:4
**growing** [3] - 54:9, 55:21, 55:22
**guard** [1] - 46:20
**guess** [7] - 43:13, 54:11, 58:9, 61:22, 71:15, 72:16, 75:24
**guidelines** [2] - 21:8, 35:5
**gurney** [2] - 68:1, 69:14
**guy** [2] - 107:1, 107:16

## H

**half** [3] - 87:5, 87:7, 87:8
**hamster** [1] - 53:3
**hand** [12] - 11:7, 16:10, 39:8, 39:14, 49:4, 63:2, 63:21, 64:6, 78:21, 78:23, 93:24, 107:24
**handling** [1] - 57:18
**hands** [1] - 24:17
**hanging** [1] - 51:11
**happy** [3] - 58:21, 58:22, 116:10
**hard** [3] - 58:3, 72:2, 94:2
**hassle** [1] - 102:5
**head** [1] - 66:8
**healthcare** [4] - 16:24, 17:7, 17:14, 84:24
**Healthcare** [1] - 96:23
**hear** [15] - 4:14, 7:2, 47:6, 48:5, 54:22, 60:1, 60:4, 60:6, 60:10, 60:15, 60:18, 63:10, 84:8, 120:14
**heard** [7] - 4:4, 8:1, 31:1, 48:2, 63:14, 84:10, 109:22
**heart** [14] - 24:24,

59:15, 70:2, 70:25, 82:20, 83:24, 84:1, 84:4, 84:6, 84:20, 84:21, 84:22, 84:23, 85:13
**heat** [6] - 22:4, 22:5, 22:7, 22:8, 34:20, 36:2
**heated** [2] - 21:1, 21:24
**heavier** [1] - 75:18
**heavy** [1] - 51:12
**held** [1] - 22:4
**help** [12] - 66:16, 67:20, 72:8, 73:15, 84:17, 86:9, 86:16, 111:6, 112:23, 112:25, 116:12, 116:15
**helped** [2] - 111:7, 114:3
**helpful** [1] - 45:22
**helping** [2] - 65:23, 116:19
**helps** [1] - 22:1
**herding** [1] - 16:4
**hereby** [1] - 121:8
**Hernandez** [5] - 76:25, 81:3, 91:3, 95:2, 119:1
**HERNANDEZ** [43] - 8:20, 47:13, 47:18, 47:22, 48:17, 49:12, 62:4, 62:13, 74:5, 74:10, 74:13, 76:10, 77:22, 79:18, 80:3, 87:23, 88:22, 89:1, 89:20, 90:2, 90:11, 90:20, 91:5, 91:6, 91:18, 91:21, 91:24, 91:25, 92:13, 92:15, 92:18, 92:21, 93:1, 93:3, 94:11, 94:16, 95:11, 102:25, 103:2, 103:4, 104:3, 104:5, 117:25
**Hernandez's** [1] - 84:13
**high** [6] - 18:24, 18:25, 51:11, 57:5, 67:3, 81:20
**higher** [1] - 45:21
**highlighted** [1] - 13:6
**highly** [1] - 6:5
**himself** [1] - 30:5
**hired** [1] - 27:16
**hiring** [2] - 97:8, 97:13
**history** [15] - 4:12,

23:2, 36:9, 36:10, 36:18, 36:19, 37:7, 37:13, 37:18, 38:19, 38:20, 38:21, 42:23, 43:9, 96:15
**hold** [6] - 39:11, 47:11, 47:14, 47:15, 47:21, 68:5
**holding** [7] - 63:2, 63:21, 64:6, 91:9, 93:5, 93:22, 93:23
**hole** [1] - 34:11
**holes** [1] - 26:24
**home** [11] - 56:14, 57:8, 57:10, 57:15, 57:20, 84:24, 111:20, 113:21, 113:23, 113:25, 114:18
**homes** [1] - 117:12
**honestly** [5] - 13:10, 54:19, 61:20, 73:14, 80:6
**Honor** [58] - 3:8, 3:13, 3:18, 5:3, 8:7, 8:9, 8:17, 9:25, 10:22, 10:23, 11:12, 14:1, 14:10, 14:18, 15:8, 21:9, 23:14, 23:22, 25:11, 30:24, 32:7, 34:13, 35:3, 36:11, 37:21, 38:12, 41:23, 44:5, 44:20, 46:12, 46:21, 47:13, 48:13, 74:6, 74:10, 76:10, 76:14, 77:22, 79:18, 80:3, 88:22, 89:25, 90:7, 91:5, 91:21, 92:21, 94:8, 94:16, 94:17, 94:21, 95:2, 95:11, 95:15, 102:4, 102:25, 103:4, 104:3, 120:2
**Honor's** [2] - 4:21, 5:3
**hopefully** [1] - 23:15
**hoping** [2] - 63:2, 70:20
**horrible** [1] - 72:14
**horror** [2] - 51:22, 51:23
**hospital** [36] - 17:9, 17:23, 17:25, 28:14, 28:16, 29:18, 32:13, 32:20, 32:22, 33:2, 36:25, 37:1, 37:4, 37:11, 56:15, 68:5, 68:18, 68:19, 68:23, 69:2, 69:5, 69:13, 69:19, 70:11, 70:13, 71:10, 71:14, 71:18,

76:5, 82:23, 82:25, 84:24, 85:13, 88:2, 95:20
**hospital's** [1] - 37:3
**hospitals** [7] - 17:18, 17:21, 18:10, 18:11, 18:18, 37:22, 58:2
**hotel** [2] - 109:11, 109:21
**hours** [4] - 98:6, 98:11, 98:20, 99:4
**house** [22] - 53:15, 53:16, 57:13, 59:7, 59:22, 59:24, 60:6, 61:1, 67:19, 68:22, 75:2, 75:20, 86:4, 105:17, 106:15, 106:17, 106:19, 106:23, 107:8, 111:16, 112:20
**household** [2] - 59:1, 111:2
**hug** [1] - 108:25
**human** [3] - 35:20, 35:21, 35:25
**hurry** [3] - 105:1, 105:2, 105:23
**hurt** [1] - 71:16
**hurting** [2] - 71:25
**hysteric** [1] - 60:22

## I

**idea** [1] - 61:16
**identify** [4] - 23:3, 23:8, 23:11, 41:16
**identifying** [1] - 45:22
**ignore** [1] - 12:25
**ill** [1] - 81:1
**illness** [3] - 58:19, 58:20, 84:15
**immediately** [3] - 64:10, 65:15, 68:19
**impact** [1] - 40:14
**impeaching** [1] - 90:7
**impeachment** [2] - 77:23, 77:24
**important** [5] - 27:3, 54:10, 55:19, 72:17, 86:16
**improper** [8] - 5:15, 6:6, 6:11, 30:2, 77:23, 77:24, 89:14, 89:17
**improved** [1] - 45:24
**incident** [4] - 59:15, 59:21, 68:19, 87:3
**incline** [1] - 11:4

**included** [1] - 22:21
**including** [1] - 80:10
**income** [1] - 51:17
**incoming** [1] - 37:3
**incorrect** [1] - 91:1
**indents** [1] - 26:24
**indicate** [2] - 39:9, 44:3
**indicated** [2] - 6:2, 6:3
**indication** [2] - 6:19, 69:3
**individual** [2] - 23:1, 23:5
**infrastructure** [1] - 51:12
**infuse** [1] - 21:2
**inherent** [1] - 5:25
**injecting** [1] - 15:2
**injure** [1] - 51:13
**inside** [7] - 22:2, 22:21, 60:6, 60:21, 88:18, 104:25, 105:1
**inspected** [2] - 37:3, 37:8
**inspection** [10] - 19:14, 21:19, 23:6, 27:16, 28:24, 29:1, 29:8, 33:19, 37:9
**installed** [1] - 18:7
**instance** [1] - 111:17
**instead** [1] - 10:8
**Institute** [1] - 19:24
**instruction** [2] - 3:10, 6:21
**instructions** [1] - 119:25
**insurance** [1] - 17:5
**intact** [1] - 34:18
**intend** [1] - 119:5
**intended** [2] - 48:3, 94:23
**interact** [1] - 106:14
**interest** [2] - 53:5, 53:19
**interested** [2] - 97:8, 101:6
**interfere** [2] - 65:19, 65:24
**internal** [1] - 22:2
**internally** [2] - 24:2, 25:10
**interpretation** [2] - 27:14, 43:12
**interpreting** [1] - 43:9
**interrupt** [1] - 65:17
**interrupted** [1] - 67:7
**intricate** [1] - 108:22
**introduce** [1] - 104:6

## I

**inviting** [1] - 6:23
**involved** [4] - 15:16, 18:11, 20:4, 20:24
**involvement** [3] - 17:12, 17:16, 41:21
**iron** [2] - 22:5, 35:22
**irrelevant** [4] - 4:25, 5:5, 31:18, 31:23
**issue** [12] - 3:16, 3:18, 3:23, 4:16, 5:12, 6:7, 6:10, 6:11, 15:2, 35:19, 72:17, 121:3
**issues** [1] - 86:10
**item** [1] - 21:3
**items** [2] - 18:3, 45:22
**itself** [1] - 22:2

## J

**Jackson** [2] - 114:24, 115:1
**Jamaica** [3] - 59:4, 104:9, 107:18
**January** [1] - 109:6
**Jermaine** [1] - 3:4
**Jersey** [1] - 19:24
**job** [12] - 18:12, 27:22, 51:7, 51:10, 51:14, 51:15, 73:13, 73:14, 110:23, 112:24, 113:1
**jobs** [1] - 35:21
**joined** [1] - 27:1
**joint** [13] - 14:11, 20:21, 21:15, 21:17, 21:22, 21:24, 22:14, 27:9, 33:12, 41:16, 42:4, 45:25, 46:5
**joints** [2] - 14:13, 33:24
**Jordan** [1] - 3:5
**Judge** [10] - 4:2, 6:25, 10:12, 29:10, 30:2, 46:24, 48:17, 77:14, 89:14, 103:7
**judge's** [1] - 9:5
**judges** [1] - 16:4
**Judges'** [1] - 16:3
**jug** [1] - 62:8
**jumper** [1] - 40:2
**Jurkovich** [1] - 84:8
**jurors** [1] - 48:2
**jury** [55] - 4:14, 6:7, 6:11, 6:23, 7:1, 7:17, 9:3, 9:4, 9:16, 9:18, 10:5, 10:13, 10:24, 15:23, 15:24, 15:25, 16:17, 17:1, 17:20,

18:22, 21:22, 22:18, 25:23, 29:13, 29:22, 30:20, 43:9, 47:3, 47:4, 48:18, 48:21, 49:1, 49:2, 53:1, 53:10, 54:16, 56:10, 61:2, 62:1, 62:10, 65:3, 77:1, 77:7, 77:21, 78:12, 91:23, 102:15, 102:19, 104:6, 104:22, 106:10, 111:6, 118:5, 119:22, 121:1

## K

**keep** [7] - 46:20, 47:21, 56:14, 71:4, 73:13, 75:20, 84:3
**kept** [1] - 36:23
**key** [1] - 38:5
**kid** [2] - 50:8, 53:24
**kidney** [6] - 79:7, 79:10, 79:11, 113:3, 114:20, 114:25
**kidneys** [1] - 113:12
**kids** [1] - 54:25
**kill** [1] - 109:5
**kind** [41] - 42:16, 42:18, 50:8, 50:11, 50:22, 51:2, 51:6, 51:7, 51:10, 51:12, 51:15, 51:20, 51:21, 51:23, 53:15, 54:20, 55:2, 55:11, 57:10, 58:25, 59:1, 63:15, 64:1, 72:23, 73:3, 73:10, 73:24, 85:14, 92:3, 92:5, 93:8, 93:10, 97:9, 109:21, 111:21, 112:19, 113:14, 117:17, 120:11
**kinds** [1] - 55:14
**kitchen** [5] - 60:7, 61:3, 67:17, 67:19, 77:2
**kneeling** [1] - 63:21
**knots** [1] - 34:22
**knowing** [1] - 111:13
**knowledge** [2] - 85:7, 88:11
**known** [2] - 5:13, 40:2
**knows** [2] - 27:23, 111:12

## L

**lab** [3] - 19:2, 19:7, 42:17
**laboratory** [1] - 18:5
**lack** [4] - 28:5, 32:16, 33:4, 37:22
**lacking** [1] - 27:19
**ladies** [10] - 7:19, 8:11, 9:19, 10:1, 16:1, 46:8, 94:18, 95:5, 103:21, 118:1
**lady** [1] - 105:2
**laid** [2] - 4:12, 61:3
**land** [2] - 117:12
**larger** [1] - 41:21
**Las** [2] - 109:9, 109:15
**last** [15] - 4:19, 4:23, 11:10, 16:13, 37:20, 49:8, 57:25, 69:12, 69:13, 73:1, 88:1, 94:24, 103:17, 109:7, 120:8
**late** [3] - 3:9, 59:20, 109:17
**law** [4] - 4:25, 6:1, 6:9, 29:13
**lawfully** [1] - 6:18
**lawn** [2] - 116:13, 116:15
**Lawyer** [1] - 104:18
**lawyers** [2] - 8:13, 17:5
**lay** [1] - 58:10
**laying** [2] - 62:23, 93:23
**lead** [1] - 34:11
**leading** [5] - 33:21, 44:5, 44:20, 45:8, 89:25
**leads** [2] - 22:23, 34:9
**lean** [1] - 55:22
**learn** [7] - 56:12, 74:2, 84:16, 84:17, 84:20, 99:20, 106:1
**learned** [4] - 20:13, 30:18, 32:2, 85:14
**learning** [2] - 19:2, 58:17
**least** [3] - 41:7, 116:20, 120:3
**leave** [5] - 46:12, 46:14, 109:15, 111:14, 114:6
**leaves** [1] - 72:11
**leaving** [2] - 19:5, 60:13

**LED** [1] - 50:1
**LEE** [66] - 3:4, 3:13, 8:7, 8:9, 8:17, 8:21, 9:7, 9:13, 9:25, 10:8, 10:22, 14:10, 15:8, 16:16, 21:11, 23:14, 23:21, 23:25, 24:10, 24:12, 25:11, 25:20, 26:1, 26:15, 28:12, 28:21, 30:12, 31:11, 31:21, 32:1, 32:10, 32:19, 33:1, 33:8, 33:18, 33:22, 34:24, 35:9, 36:11, 36:16, 37:25, 38:16, 39:2, 41:23, 43:22, 44:1, 44:8, 44:23, 45:5, 45:10, 46:7, 46:20, 46:24, 47:5, 47:9, 95:2, 95:15, 95:19, 95:22, 96:1, 102:4, 103:12, 119:1, 119:6, 120:2, 120:8
**Lee** [15] - 3:4, 3:11, 3:12, 3:24, 7:2, 8:6, 14:7, 15:7, 42:22, 46:17, 47:6, 102:12, 103:11, 104:18, 118:25
**Lee's** [1] - 43:16
**left** [6] - 39:8, 44:2, 68:20, 72:23, 85:13, 105:24
**left-hand** [1] - 39:8
**legacy** [1] - 88:17
**legal** [3] - 16:6, 28:13, 28:23
**less** [4] - 100:6, 100:7, 100:8, 119:16
**level** [2] - 46:3, 78:6
**life** [17] - 50:19, 50:20, 50:23, 56:4, 56:17, 56:18, 69:4, 69:19, 70:8, 72:13, 73:20, 80:16, 80:17, 80:24, 108:22, 117:7, 120:9
**lifetime** [1] - 37:5
**LifeVest** [35] - 4:7, 4:15, 5:7, 6:1, 6:13, 6:17, 8:2, 8:3, 11:23, 12:18, 12:21, 13:4, 20:16, 21:6, 45:6, 45:11, 83:25, 85:15, 86:10, 88:1, 94:13, 98:8, 98:9, 99:2, 99:13, 101:9, 101:10, 101:16, 101:18, 101:22, 102:1
**lift** [1] - 70:22

**likely** [1] - 69:25
**limine** [3] - 4:22, 7:12, 29:11
**limited** [1] - 44:24
**line** [12] - 89:9, 90:5, 90:10, 90:12, 91:17, 92:1, 92:11, 92:14, 92:15, 97:3, 101:12, 113:16
**lingering** [1] - 104:24
**list** [2] - 23:16, 114:25
**listen** [1] - 31:4
**literally** [2] - 63:22, 69:14
**live** [14] - 8:15, 82:12, 82:14, 84:17, 87:18, 88:18, 95:8, 99:7, 99:10, 99:11, 99:14, 99:21, 100:1, 100:12
**lived** [3] - 82:10, 82:14, 110:5
**living** [4] - 49:19, 104:10, 110:11, 114:7
**LLC** [1] - 3:2
**lock** [2] - 36:6, 68:21
**logged** [2] - 37:9, 37:10
**look** [12] - 17:10, 24:2, 25:6, 25:24, 26:8, 26:23, 27:24, 39:14, 76:7, 76:23, 92:16, 117:11
**looked** [3] - 88:6, 105:2, 108:9
**looking** [7] - 4:19, 17:6, 18:4, 20:10, 26:9, 40:4, 107:1
**looks** [4] - 26:18, 27:4, 27:5, 118:16
**loose** [1] - 40:14
**lost** [3] - 71:2, 82:3, 94:24
**love** [9] - 52:17, 52:19, 52:22, 54:22, 54:24, 111:12, 117:4, 117:6
**loved** [15] - 50:11, 51:22, 51:23, 53:2, 53:3, 53:4, 59:9, 106:21, 111:1, 112:2, 112:3, 116:6
**lover** [1] - 53:11
**loves** [3] - 111:24
**loving** [1] - 56:23
**luggage** [1] - 109:18
**lunch** [3] - 9:21, 10:2, 119:8
**Lunch** [1] - 10:17

**lunchtime** [1] - 118:20
**lying** [2] - 91:9, 93:5

## M

**machine** [2] - 24:25, 35:20
**machines** [1] - 35:22
**magnification** [5] - 25:21, 25:22, 26:7, 45:22, 46:3
**magnified** [1] - 21:19
**magnifying** [1] - 22:15
**maintained** [1] - 18:7
**major** [1] - 56:3
**Man** [1] - 111:18
**man** [6] - 29:15, 50:25, 73:3, 73:4, 108:10, 116:1
**manage** [2] - 58:14, 58:16
**managed** [6] - 56:10, 56:11, 56:12, 82:11, 82:12, 82:14
**manager** [2] - 16:24, 17:2
**manner** [1] - 90:24
**manual** [3] - 20:3, 86:15, 86:19
**manufacturer** [3] - 17:25, 18:3, 42:24
**manufacturing** [3] - 5:21, 5:24, 29:17
**March** [1] - 7:6
**marketed** [1] - 6:18
**marks** [2] - 26:1, 26:2
**married** [9] - 54:25, 107:22, 107:25, 109:2, 109:3, 109:11, 109:16, 109:20, 109:21
**match** [2] - 115:16, 115:17
**materia** [4] - 91:2, 91:12, 91:16, 92:20
**materials** [1] - 27:8
**math** [1] - 101:14
**matter** [7] - 4:25, 6:1, 6:9, 106:16, 109:21, 114:10, 121:10
**mean** [16] - 6:20, 13:24, 44:18, 58:23, 60:23, 61:22, 63:18, 72:6, 78:15, 79:22, 80:1, 98:25, 109:13, 113:10, 115:6, 115:24

**meaning** [1] - 8:12
**means** [4] - 5:23, 20:23, 26:25, 44:4
**meant** [3] - 13:13, 19:21
**meantime** [1] - 70:23
**mechanical** [1] - 36:6
**mechanically** [2] - 34:7, 34:18
**medical** [20] - 17:13, 17:16, 17:19, 17:21, 17:22, 18:15, 32:15, 32:21, 35:14, 36:21, 37:11, 42:24, 79:23, 85:15, 96:5, 96:11, 96:13, 96:23, 96:24, 97:1
**Medical** [1] - 27:15
**medication** [1] - 114:4
**medium** [6] - 78:14, 78:15, 92:8, 93:12, 93:13
**meet** [6] - 29:23, 79:22, 84:11, 104:20, 106:6
**meeting** [9] - 9:5, 9:20, 10:19, 16:2, 16:3, 79:16, 79:21, 79:25, 80:2
**melt** [3] - 21:2, 21:25, 34:21
**memories** [2] - 54:14, 75:3
**memory** [3] - 74:22, 75:21, 88:17
**mentality** [1] - 107:21
**mention** [1] - 89:22
**mentioned** [4] - 45:21, 55:17, 67:13, 80:14
**mess** [1] - 67:12
**message** [1] - 85:2
**met** [8] - 69:1, 79:15, 84:9, 85:23, 99:20, 104:21, 104:22, 106:22
**metal** [1] - 26:7
**metallurgist** [6] - 15:20, 15:21, 40:18, 40:20, 42:6, 42:9
**metals** [1] - 51:12
**method** [1] - 23:6
**Miami** [2] - 121:15, 121:15
**mic** [1] - 48:6
**microphone** [3] - 43:23, 45:17, 118:10

**microphones** [2] - 48:8, 48:15
**microscope** [3] - 42:16, 42:17, 42:18
**microscopic** [1] - 15:15
**middle** [1] - 25:5
**midway** [1] - 67:9
**might** [5] - 67:11, 67:12, 74:1, 85:3, 113:13
**military** [1] - 20:12
**million** [1] - 117:11
**mindful** [1] - 48:7
**mine** [3] - 16:5, 60:3, 107:9
**minimum** [3] - 32:4, 33:9, 33:25
**Minneapolis** [1] - 36:25
**minute** [4] - 3:17, 42:5, 54:21, 104:3
**minutes** [7] - 9:2, 29:15, 47:23, 61:23, 62:3, 102:13, 102:16
**Miramar** [1] - 117:10
**miserable** [1] - 72:12
**misrepresented** [2] - 77:6, 78:11
**miss** [1] - 72:20
**mistaken** [1] - 40:25
**mistrial** [2] - 4:3, 7:13
**mobile** [1] - 114:11
**mock** [1] - 27:16
**model** [2] - 17:24, 50:22
**moderate** [1] - 78:6
**mom** [74] - 50:16, 51:16, 51:19, 51:21, 52:1, 52:6, 52:19, 52:22, 53:24, 53:25, 54:11, 54:12, 54:13, 54:15, 54:21, 55:2, 55:8, 55:19, 55:24, 56:1, 56:21, 56:24, 57:16, 57:20, 58:13, 59:4, 59:8, 59:17, 59:19, 60:6, 60:10, 60:12, 60:15, 60:22, 61:2, 61:3, 61:10, 62:21, 62:23, 62:25, 63:11, 63:21, 64:1, 65:5, 65:9, 67:16, 68:9, 68:20, 69:18, 72:16, 72:20, 72:23, 73:4, 73:16, 73:17, 73:19, 75:3, 75:10, 75:12, 76:6, 80:15, 80:18, 83:18, 87:6,

89:23, 91:8, 91:9, 93:5, 93:6, 93:22
**mom's** [7] - 49:18, 51:4, 54:12, 64:6, 69:14, 72:22, 93:23
**moment** [6] - 5:1, 10:25, 53:21, 103:20, 114:12, 114:15
**Mommy** [1] - 84:4
**Monday** [2] - 118:17, 118:24
**money** [2] - 57:19, 57:20
**monitor** [1] - 76:23
**month** [5] - 98:1, 98:17, 100:3, 101:3, 101:17
**months** [2] - 97:18, 97:24
**Moody** [1] - 7:5
**morning** [16] - 4:2, 5:20, 7:19, 7:23, 7:25, 59:16, 59:17, 69:25, 109:17, 114:5, 118:3, 118:20, 119:14, 120:13, 120:18, 120:21
**most** [4] - 26:10, 35:19, 58:23, 107:18
**mother** [19] - 49:14, 50:5, 50:8, 55:21, 55:22, 65:20, 73:1, 77:3, 78:5, 79:6, 79:16, 80:8, 80:11, 80:12, 82:17, 83:17, 85:23, 86:23, 88:16
**mother's** [3] - 75:20, 75:25, 86:16
**motion** [4] - 4:3, 4:22, 5:11, 7:12
**motions** [1] - 29:10
**Motor** [1] - 7:5
**mouth** [2] - 68:14, 90:3
**move** [11] - 21:9, 23:14, 24:1, 25:11, 28:5, 34:13, 36:11, 37:21, 72:13, 111:20, 117:10
**moved** [3] - 4:23, 58:11, 87:22
**moves** [1] - 5:4
**movie** [7] - 51:21, 107:7, 107:12, 107:13, 107:14, 107:16
**movies** [14] - 50:11, 51:20, 51:22, 52:7, 52:9, 52:11, 52:14, 105:13, 107:6,

107:11, 107:17, 107:21
**moving** [3] - 59:7, 61:4, 68:14
**MR** [204] - 3:4, 3:5, 3:8, 3:13, 3:16, 3:21, 4:2, 7:3, 7:5, 7:9, 7:11, 8:7, 8:9, 8:17, 8:20, 8:21, 9:7, 9:13, 9:25, 10:8, 10:12, 10:16, 10:22, 10:23, 11:12, 11:15, 14:1, 14:5, 14:10, 14:20, 15:8, 15:13, 15:14, 16:16, 21:9, 21:11, 23:14, 23:18, 23:21, 23:25, 24:10, 24:12, 25:11, 25:16, 25:20, 26:1, 26:15, 28:5, 28:12, 28:21, 29:10, 30:12, 30:23, 31:8, 31:11, 31:18, 31:21, 31:23, 32:1, 32:7, 32:10, 32:16, 32:19, 32:23, 33:1, 33:4, 33:8, 33:13, 33:18, 33:20, 33:22, 34:3, 34:13, 34:24, 35:3, 35:9, 35:17, 36:11, 36:13, 36:16, 37:21, 37:25, 38:12, 38:16, 38:23, 39:2, 39:6, 41:23, 42:2, 43:20, 43:22, 44:1, 44:5, 44:8, 44:20, 44:23, 45:3, 45:5, 45:8, 45:10, 46:7, 46:12, 46:20, 46:24, 46:25, 47:5, 47:9, 47:13, 47:17, 47:18, 47:22, 48:5, 48:10, 48:13, 48:17, 49:12, 62:4, 62:13, 74:5, 74:10, 74:13, 76:10, 76:13, 76:17, 77:14, 77:17, 77:22, 78:1, 78:24, 79:2, 79:18, 79:20, 80:3, 80:7, 87:23, 87:25, 88:20, 88:22, 89:1, 89:14, 89:17, 89:20, 89:25, 90:2, 90:7, 90:11, 90:18, 90:20, 91:1, 91:5, 91:6, 91:12, 91:15, 91:18, 91:21, 91:23, 91:24, 91:25, 92:11, 92:13, 92:14, 92:15, 92:18, 92:19, 92:21, 93:1, 93:3, 94:8, 94:11, 94:16, 95:2, 95:11, 95:15, 95:18,

95:19, 95:20, 95:22, 96:1, 102:4, 102:8, 102:25, 103:2, 103:4, 103:7, 103:10, 103:12, 104:3, 104:5, 117:25, 118:8, 118:11, 119:1, 119:6, 119:10, 119:14, 119:17, 119:23, 120:1, 120:2, 120:5, 120:8, 120:11, 120:17, 120:22

**multiple** [4] - 98:24, 100:2, 100:3, 100:5

## N

**name** [11] - 11:10, 16:13, 49:8, 49:9, 63:2, 79:15, 84:8, 84:10, 96:2, 103:17, 104:7

**nature** [3] - 28:24, 29:8, 53:20

**neat** [2] - 116:6

**neatly** [1] - 116:7

**necessary** [1] - 41:16

**need** [18] - 4:1, 11:6, 37:14, 45:19, 46:12, 54:21, 66:17, 67:11, 67:21, 69:7, 72:18, 73:13, 79:4, 94:25, 102:10, 116:9, 118:6

**needed** [4] - 16:6, 39:15, 40:5, 41:10

**needs** [2] - 39:14, 46:18

**neighborhood** [1] - 117:11

**neighboring** [1] - 59:12

**nephrologist** [1] - 113:9

**network** [1] - 40:4

**never** [20] - 6:17, 42:24, 43:2, 43:5, 59:4, 73:21, 73:22, 73:23, 79:15, 80:20, 83:18, 85:11, 85:12, 86:12, 86:19, 86:21, 86:23, 88:6, 115:17, 117:6

**New** [1] - 19:23

**new** [6] - 17:9, 19:13, 19:17, 58:17, 87:20, 97:8

**news** [2] - 118:16, 118:17

**next** [27] - 7:2, 10:7, 27:3, 46:11, 46:23, 48:1, 48:16, 59:19, 60:4, 61:18, 62:25, 63:21, 64:7, 66:23, 67:16, 69:14, 69:22, 75:14, 92:1, 92:2, 95:1, 95:5, 97:12, 103:11, 107:9, 119:14

**night** [7] - 4:19, 107:7, 107:12, 107:13, 109:24, 110:12, 114:5

**nights** [1] - 107:7

**nine** [3] - 91:17, 97:2, 97:3

**nobody** [1] - 80:23

**node** [1] - 25:6

**noise** [5] - 12:7, 12:22, 12:23, 12:25, 13:5

**non** [1] - 21:7

**non-complete** [1] - 21:7

**none** [5] - 3:13, 23:18, 25:16, 30:24

**noon** [1] - 119:18

**normal** [2] - 56:17, 56:18

**north** [2] - 53:12, 59:11

**North** [2] - 19:6, 121:15

**Northern** [1] - 7:6

**note** [1] - 9:7

**nothing** [5] - 7:24, 37:17, 41:11, 68:15, 88:20

**notice** [2] - 26:23, 27:3

**November** [4] - 40:8, 59:14, 83:24, 84:23

**number** [6] - 3:3, 20:9, 23:15, 99:22, 100:6, 105:9

**nurse** [1] - 84:24

**nurses** [3] - 56:13, 58:1, 69:2

## O

**o'clock** [4] - 10:2, 10:11, 103:8, 118:2

**oath** [1] - 8:13

**object** [6] - 21:9, 31:7, 38:12, 77:22, 89:14, 90:8

**Objection** [1] - 80:3

**objection** [28] - 3:12,

23:17, 25:15, 28:5, 29:22, 29:23, 31:18, 31:23, 32:7, 32:16, 32:23, 33:4, 33:13, 33:20, 33:21, 34:3, 35:3, 35:17, 36:13, 38:23, 39:6, 44:5, 45:3, 45:8, 79:18, 87:23, 89:25, 90:18

**observe** [2] - 35:25, 100:16

**observed** [4] - 100:19, 100:21, 100:24, 100:25

**obtain** [1] - 96:13

**obviously** [13] - 4:18, 51:25, 54:3, 56:13, 60:8, 71:8, 71:23, 72:12, 73:20, 78:16, 80:14, 88:9, 93:25

**Ocala** [1] - 53:12

**occasion** [2] - 83:4, 86:3

**occasions** [7] - 83:9, 83:12, 83:13, 83:15, 83:20, 83:21, 85:24

**October** [1] - 77:19

**offer** [4] - 14:9, 14:22, 21:5, 27:12

**offered** [2] - 14:17, 84:24

**offering** [11] - 11:19, 14:10, 14:16, 14:17, 15:7, 15:8, 15:9, 28:20, 28:21, 31:12, 43:17

**office** [1] - 113:10

**OFFICER** [10] - 7:16, 9:3, 9:16, 10:4, 15:24, 47:3, 48:19, 49:1, 61:25, 118:4

**officer** [2] - 110:13, 110:15

**Official** [1] - 121:14

**often** [2] - 106:20, 107:6

**oils** [1] - 22:24

**Oklahoma** [1] - 7:6

**old** [7] - 19:12, 50:3, 50:5, 107:2, 110:14, 115:23, 116:1

**older** [2] - 54:1, 75:14

**omnibus** [1] - 4:22

**once** [6] - 18:6, 60:7, 65:2, 67:10, 83:19, 119:1

**one** [71] - 5:19, 7:3, 13:1, 13:6, 14:11, 14:12, 17:10, 18:5,

20:22, 21:3, 21:24, 24:16, 24:20, 24:21, 25:4, 25:7, 27:17, 36:4, 36:24, 38:20, 43:15, 43:16, 43:17, 48:2, 48:24, 68:24, 69:14, 73:14, 73:20, 74:3, 74:5, 74:12, 74:14, 74:15, 78:16, 82:3, 82:17, 83:3, 84:14, 85:13, 85:20, 86:3, 94:16, 95:16, 95:17, 95:19, 97:7, 99:3, 99:10, 99:11, 99:13, 99:20, 99:21, 105:17, 106:12, 108:23, 111:1, 111:9, 111:18, 112:5, 112:23, 113:11, 114:4, 114:12, 114:13, 117:7, 117:19, 120:11

**ones** [2] - 31:16, 100:19

**open** [4] - 8:19, 8:25, 24:13, 74:3

**opened** [2] - 31:3, 60:8

**opening** [3] - 63:8, 63:10, 77:1

**operator** [2] - 66:22, 67:13

**opine** [1] - 30:7

**opinion** [37] - 5:9, 8:1, 8:4, 8:5, 13:21, 13:23, 14:4, 14:9, 14:14, 14:23, 15:6, 15:9, 20:16, 20:19, 20:20, 21:5, 21:12, 21:16, 27:11, 27:12, 27:13, 28:11, 28:20, 28:21, 29:9, 30:4, 30:8, 38:8, 38:24, 41:8, 42:4, 42:10, 42:11, 42:14, 43:17, 78:15, 108:23

**opinions** [14] - 11:20, 14:2, 14:11, 14:18, 14:22, 20:18, 29:20, 31:13, 36:7, 36:9, 38:2, 38:11, 38:13, 39:4

**option** [1] - 85:3

**options** [2] - 115:10, 115:13

**orange** [1] - 27:4

**Orange** [1] - 110:15

**Order** [2] - 3:1, 10:18

**order** [8] - 4:20, 5:4, 5:16, 7:12, 19:18,

25:1, 116:7, 120:13

**ordering** [1] - 120:11

**organized** [1] - 114:5

**originally** [1] - 104:8

**Orsini** [7] - 95:3, 95:14, 95:18, 95:23, 96:3, 102:22, 120:17

**Orsini's** [1] - 120:7

**OSHA** [3] - 98:2, 101:6, 101:7

**outlet** [1] - 45:18

**outside** [10] - 10:13, 10:24, 16:7, 53:6, 57:12, 59:25, 60:2, 60:9, 105:4, 105:6

**outsider** [1] - 106:19

**outweigh** [1] - 6:1

**overlay** [1] - 34:16

**overruled** [24] - 21:10, 31:19, 31:24, 32:9, 32:24, 33:6, 33:14, 34:4, 34:14, 35:4, 35:18, 37:24, 38:14, 39:1, 39:7, 44:6, 44:21, 45:4, 77:25, 80:5, 89:19, 90:1, 90:9, 90:19

**oversight** [3] - 27:18, 27:20, 28:3

**overwhelmed** [1] - 64:19

**own** [7] - 20:2, 55:20, 74:4, 89:15, 89:17, 90:7, 117:2

**oxygen** [1] - 71:1

## P

**p.m** [10] - 10:5, 15:25, 47:4, 49:2, 62:1, 62:10, 102:15, 102:19, 118:5, 121:5

**package** [1] - 37:18

**page** [21] - 13:6, 38:5, 38:6, 40:25, 43:23, 74:12, 74:17, 74:19, 74:25, 75:5, 75:8, 75:14, 75:16, 89:8, 91:15, 91:17, 92:16, 96:4, 96:10, 97:3, 109:7

**pages** [2] - 4:21, 77:18

**pain** [3] - 56:7, 71:25

**painful** [2] - 54:19, 66:3

**pair** [1] - 34:20

**paragraph** [1] - 13:6

**paramedics** [2] -

66:18, 69:8

**paraphrasing** [1] - 4:18

**parents** [5] - 60:6, 80:17, 84:1, 86:5, 86:15

**pari** [4] - 91:2, 91:12, 91:16, 92:19

**parks** [2] - 50:10, 54:23

**part** [18] - 5:11, 19:7, 22:21, 24:4, 24:16, 56:17, 56:18, 58:23, 63:18, 72:3, 78:19, 78:23, 93:20, 93:22, 106:8, 107:18, 108:22, 110:12

**part-time** [1] - 110:12

**particular** [13] - 17:6, 18:4, 24:4, 25:9, 26:7, 37:13, 51:20, 54:14, 98:6, 105:17, 107:12, 107:17, 114:11

**parties** [4] - 28:7, 48:7, 103:23, 111:24

**Partin** [3] - 8:10, 8:18, 8:20

**parts** [3] - 24:14, 39:9, 44:3

**party** [1] - 59:10

**pass** [3] - 83:17, 83:18, 83:20

**passage** [1] - 92:23

**passed** [9] - 50:5, 54:16, 76:6, 83:3, 83:8, 83:12, 83:18, 83:19, 87:6

**passing** [2] - 55:21, 72:22

**patch** [1] - 108:4

**patience** [1] - 16:2

**patient** [12] - 5:10, 6:2, 6:4, 24:23, 25:2, 98:5, 99:2, 99:7, 99:11, 100:15, 100:17

**patient's** [1] - 24:25

**patients** [6] - 96:25, 98:9, 101:16, 101:22, 102:1

**PATRICIA** [1] - 121:13

**patterns** [1] - 13:2

**pause** [1] - 9:12

**pay** [1] - 57:17

**pencil** [1] - 22:6

**people** [7] - 6:16, 37:3, 37:15, 62:17, 106:13, 110:15, 118:13

**per** [3] - 12:21, 13:5, 102:10

**perfect** [3] - 24:14, 34:11, 39:12

**perfectly** [1] - 43:15

**perhaps** [1] - 48:3

**period** [6] - 17:18, 81:4, 82:12, 87:8, 98:1, 101:17

**permits** [1] - 5:10

**person** [8] - 8:15, 73:7, 73:8, 88:16, 106:17, 108:24, 116:6

**person's** [1] - 13:20

**personality** [3] - 56:22, 116:4, 116:5

**personally** [1] - 79:15

**perspective** [2] - 54:4, 68:13

**pet** [1] - 53:2

**Pete** [1] - 3:5

**PG** [1] - 84:3

**phone** [13] - 35:14, 52:5, 60:2, 60:9, 64:11, 64:13, 64:15, 66:16, 68:22, 105:15, 105:16, 105:25

**photo** [1] - 75:12

**photograph** [3] - 25:13, 25:17, 25:21

**photos** [1] - 75:25

**physically** [2] - 22:20, 75:21

**PICC** [1] - 113:16

**pick** [3] - 20:2, 24:24, 107:8

**picture** [10] - 25:23, 27:9, 45:21, 45:23, 54:8, 74:17, 74:20, 74:25, 83:25, 109:8

**pictures** [4] - 74:15, 75:9, 75:14, 75:16

**piece** [5] - 17:9, 17:24, 26:20, 26:21, 54:10

**Pinnacle** [3] - 96:23, 96:24, 97:1

**pipe** [1] - 50:1

**place** [5] - 21:4, 25:9, 50:1, 58:2, 72:4

**places** [1] - 53:12

**placing** [4] - 39:9, 44:3, 101:22, 102:1

**plain** [7] - 28:13, 28:23, 29:7, 31:25, 44:9, 44:10, 71:7

**plaintiff** [1] - 3:4

**plaintiffs'** [6] - 4:6, 5:14, 6:6, 6:22, 74:10,

118:13

**Plaintiffs'** [6] - 23:15, 23:20, 36:11, 36:15, 43:22, 74:8

**plan** [1] - 5:24

**plane** [3] - 109:16, 109:17, 109:18

**planning** [1] - 59:9

**plans** [8] - 58:25, 59:1, 73:24, 115:4, 115:6, 116:22, 116:24, 117:1

**play** [2] - 8:9, 8:21

**played** [3] - 8:19, 8:25, 9:22

**pleasant** [2] - 58:21, 58:22

**plug** [2] - 71:8, 82:18

**PMA** [2] - 6:9, 15:10

**point** [25] - 3:23, 14:1, 19:5, 34:16, 38:14, 41:11, 43:15, 56:24, 58:13, 60:21, 68:6, 69:4, 69:18, 70:7, 71:2, 71:7, 80:24, 85:13, 89:12, 92:9, 93:14, 112:17, 113:11, 115:15, 117:20

**pond** [1] - 117:13

**population** [2] - 6:2, 6:4

**porch** [2] - 59:25, 60:2

**portion** [1] - 29:6

**Portions** [1] - 95:23

**portions** [1] - 8:10

**position** [7] - 18:13, 61:7, 61:9, 61:14, 73:20, 97:9, 97:10

**positively** [1] - 115:25

**possibility** [1] - 85:3

**possible** [1] - 84:3

**possibly** [5] - 51:13, 55:23, 65:16, 65:17, 117:21

**powerful** [1] - 42:20

**practices** [3] - 18:14, 20:12, 32:2

**praying** [1] - 67:18

**preempted** [1] - 6:9

**preemption** [5] - 15:3, 33:13, 34:3, 35:17, 37:22

**prefer** [2] - 91:19, 120:14

**pregnant** [1] - 104:25

**prejudicial** [3] - 4:14,

5:2, 5:19

**preliminary** [1] - 119:25

**prep** [1] - 18:25

**prepared** [1] - 4:10

**prepurchase** [1] - 18:2

**preschool** [1] - 75:6

**prescribed** [4] - 85:17, 85:18, 85:21, 85:22

**prescribing** [1] - 8:2

**presence** [4] - 8:13, 10:13, 10:24, 16:7

**present** [4] - 8:12, 86:3, 111:8, 111:22

**presented** [1] - 95:6

**press** [1] - 67:11

**pressure** [1] - 81:20

**preteens** [1] - 54:1

**pretty** [12] - 50:14, 50:16, 53:18, 72:3, 84:5, 104:14, 106:2, 106:13, 106:14, 107:16, 107:18, 117:19

**prevented** [1] - 29:2

**previously** [1] - 26:22

**primarily** [1] - 18:12

**private** [2] - 18:24, 46:19

**problem** [7] - 14:20, 39:4, 48:22, 91:21, 91:24, 110:3, 116:20

**problems** [3] - 82:20, 86:10, 118:23

**procedure** [2] - 89:15, 89:17

**proceed** [5] - 8:6, 11:12, 48:1, 76:14, 104:2

**proceeding** [2] - 119:8, 119:24

**proceedings** [2] - 121:5, 121:9

**process** [16] - 15:10, 29:5, 29:17, 29:22, 32:5, 33:9, 33:11, 35:14, 71:3, 97:13, 97:16, 97:19, 113:20, 115:7, 120:2

**processes** [5] - 28:22, 30:16, 34:25, 35:10

**product** [4] - 20:5, 36:22, 36:25, 37:19

**production** [3] - 49:20, 49:23, 74:3

**professional** [1] -

72:7

**professor** [1] - 19:23

**proffered** [1] - 15:5

**program** [3] - 19:2, 19:18, 35:6

**programmed** [1] - 35:23

**progressively** [1] - 58:14

**project** [3] - 19:20, 20:1, 20:2

**prompt** [2] - 60:14, 66:11

**proper** [10] - 17:24, 22:4, 22:13, 29:1, 32:5, 33:24, 34:2, 35:15, 37:6, 97:14

**properly** [9] - 14:11, 19:13, 22:12, 25:24, 26:13, 27:1, 34:6, 36:3, 38:3

**proposition** [2] - 7:10, 7:11

**propriety** [1] - 12:15

**prove** [1] - 19:20

**provide** [1] - 51:16

**provided** [2] - 27:19, 36:10

**PSR** [24] - 95:15, 97:17, 97:22, 97:25, 98:4, 98:6, 98:9, 99:1, 99:7, 99:12, 99:13, 99:20, 99:24, 100:14, 100:17, 100:20, 100:25, 101:4, 101:11, 101:14, 101:18, 101:20, 101:24

**PSRs** [1] - 97:8

**public** [1] - 62:16

**published** [1] - 4:9

**pull** [3] - 34:18, 43:22, 109:7

**pulled** [6] - 20:21, 25:13, 71:8, 82:18, 88:4, 94:13

**pulling** [1] - 34:19

**pulse** [6] - 68:3, 68:4, 68:5, 69:17

**purpose** [1] - 53:8

**purposes** [1] - 46:22

**push** [1] - 34:16

**push-point** [1] - 34:16

**put** [20] - 6:20, 7:3, 19:12, 19:13, 22:4, 22:5, 23:23, 35:24, 39:13, 39:24, 42:23, 44:11, 64:22, 68:1, 69:4, 69:18, 73:20,

78:16, 111:20, 119:11
**puts** [1] - 72:14

## Q

**qualifications** [3] - 13:21, 42:7, 42:13
**qualified** [1] - 11:20
**quality** [12] - 14:13, 14:14, 18:14, 20:13, 28:22, 29:2, 29:5, 30:16, 32:2, 33:3, 33:9, 35:5
**questions** [23] - 11:17, 13:22, 15:11, 31:4, 41:23, 43:16, 43:20, 46:9, 54:6, 61:5, 74:7, 76:11, 76:21, 79:4, 84:14, 86:10, 89:11, 92:25, 93:16, 94:6, 94:17, 94:19, 95:3
**quick** [2] - 105:4, 120:3
**quickly** [2] - 3:18, 7:4
**quite** [1] - 20:10
**quote** [3] - 5:4, 5:9, 5:11

## R

**rabbit** [1] - 53:2
**radiation** [1] - 74:1
**radio** [2] - 19:10, 35:13
**rain** [3] - 105:20, 105:23, 105:24
**raining** [2] - 105:17, 105:18
**raise** [4] - 11:7, 16:10, 49:4, 53:16
**raised** [1] - 4:15
**raising** [1] - 73:23
**ran** [4] - 10:19, 16:3, 57:15, 111:2
**rate** [1] - 24:24
**rather** [1] - 38:20
**ray** [1] - 21:20
**re** [3] - 32:8, 92:22, 92:24
**re-read** [2] - 92:22, 92:24
**reach** [2] - 36:9, 39:4
**reached** [2] - 20:16, 97:16
**reaching** [2] - 36:7, 38:8
**react** [1] - 60:14

**reaction** [4] - 60:11, 63:13, 77:1, 106:25
**read** [39] - 3:14, 3:20, 8:3, 28:23, 29:3, 29:6, 29:19, 31:15, 31:16, 31:17, 31:22, 39:8, 44:2, 77:12, 77:20, 78:2, 86:19, 86:21, 86:23, 86:25, 91:1, 91:3, 91:14, 91:15, 91:16, 91:19, 91:22, 92:11, 92:13, 92:15, 92:17, 92:18, 92:19, 92:22, 92:24, 95:9, 95:24, 102:9, 120:8
**reading** [4] - 5:3, 10:9, 43:11, 102:22
**ready** [15] - 7:1, 8:6, 8:16, 8:23, 10:21, 16:9, 36:22, 48:25, 62:12, 95:22, 102:21, 104:2, 119:11, 119:17, 120:22
**real** [2] - 12:6, 105:12
**realize** [1] - 65:15
**realized** [2] - 65:9, 67:10
**really** [19] - 6:11, 13:13, 27:23, 29:25, 50:12, 51:16, 51:25, 53:20, 55:20, 61:6, 66:1, 69:24, 71:11, 72:18, 76:23, 84:3, 106:18, 107:10, 118:11
**rear** [3] - 24:18, 39:15, 44:14
**reason** [5] - 4:8, 107:17, 111:12, 111:13, 120:17
**reasons** [3] - 5:18, 73:19, 82:17
**receive** [6] - 98:19, 98:23, 99:18, 99:23, 101:3, 101:11
**received** [4] - 5:22, 101:15, 101:21, 101:25
**recess** [10] - 9:14, 9:15, 10:2, 10:17, 47:24, 62:6, 102:17, 118:1, 118:7, 121:4
**recitation** [1] - 120:7
**recollection** [1] - 113:16
**recommend** [1] - 114:24
**reconsider** [1] - 6:8
**reconsidering** [1] -

6:16
**record** [10] - 7:3, 11:10, 16:13, 36:23, 46:21, 47:19, 47:25, 49:8, 96:2, 103:17
**records** [1] - 110:22
**recruit** [1] - 58:1
**redirect** [2] - 43:21, 88:21
**REDIRECT** [2] - 43:25, 88:25
**reevaluating** [1] - 4:17
**reference** [1] - 8:4
**referred** [1] - 25:5
**referring** [3] - 26:16, 26:17, 39:18
**refresher** [1] - 37:15
**regain** [1] - 68:9
**regard** [2] - 21:5, 43:8
**regarding** [6] - 5:17, 7:20, 8:3, 15:11, 36:8, 43:5
**regardless** [1] - 35:13
**register** [1] - 37:1
**regulation** [7] - 28:13, 28:20, 30:1, 30:12, 30:14, 31:1, 43:18
**regulations** [18] - 11:19, 28:15, 28:17, 28:23, 29:3, 29:6, 29:12, 29:19, 29:23, 30:5, 30:13, 30:15, 30:24, 31:13, 31:16, 32:15, 32:21
**rejected** [2] - 85:4, 85:5
**relate** [1] - 33:19
**related** [2] - 3:16, 36:8
**relates** [12] - 18:18, 20:13, 20:15, 25:23, 32:15, 33:3, 33:23, 38:11, 41:8, 101:15, 101:21, 101:25
**relating** [1] - 33:25
**relation** [3] - 61:6, 61:9, 104:17
**relationship** [10] - 49:13, 49:15, 53:23, 53:25, 105:11, 105:12, 106:1, 106:10, 107:4, 110:16
**relayed** [1] - 85:2
**release** [1] - 93:24
**relevance** [4] - 32:8, 32:16, 32:23, 33:4

**relevant** [1] - 5:7
**reliable** [1] - 23:6
**relied** [2] - 30:9, 38:2
**remain** [1] - 46:18
**remainder** [2] - 22:16, 102:9
**remains** [2] - 118:21, 118:22
**remarried** [3] - 87:5, 87:14, 87:15
**remember** [72] - 13:3, 13:9, 13:10, 50:21, 57:4, 59:15, 59:16, 61:14, 61:16, 61:18, 62:21, 64:11, 64:23, 66:21, 69:8, 69:12, 69:21, 69:22, 70:11, 70:13, 70:15, 70:17, 70:18, 70:19, 71:9, 71:13, 74:14, 74:15, 74:17, 74:19, 74:21, 74:25, 75:1, 75:3, 75:5, 75:8, 75:10, 75:11, 75:12, 75:15, 75:16, 75:17, 76:25, 77:4, 77:9, 79:6, 79:8, 79:9, 79:13, 79:15, 79:21, 79:24, 79:25, 80:2, 80:10, 83:8, 84:18, 85:6, 86:7, 91:7, 96:7, 98:3, 98:16, 105:16, 109:4, 109:5, 113:17, 113:19
**reminded** [1] - 4:20
**reminding** [1] - 48:14
**renal** [1] - 80:12
**render** [3] - 13:21, 13:23, 30:4
**renew** [1] - 4:3
**rep** [2] - 95:15, 97:11
**repair** [2] - 19:10, 37:10
**repairs** [3] - 18:7, 37:11, 41:10
**repeat** [2] - 61:8, 101:19
**replaced** [9] - 39:14, 39:16, 39:21, 40:5, 40:7, 41:12, 41:13, 44:12, 44:19
**replacement** [2] - 39:9, 44:3
**replacing** [2] - 40:9, 40:10
**report** [13] - 4:10, 13:7, 25:13, 25:14, 27:14, 30:9, 30:10, 38:1, 38:4, 38:5,

38:18, 40:24
**REPORTER** [1] - 26:2
**Reporter** [1] - 121:14
**represent** [1] - 46:21
**representative** [3] - 85:24, 86:4, 86:14
**representatives** [1] - 97:7
**require** [6] - 28:24, 28:25, 39:9, 40:10, 44:3, 46:3
**required** [8] - 18:14, 19:11, 19:14, 23:11, 32:4, 34:1, 35:25, 41:12
**requires** [2] - 15:1, 29:7
**rescue** [1] - 67:22
**research** [1] - 17:23
**respect** [13] - 18:15, 32:3, 32:22, 51:2, 51:19, 52:18, 53:5, 54:8, 55:23, 94:12, 101:18, 106:3, 115:21
**respectfully** [1] - 5:14
**respond** [1] - 63:3
**responding** [1] - 94:1
**rest** [10] - 24:17, 24:22, 26:5, 26:14, 91:12, 118:18, 118:20, 119:5, 120:20
**restroom** [2] - 48:24, 103:5
**result** [5] - 4:8, 5:5, 5:6, 33:11, 35:2
**results** [5] - 4:9, 4:24, 5:17, 37:8
**resume** [4] - 7:25, 10:2, 16:9, 118:2
**resumé** [3] - 97:13, 97:20, 97:25
**resuscitate** [3] - 70:3, 70:9, 71:20
**retire** [1] - 16:21
**retired** [4] - 16:18, 16:19, 16:23, 27:15
**return** [1] - 46:15
**returned** [1] - 88:2
**review** [7] - 12:14, 12:16, 31:15, 36:8, 38:7, 97:14, 119:25
**reviewed** [5] - 5:9, 28:13, 30:13, 36:10, 38:2
**revisit** [1] - 4:13
**reworked** [1] - 28:1
**rhythm** [2] - 12:1,

12:6

**Richard** [4] - 11:8, 11:11, 16:11, 16:14
**RICHARD** [2] - 11:11, 16:14
**ridiculous** [4] - 92:7, 92:8, 93:12, 93:13
**ridiculously** [1] - 64:1
**right-hand** [1] - 39:14
**Rimkus** [8] - 16:25, 17:3, 17:4, 17:7, 17:12, 17:15, 17:17, 18:17
**rims** [2] - 111:18, 111:21
**ripped** [2] - 88:7, 88:13
**rise** [8] - 9:3, 9:16, 10:4, 15:24, 47:3, 49:1, 61:25, 118:4
**risk** [3] - 6:2, 51:10, 51:11
**risky** [2] - 51:14, 51:15
**road** [1] - 55:10
**role** [1] - 50:22
**Romania** [7] - 49:17, 54:8, 67:6, 106:6, 108:18, 110:5, 114:2
**room** [3] - 70:13, 98:4, 100:15
**rooms** [1] - 69:14
**rotation** [1] - 37:13
**rounds** [1] - 99:3
**routinely** [1] - 21:18
**RPR** [1] - 121:13
**ruled** [1] - 6:22
**rules** [1] - 19:8
**ruling** [1] - 4:21
**run** [3] - 22:8, 26:13, 103:4
**running** [2] - 12:18, 67:18

## S

**sacrifice** [2] - 52:13, 52:15
**sad** [1] - 72:12
**safe** [1] - 6:13
**safety** [1] - 6:16
**sales** [2] - 97:7, 97:11
**Samantha** [5] - 95:3, 95:14, 95:23, 96:3, 120:7
**sat** [2] - 67:16, 99:11

**Saturday** [2] - 112:5, 112:7
**save** [1] - 102:4
**saving** [2] - 117:16, 117:17
**Saw** [1] - 51:22
**saw** [21] - 18:8, 30:5, 61:1, 62:21, 62:23, 63:20, 63:21, 64:6, 69:12, 77:2, 80:8, 81:6, 81:13, 83:3, 83:18, 83:20, 88:1, 88:6, 91:8, 93:4, 108:12
**scare** [1] - 107:21
**scared** [1] - 107:16
**scary** [12] - 51:22, 52:7, 52:9, 52:11, 52:14, 52:19, 107:14, 107:16, 107:17, 107:19, 107:21
**scenarios** [2] - 100:14, 100:16
**schedule** [2] - 103:7, 118:25
**scheduling** [5] - 7:22, 7:24, 118:12, 118:14, 121:3
**school** [9] - 18:24, 18:25, 19:16, 57:5, 67:3, 73:18, 73:25, 74:2
**scope** [1] - 38:12
**screamed** [1] - 65:4
**screaming** [2] - 63:2, 67:18
**screen** [1] - 26:1
**screens** [1] - 50:1
**scroll** [1] - 74:11
**seat** [3] - 11:6, 24:8, 24:11
**seated** [10] - 7:18, 9:19, 11:9, 16:2, 48:23, 49:3, 49:7, 62:11, 102:20, 103:16
**second** [20] - 8:1, 14:12, 20:22, 21:5, 27:11, 27:12, 27:13, 40:17, 52:19, 54:11, 65:6, 66:10, 67:1, 69:7, 74:5, 83:7, 94:16, 95:17, 99:21, 107:25
**seconds** [6] - 78:6, 78:8, 78:9, 78:10, 92:9, 93:14
**section** [3] - 91:2, 91:4, 92:24
**SECURITY** [10] - 7:16, 9:3, 9:16, 10:4,

15:24, 47:3, 48:19, 49:1, 61:25, 118:4
**see** [41] - 10:10, 22:15, 24:13, 25:6, 26:5, 26:18, 35:6, 35:8, 38:15, 39:24, 40:1, 40:13, 40:14, 44:14, 53:22, 54:24, 54:25, 55:6, 59:19, 60:21, 60:22, 64:7, 64:8, 68:9, 68:12, 68:17, 69:10, 70:20, 72:18, 73:5, 77:25, 89:9, 89:13, 97:4, 99:16, 114:25, 115:14, 117:20, 118:3, 118:12
**seeing** [9] - 25:23, 26:8, 30:18, 38:10, 59:16, 64:21, 74:21, 75:1, 83:11
**seeking** [1] - 14:8
**seem** [1] - 13:22
**sell** [1] - 117:13
**semesters** [1] - 73:22
**send** [3] - 27:25, 57:17, 86:9
**sending** [1] - 37:15
**senior** [1] - 20:1
**sense** [1] - 64:2
**sent** [1] - 111:14
**separate** [1] - 85:24
**separated** [1] - 25:14
**sequence** [1] - 69:22
**series** [2] - 11:16, 94:6
**serious** [2] - 84:15, 86:17
**service** [1] - 37:19
**set** [6] - 14:21, 28:17, 49:25, 62:7, 102:18, 114:3
**setting** [6] - 18:5, 18:6, 28:16, 32:20, 32:22, 33:2
**settings** [1] - 50:1
**setup** [1] - 24:22
**seven** [2] - 4:21, 78:8
**several** [8] - 18:3, 26:23, 78:6, 78:9, 78:10, 83:8, 83:12, 83:13
**shaking** [18] - 63:11, 63:25, 77:3, 78:5, 78:19, 78:21, 78:22, 89:23, 90:15, 90:16, 91:10, 92:6, 93:6, 93:11, 93:15, 93:17, 93:24, 94:3

**share** [5] - 16:17, 18:22, 53:5, 54:14, 55:24
**shark** [1] - 75:15
**shaving** [1] - 108:9
**shock** [3] - 24:19, 25:1, 25:3
**shocked** [5] - 63:15, 65:17, 67:13, 67:15, 77:6
**short** [3] - 47:1, 55:5, 80:23
**show** [12] - 15:16, 24:3, 26:1, 26:2, 29:16, 39:17, 71:24, 77:18, 77:20, 88:23, 99:4, 99:12
**showed** [4] - 42:22, 50:25, 98:20, 99:13
**showing** [2] - 24:17, 26:14
**shown** [4] - 3:11, 20:4, 50:24, 51:1
**shows** [2] - 22:12, 53:13
**shrine** [1] - 75:24
**sick** [6] - 56:1, 58:14, 80:19, 84:4, 84:6, 112:8
**sicker** [1] - 112:15
**sickness** [3] - 56:3, 58:17
**side** [8] - 18:4, 18:5, 34:12, 39:15, 49:18, 51:4, 51:11, 75:19
**Sidebar** [1] - 31:10
**sidebar** [2] - 28:8, 28:9
**sides** [4] - 8:11, 8:14, 25:7, 34:10
**signal** [1] - 24:24
**significance** [2] - 38:10, 41:2
**silly** [2] - 60:11, 60:13
**silver** [4] - 22:12, 22:13, 34:12, 35:8
**similar** [1] - 52:15
**simply** [1] - 27:7
**single** [2] - 43:18, 111:10
**sister** [6] - 104:23, 104:24, 104:25, 105:8, 105:9
**sit** [5] - 66:18, 95:11, 98:24, 99:3, 107:15
**sitting** [1] - 69:14
**situated** [1] - 61:6
**situation** [2] - 67:25, 71:11

**six** [3] - 4:21, 74:25, 96:10
**slightly** [2] - 66:6, 66:7
**slower** [1] - 3:20
**small** [1] - 15:16
**smoothly** [1] - 27:1
**snapped** [1] - 26:21
**so..** [1] - 87:13
**software** [7] - 11:23, 12:8, 12:9, 12:11, 12:12, 12:18, 14:16
**sold** [1] - 36:24
**solder** [75] - 14:13, 14:15, 19:2, 19:7, 19:21, 19:22, 20:21, 21:1, 21:13, 21:14, 21:15, 21:17, 21:22, 21:23, 21:24, 22:2, 22:6, 22:7, 22:10, 22:12, 22:14, 22:20, 22:21, 23:2, 23:3, 23:8, 23:10, 23:11, 25:24, 26:12, 26:14, 26:20, 26:25, 27:2, 27:6, 27:7, 27:9, 27:19, 27:22, 27:23, 27:25, 29:1, 32:5, 33:12, 33:23, 33:25, 34:1, 34:6, 34:10, 34:16, 34:17, 34:21, 35:1, 35:2, 35:15, 35:24, 36:2, 36:3, 36:6, 38:3, 38:11, 39:4, 40:21, 41:9, 41:16, 41:20, 42:4, 42:10, 45:23, 45:25, 46:5
**soldered** [3] - 14:12, 25:25, 26:13
**soldering** [51] - 14:11, 14:21, 14:23, 15:1, 15:8, 15:9, 15:12, 18:19, 18:20, 18:21, 18:23, 19:11, 19:12, 19:14, 20:6, 20:8, 20:14, 20:15, 20:23, 21:21, 22:3, 22:5, 23:6, 27:22, 27:24, 28:2, 28:22, 29:2, 29:5, 29:6, 29:22, 30:4, 30:17, 32:3, 32:5, 33:3, 33:10, 33:11, 34:10, 35:11, 35:20, 35:21, 40:10, 41:11, 44:24, 45:1, 45:7, 45:12, 45:15, 45:18
**soldiering** [1] - 18:19
**solid** [1] - 55:20

solution [1] - 22:22
someone [10] - 27:21, 27:23, 28:25, 30:9, 33:9, 34:1, 40:9, 51:1, 55:22, 98:20
sometimes [9] - 17:5, 22:14, 52:8, 53:14, 53:21, 107:10, 107:14, 116:11, 116:16
somewhere [3] - 100:10, 111:14, 115:25
son [2] - 106:4, 106:24
soon [4] - 4:5, 40:23, 117:21, 120:22
sophisticated [1] - 21:21
sorry [16] - 7:8, 10:19, 38:6, 43:23, 46:20, 60:1, 61:5, 61:12, 66:10, 67:7, 69:7, 70:17, 89:16, 98:25, 101:19, 101:23
sought [1] - 72:7
sound [1] - 94:7
sounded [1] - 60:19
sounds [1] - 94:5
source [1] - 51:17
Southern [1] - 3:21
Space [1] - 110:19
span [3] - 98:11, 100:3, 101:4
speaking [2] - 14:6, 47:7
specialist [1] - 110:22
specific [1] - 33:15
specifically [3] - 14:7, 38:20, 98:3
specifications [4] - 12:22, 13:5, 14:20, 27:18
specificity [2] - 32:17, 33:5
speed [1] - 120:2
spell [4] - 11:9, 16:12, 49:7, 103:16
spend [3] - 52:1, 52:6, 54:22
spent [2] - 19:2, 86:4
spirit [1] - 70:22
splice [2] - 45:17
spot [4] - 26:12, 26:23, 26:24
spots [1] - 26:23
stabilized [1] - 68:6
stadium [2] - 110:13, 110:14

staff [4] - 18:8, 18:10, 37:4, 37:5
Staffing [4] - 58:1, 58:5, 58:11, 110:24
stage [1] - 80:12
stamp [1] - 5:22
stand [4] - 11:3, 48:20, 95:12, 100:15
standard [2] - 33:9, 35:19
standards [7] - 14:13, 14:14, 20:13, 29:2, 33:3, 35:16, 36:4
standing [2] - 51:4, 105:3
start [7] - 9:6, 74:12, 76:24, 93:2, 112:8, 112:15, 113:15
started [18] - 7:21, 19:17, 22:5, 54:1, 58:13, 79:11, 82:20, 92:10, 92:14, 93:14, 98:14, 101:14, 105:11, 105:12, 105:25, 110:4, 113:22
starting [2] - 20:10, 59:5
starts [1] - 39:8
state [11] - 3:23, 11:9, 14:7, 16:12, 47:20, 49:7, 64:19, 71:2, 71:4, 72:14, 103:16
statement [2] - 77:1, 95:8
states [1] - 59:12
States [1] - 121:14
stay [6] - 21:4, 64:9, 67:17, 67:20, 71:12, 84:25
stayed [2] - 68:21, 68:22
steel [1] - 104:13
step [10] - 6:15, 11:5, 23:23, 23:24, 30:11, 31:5, 46:10, 62:2, 94:20, 103:14
stepfather [11] - 49:16, 77:2, 78:4, 79:17, 80:11, 85:23, 86:21, 87:2, 87:5, 87:19, 88:11
steps [4] - 34:5, 37:6, 97:10, 97:21
Sterling [18] - 46:24, 48:17, 49:6, 49:9, 76:18, 82:7, 106:1, 106:11, 106:22, 106:23, 107:4, 107:9,

107:10, 110:7, 111:23, 114:2, 115:18
STERLING [1] - 49:10
Sterling's [1] - 106:25
stick [1] - 53:21
sticker [1] - 76:5
still [9] - 26:20, 26:21, 58:14, 75:13, 78:11, 82:13, 103:7, 103:25, 108:15
stole [2] - 109:12, 109:13
stomach [1] - 82:1
stood [1] - 64:24
stop [12] - 9:24, 38:17, 57:7, 60:24, 65:11, 65:13, 67:1, 105:14, 108:2, 109:20, 114:7, 114:18
stopped [3] - 8:2, 67:9, 108:9
store [1] - 105:16
story [1] - 109:22
straight [2] - 116:9, 116:10
strange [2] - 111:11, 111:12
strangers [1] - 106:20
strength [1] - 78:6
strike [4] - 21:9, 28:5, 34:13, 37:21
striking [1] - 8:3
stripe [1] - 26:19
strong [2] - 71:12, 71:24
struggle [2] - 73:16
students [2] - 19:19, 20:2
study [1] - 96:6
stuff [10] - 54:5, 54:7, 57:19, 92:10, 93:15, 110:17, 111:21, 114:4, 114:5, 115:3
subcontractor [3] - 96:17, 96:18, 97:5
submit [1] - 97:13
submitted [2] - 97:19, 97:25
substance [1] - 13:24
sudden [2] - 26:10, 60:10
suffer [1] - 82:18
suffered [2] - 15:17, 42:7
suffering [1] - 88:16

sugar [1] - 63:7
suggest [2] - 6:5, 6:12
suggesting [1] - 3:10
Supp [1] - 7:5
support [10] - 38:2, 69:1, 69:5, 69:19, 70:8, 71:19, 73:12, 73:14, 73:15, 117:9
supposed [9] - 9:8, 12:21, 12:25, 13:1, 13:4, 30:17, 65:18, 109:15, 109:16
supposedly [1] - 36:23
surprises [3] - 111:11, 111:23, 111:24
survival [1] - 5:10
sustain [1] - 33:21
sustained [4] - 32:18, 45:9, 79:19, 87:24
sweep [3] - 116:12, 116:21
sweeping [1] - 116:17
sworn [7] - 11:7, 11:8, 16:10, 16:11, 49:5, 49:6, 103:15
Szymkiewicz [3] - 8:22, 8:24, 9:22

## T

table [1] - 39:25
tank [1] - 111:15
tap [1] - 78:15
taught [1] - 88:18
TE [1] - 24:18
TE-1 [3] - 39:15, 39:23, 40:2
TE-2 [2] - 39:15, 39:23
teach [2] - 19:22, 98:8
teaching [6] - 19:17, 19:24, 19:25, 20:12, 23:2
teacup [1] - 53:3
tears [1] - 71:16
technical [3] - 18:25, 37:4, 79:24
technician [1] - 19:10
techniques [1] - 37:6
technology [6] - 16:24, 17:8, 17:14, 17:19, 19:19, 20:5

Technology [1] - 19:24
teens [1] - 54:2
temperature [1] - 26:13
ten [11] - 41:7, 47:23, 96:9, 100:6, 100:7, 100:10, 100:19, 100:23, 102:13, 102:16
tend [1] - 72:11
tended [2] - 52:1, 55:4
Tennessee [1] - 59:11
tensile [2] - 15:17
term [4] - 20:23, 21:13, 21:14, 22:17
terms [8] - 12:5, 20:8, 52:16, 56:22, 65:7, 72:1, 79:24, 115:4
terrified [1] - 51:25
test [1] - 13:20
testified [5] - 43:5, 76:21, 84:13, 88:1, 95:8
testifies [2] - 10:14, 120:25
testify [4] - 5:8, 6:15, 30:4, 78:4
testifying [2] - 8:15, 77:9
testimony [31] - 4:6, 5:16, 6:7, 7:21, 7:22, 7:25, 8:4, 8:5, 8:12, 8:13, 8:14, 8:18, 9:9, 13:20, 31:6, 34:25, 77:7, 78:11, 83:7, 83:11, 89:2, 89:6, 95:6, 95:7, 95:14, 102:24, 103:22, 103:24, 120:13, 120:15
THE [157] - 3:2, 3:7, 3:12, 3:14, 3:20, 3:25, 7:1, 7:4, 7:8, 7:10, 7:14, 7:18, 8:8, 8:11, 8:23, 9:1, 9:5, 9:11, 9:14, 9:17, 9:19, 9:24, 10:1, 10:6, 10:10, 10:15, 10:19, 10:25, 11:11, 11:13, 13:19, 14:3, 14:6, 14:19, 15:5, 15:11, 15:23, 16:1, 16:14, 21:10, 23:17, 23:19, 23:24, 24:7, 24:11, 25:15, 25:17, 26:2, 28:7, 28:10, 28:19, 30:3,

31:4, 31:9, 31:19, 31:24, 32:9, 32:18, 32:24, 33:6, 33:14, 33:21, 34:4, 34:14, 35:4, 35:18, 36:14, 37:24, 38:14, 39:1, 39:7, 41:24, 43:21, 44:6, 44:21, 45:4, 45:9, 46:8, 46:14, 46:23, 47:1, 47:6, 47:11, 47:20, 47:23, 47:25, 48:6, 48:11, 48:14, 48:18, 48:20, 48:22, 48:23, 49:3, 49:9, 61:23, 62:2, 62:5, 62:7, 62:9, 62:11, 74:9, 76:12, 76:15, 77:16, 77:25, 78:25, 79:19, 80:5, 87:24, 88:21, 88:24, 89:16, 89:19, 90:1, 90:9, 90:19, 91:3, 91:13, 91:19, 92:16, 92:23, 94:10, 94:18, 94:21, 94:22, 95:4, 95:13, 95:21, 102:12, 102:16, 102:18, 102:20, 102:24, 103:1, 103:3, 103:6, 103:9, 103:11, 103:13, 103:18, 103:20, 117:24, 118:1, 118:6, 118:10, 118:25, 119:4, 119:7, 119:12, 119:16, 119:21, 119:24, 120:10, 120:16, 120:19, 120:24
**therapist** [1] - 74:1
**therapy** [5] - 24:19, 24:25, 25:1, 40:2, 44:14
**therefore** [1] - 42:13
**thick** [1] - 51:4
**thin** [2] - 26:19, 51:4
**thinking** [2] - 65:7, 74:1
**thinks** [1] - 14:23
**thoroughly** [1] - 86:15
**three** [12] - 74:19, 77:9, 83:14, 83:15, 97:18, 97:24, 98:1, 100:3, 101:3, 101:17, 106:18, 107:3
**three-month** [4] - 98:1, 100:3, 101:3, 101:17
**throughout** [2] - 22:10, 26:14

**Thursday** [3] - 7:25, 9:7, 118:22
**tilted** [1] - 66:8
**timing** [1] - 7:20
**tip** [1] - 22:6
**tired** [2] - 108:16, 114:13
**today** [7] - 13:13, 27:12, 35:20, 38:25, 102:24, 119:11, 120:8
**toddler** [1] - 50:21
**together** [14] - 6:20, 21:1, 27:8, 40:3, 45:16, 50:13, 58:18, 59:5, 59:12, 72:18, 84:15, 84:16, 92:19, 92:22
**togethers** [1] - 111:25
**token** [1] - 80:23
**tomorrow** [15] - 7:23, 103:23, 103:25, 118:2, 118:3, 118:20, 119:9, 119:11, 119:18, 120:4, 120:5, 120:14, 120:15, 120:18, 121:4
**tonight** [1] - 118:19
**took** [15] - 4:5, 6:15, 46:21, 57:21, 67:3, 68:1, 68:20, 68:23, 68:24, 69:16, 85:8, 94:24, 98:6, 98:20, 105:3
**top** [2] - 25:8, 57:12
**topic** [2] - 13:15, 77:19
**torn** [1] - 71:11
**totally** [1] - 5:15
**touch** [6] - 64:25, 65:5, 65:14, 65:16, 67:12, 67:14
**towards** [1] - 26:9
**traces** [1] - 22:15
**track** [1] - 94:24
**tracking** [1] - 37:2
**tracks** [1] - 36:23
**train** [4] - 98:5, 98:7, 100:15, 100:16
**trained** [5] - 18:9, 23:1, 23:5, 37:6, 98:4
**training** [34] - 28:24, 28:25, 29:8, 33:19, 37:3, 97:15, 97:20, 97:25, 98:2, 98:8, 98:11, 98:19, 98:23, 99:3, 99:6, 99:7, 99:12, 99:14, 99:18, 99:23, 100:1, 100:12, 100:17, 101:2, 101:3,

101:6, 101:7, 101:9, 101:10, 101:12, 101:15, 101:21, 101:25
**trainings** [3] - 99:19, 100:20, 102:2
**transcribe** [1] - 102:10
**transcript** [4] - 88:23, 95:9, 102:4, 102:6
**transcription** [1] - 121:9
**transplant** [5] - 114:20, 114:25, 115:5, 115:8, 115:11
**transported** [1] - 68:24
**trapped** [1] - 68:15
**travel** [2] - 52:18, 53:8
**tremendous** [1] - 71:25
**triage** [1] - 96:25
**trial** [8] - 4:9, 4:24, 5:5, 5:6, 5:9, 6:10, 8:15, 16:9
**tried** [5] - 6:20, 50:10, 68:6, 72:17, 84:3
**triggered** [1] - 65:15
**trips** [4] - 50:13, 50:15, 53:12, 59:3
**trouble** [3] - 73:10, 81:17, 81:21
**truck** [4] - 68:2, 68:21, 111:17, 111:19
**truly** [2] - 51:1, 63:17
**try** [17] - 4:4, 6:11, 21:23, 59:11, 66:5, 66:20, 67:9, 69:1, 71:24, 72:11, 72:15, 73:14, 110:17, 115:18, 116:11, 116:15
**trying** [18] - 56:12, 64:20, 64:21, 67:20, 68:13, 68:15, 70:19, 70:22, 70:24, 71:12, 71:24, 73:2, 73:13, 73:25, 78:18, 112:23, 112:25, 113:19
**turn** [7] - 7:24, 47:5, 47:14, 104:1, 116:9, 116:10, 121:2
**turned** [1] - 116:8
**turning** [3] - 19:3, 47:16, 69:25
**TV** [2] - 45:17, 60:13
**twice** [1] - 65:4

**twist** [2] - 34:17, 34:22
**twisted** [1] - 34:20
**two** [26] - 13:1, 14:10, 18:5, 20:18, 25:3, 25:7, 27:17, 38:6, 40:3, 40:13, 41:1, 44:14, 44:17, 71:21, 73:19, 74:17, 83:14, 83:15, 85:24, 87:8, 99:3, 99:18, 99:19, 99:22, 101:2, 119:10
**type** [5] - 3:9, 35:13, 35:19, 36:4, 114:11
**types** [2] - 12:1, 101:2

## U

**U.S** [1] - 104:15
**Uggh** [1] - 108:12
**unconscious** [1] - 70:15
**under** [4] - 8:13, 22:15, 39:19, 81:23
**understood** [2] - 30:17, 80:15
**unfortunately** [1] - 28:2
**union** [1] - 58:7
**unit** [1] - 110:9
**United** [1] - 121:14
**unprompted** [1] - 4:7
**unrung** [1] - 6:22
**unusual** [1] - 7:24
**up** [56] - 4:1, 11:4, 19:8, 20:22, 21:1, 21:25, 22:6, 22:12, 24:24, 26:6, 28:16, 28:17, 37:18, 38:4, 42:3, 42:23, 43:22, 49:25, 52:18, 53:12, 54:9, 54:25, 55:21, 55:22, 58:9, 59:11, 60:21, 63:22, 64:10, 65:6, 66:10, 67:12, 68:21, 69:7, 70:20, 71:11, 74:3, 74:8, 79:4, 91:20, 92:25, 105:1, 105:2, 105:18, 105:23, 107:18, 107:24, 107:25, 108:4, 109:7, 112:9, 114:3, 116:7, 118:6, 119:12, 120:20
**upset** [1] - 63:15
**urn** [1] - 76:2
**user** [3] - 18:8,

29:18, 37:14
**user's** [1] - 20:3
**usual** [1] - 103:8
**utilizes** [1] - 11:23

## V

**value** [1] - 108:23
**various** [2] - 35:11, 41:10
**Vegas** [2] - 109:9, 109:15
**verdict** [2] - 120:14, 120:20
**versus** [3] - 3:2, 3:19, 7:5
**Vest** [1] - 5:5
**vest** [15] - 4:9, 4:24, 65:16, 65:18, 67:10, 67:12, 67:14, 69:10, 69:12, 69:13, 88:6, 98:21, 99:4, 99:12, 99:21
**video** [3] - 8:9, 8:21, 95:9
**videotaped** [2] - 8:24, 9:22
**view** [1] - 24:21
**violated** [4] - 30:14, 30:15, 31:13, 43:17
**violation** [5] - 5:15, 7:12, 29:4, 30:19, 30:21
**vision** [2] - 45:24, 82:3
**visit** [1] - 113:9
**visitor** [1] - 76:5
**visual** [5] - 19:14, 21:18, 21:19, 23:6, 26:8
**visually** [1] - 23:3
**voice** [1] - 60:19
**voir** [6] - 10:13, 10:23, 13:19, 13:25, 29:15, 30:6
**VOIR** [1] - 11:14
**VPK** [1] - 75:7

## W

**wait** [3] - 46:15, 66:18, 103:20
**waiting** [5] - 16:8, 66:16, 69:2, 70:23, 103:21
**wake** [2] - 63:22, 70:20
**Walgreens** [1] - 85:19

**walk** [2] - 11:4, 85:19
**walked** [6] - 62:21, 63:4, 64:6, 77:2, 78:4, 105:4
**wall** [1] - 50:2
**walls** [1] - 50:2
**Wang** [1] - 27:15
**wants** [1] - 72:12
**warm** [1] - 22:6
**wash** [1] - 112:22
**washing** [1] - 112:23
**watch** [9] - 11:4, 51:21, 52:4, 52:13, 52:14, 81:8, 99:1, 103:14, 107:8
**watching** [2] - 50:11, 52:6
**water** [2] - 62:4, 62:8
**ways** [1] - 84:14
**weak** [3] - 70:25, 84:4, 114:13
**wearable** [3] - 43:2, 43:5, 44:24
**wearing** [1] - 85:14
**web** [1] - 29:24
**wedding** [3] - 87:12, 87:16, 109:10
**week** [6] - 107:8, 107:9, 107:12, 107:13
**weekend** [1] - 118:24
**weekly** [1] - 117:11
**welcome** [1] - 7:19
**welder** [3] - 51:8, 51:9, 104:11
**welding** [4] - 51:12, 104:12, 104:13, 104:14
**West** [1] - 117:10
**wheels** [2] - 116:8, 116:9
**whole** [5] - 24:5, 67:21, 91:19, 92:22, 92:23
**wife** [3] - 87:20, 104:19, 116:3
**willful** [1] - 7:11
**Wilson** [1] - 49:17
**winding** [1] - 118:12
**wire** [23] - 15:16, 24:20, 25:7, 25:9, 26:4, 26:20, 34:11, 34:15, 34:22, 39:15, 39:18, 40:3, 40:6, 40:9, 40:10, 40:13, 40:14, 42:7, 45:17
**wires** [10] - 20:25, 22:23, 25:7, 34:17, 36:6, 39:21, 39:22, 40:5, 40:14, 41:12
**wiring** [2] - 24:21,

39:19
**wise** [1] - 20:8
**wish** [3] - 55:7, 55:14, 55:17
**withdraw** [1] - 70:12
**witness** [24] - 10:7, 11:1, 11:8, 13:20, 14:9, 16:11, 23:23, 24:7, 28:6, 46:9, 46:11, 46:18, 46:22, 46:23, 48:1, 48:16, 49:6, 90:8, 95:1, 95:5, 95:7, 103:11, 103:15, 121:2
**WITNESS** [8] - 11:11, 16:14, 48:22, 49:9, 62:5, 62:9, 94:21, 103:18
**witnesses** [4] - 104:1, 118:17, 118:19, 119:8
**WL** [2] - 3:19, 3:21
**woman's** [1] - 54:4
**wondering** [1] - 65:24
**words** [8] - 27:21, 78:13, 85:19, 89:23, 89:24, 90:3, 90:15, 93:16
**works** [1] - 99:12
**world** [1] - 58:2
**worrier** [1] - 84:3
**worry** [2] - 55:9, 84:2
**worse** [1] - 81:3
**wound** [1] - 19:8
**wrapping** [1] - 30:25
**write** [1] - 20:3
**writing** [1] - 19:24
**written** [5] - 29:7, 30:9, 44:9, 44:10, 44:18
**wrote** [2] - 27:15, 76:6

**X**

**x-ray** [1] - 21:20

**Y**

**Y-O-U-M-A-S** [1] - 49:10
**year** [11] - 16:22, 19:1, 79:8, 82:22, 87:5, 87:7, 87:8, 96:6, 96:7, 109:2
**year-and-a-half** [3] - 87:5, 87:7, 87:8
**years** [17] - 17:18,

19:9, 20:8, 20:11, 49:23, 55:9, 77:10, 81:4, 87:8, 89:3, 96:9, 96:21, 97:2, 98:13, 112:8, 112:15, 116:1
**yell** [1] - 60:10
**yelling** [2] - 60:15, 65:14
**yellow** [1] - 27:4
**yesterday** [4] - 4:4, 4:5, 7:21, 8:1
**Yorkie** [1] - 53:4
**Youmas** [7] - 46:24, 48:17, 48:20, 49:4, 49:6, 49:9, 49:13
**young** [5] - 55:7, 74:23, 80:18, 115:22, 115:25
**younger** [1] - 53:24
**yourself** [4] - 51:13, 65:11, 73:12, 104:6

**Z**

**zero** [1] - 43:17
**Zoll** [22] - 3:2, 3:6, 27:15, 27:16, 31:13, 36:10, 38:7, 43:17, 47:16, 85:24, 86:3, 86:8, 86:14, 96:17, 97:6, 97:11, 97:17, 97:22, 98:13, 101:20, 101:24
**Zoll's** [3] - 4:22, 25:22, 44:18
**zoom** [3] - 39:11, 40:25, 43:23